


90 Gillett Street
Hartford, CT 06105
P: (860) 522-8338
F: (860) 728-0401

Kenneth J. Bartschi*
Karen L. Dowd
Wesley W. Horton
Dana M. Hrelic*
Kimberly A. Knox
Brendon P. Levesque
Robert M. Shields, Jr.
Michael S. Taylor
*Also Admitted in New York

kbartschi@hortonshieldsknox.com

**24 February 2012**
**by electronic filing & hand-delivery**

**Hon. Vanessa L. Bryant, U.S. District Court Judge**
**Unites States Courthouse**
**450 Main Street – Suite 320**
**Hartford CT 06103**

**Re: *Pedersen et al. v. Office of Personnel Management et al.*, No. 3:10 CV 1750 (VLB)**

**Dear Judge Bryant:**

**Please find enclosed a copy of the decision of the District Court for the Northern District of California in *Golinski v. Office of Personnel Management*, C 10-00257 JSW (N.D. Cal. Feb. 22, 2012), which was decided this week and which is pertinent to the above-captioned matter.**

**Sincerely,**

Kenneth J. Bartschi

**Kenneth J. Bartschi, #ct17225**
**Counsel for the Plaintiffs**

**<u>Certificate of Service</u>**

**I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on February 24, 2012.**

Kenneth J. Bartschi

**Kenneth J. Bartschi**

United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

KAREN GOLINSKI,

Plaintiff,

v.

UNITED STATES OFFICE OF PERSONNEL MANAGEMENT and JOHN BERRY, Director of the United States Office of Personnel Management, in his official capacity,

Defendants.
_______________________________________/

No. C 10-00257 JSW

**ORDER**

Now before the Court are the motion to dismiss and the motion to strike filed by Intervenor-Defendant the Bipartisan Legal Advisory Group of the United States House of Representatives ("BLAG") and the motion for summary judgment filed by Plaintiff Karen Golinski ("Ms. Golinski"). Defendants the United States Office of Personnel Management ("the OPM") and John Berry, its director, also filed a motion to dismiss and a response to BLAG's motion to dismiss. These motions compel the Court to determine whether the Defense of Marriage Act ("DOMA"), 1 U.S.C. Section 7, as applied to Ms. Golinski, violates the United States Constitution by refusing to recognize lawful marriages in the application of laws governing benefits for federal employees. Having considered the parties' papers, relevant legal authority, and the record in this case, the Court HEREBY DENIES BLAG's motion to dismiss; DENIES as moot BLAG's motion to strike; GRANTS Ms. Golinski's motion for summary judgment; and GRANTS the OPM's motion to dismiss.

**BACKGROUND**

The pertinent facts are not in dispute. Ms. Golinski is a staff attorney in the Motions Unit of the Office of Staff Attorneys in the United States Court of Appeals for the Ninth Circuit. (Second Amended Complaint ("SAC") at ¶ 18.) Ms. Golinski has been partners with Amy Cunninghis ("Ms. Cunninghis") for over twenty years. They registered as domestic partners with the City and County of San Francisco in 1995, and with the State of California in 2003. (*Id.* at ¶¶ 15-17.) On August 21, 2008, they were legally married under the laws of the State of California. (*Id.* at ¶ 17.)

Shortly after they married, Ms. Golinski sought to enroll Ms. Cunninghis in her existing family coverage health insurance plan, Blue Cross and Blue Shield Service Benefit Plan, which she purchases through her employer and which already covers the couple's adopted minor child. (*Id.* at ¶¶ 19, 22.) The Administrative Office of the United States Courts ("AO") refused to process her request on the basis that Ms. Golinski and her spouse are both women. (*Id.* at ¶ 23.) Finding that she could not secure comparable health insurance coverage, on October 2, 2008, Ms. Golinski filed a complaint under the Ninth Circuit's Employment Dispute Resolution ("EDR") Plan, and contended that the refusal to grant her health benefits was a violation of the Plan's nondiscrimination provision. (*Id.* at ¶ 48.) The EDR Plan specifically prohibits employment discrimination based on, among other things, sex or sexual orientation. (*Id.* at ¶ 47.)

By orders dated November 24, 2008 and January 13, 2009, Chief Judge Alex Kozinski, sitting in his administrative capacity as arbiter of the Judicial Council, found that Ms. Golinski had suffered discrimination under the Court's EDR Plan and ordered the AO to process her health benefit election forms. (*Id.*, Exs. A, B.) Chief Judge Kozinski found that the denial of health benefits was based solely on the grounds of sex and sexual orientation, in direct violation of the EDR Plan's non-discrimination provision covering Ninth Circuit employees. (*Id.*, Ex. B at 1-2.) Chief Judge Kozinski found that, regardless of the language in DOMA, the OPM had the discretion to extend health benefits to Ms. Golinski's same-sex spouse by interpreting the terms "family members" and "member of the family" to set a floor, not a ceiling, to coverage

eligibility. (*Id.* at 2-3.) Chief Judge Kozinski ordered the AO "to submit Karen Golinski's Health Benefits Election form 2089 ... to the appropriate insurance carrier. Any future health benefit forms are also to be processed without regard to the sex of the listed spouse." (*Id.*, Ex. B at 7.)

The AO complied, but the OPM instructed Ms. Golinski's insurance carrier not to comply with the Ninth Circuit Judicial Council's remedial order. The OPM directed the AO and the Blue Cross and Blue Shield Service Benefit Plan not to process Ms. Golinski's request on the basis that federal law, specifically Section 3 of DOMA, defines spouse as a member of the opposite sex and, accordingly, proscribes the enrollment of Ms. Golinski's same-sex spouse in her health benefits program.

In response, on November 19, 2009, Chief Judge Kozinski issued another order addressing the OPM's conduct. The Chief Judge, again sitting as an administrator, held that he had the authority, under both the Ninth Circuit's EDR Plan and the separation of powers doctrine, to interpret the laws applicable to judicial employees in a manner that would displace "any contrary interpretation by an agency or an officer of the Executive." (*Id.*, Ex. C at 14-15.) Chief Judge Kozinski held that allowing the OPM to interfere with his orders would be tantamount to permitting it to exercise "dominance over logistics to destroy [the Judiciary's] autonomy." (*Id.* at 11.) The Chief Judge further held that "[o]rdering enrollment is proper and within my jurisdiction because Congress intended [the EDR] tribunal to be the sole forum for adjudicating complaints of workplace discrimination by employees of the Judiciary. With that responsibility must come power equal to the task." (*Id.* at 9.)

Chief Judge Kozinski granted Ms. Golinski both back pay and prospective relief. The injunctive relief required that the OPM "rescind its guidance or directive to the Blue Cross and Blue Shield Service Benefit plan and any other plan that Ms. Golinski's wife is not eligible to be enrolled as her spouse under the terms of the Federal Employees Health Benefits Program because of her sex or sexual orientation, or that the plans would violate their contracts with the OPM by enrolling Ms. Golinski's wife as a beneficiary" and "[c]ease at once its interference with the jurisdiction of this tribunal. Specifically, OPM shall not advise Ms. Golinski's health

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

plan, the Blue Cross and Blue Shield Service Benefit Plan, that providing coverage for Ms. Golinski's wife violates DOMA or any other federal law. Nor shall OPM interfere in any way with the delivery of health benefits to Ms. Golinski's wife on the basis of her sex or sexual orientation." (*Id.* at 15-16 (emphasis in original).)

The Chief Judge, in his order dated November 19, 2009, also invited the OPM to "appeal so much of this order as concerns it using the procedures outlines in the [EDR] plan." (*Id.* at 16.) In response, the OPM did not appeal the order, but instead issued a press release indicating that it was under no obligation to comply with the administrative order and, although in favor of its repeal, indicated that the Executive agency was tasked with enforcing DOMA, which prohibits same-sex spouses of federal employees from enrolling in the federal health benefits program. (*Id.*, Ex. F.)

In his final administrative order, dated December 22, 2009, Chief Judge Kozinski stated that the time for appeal had expired, thus rendering his prior orders in the matter "final and preclusive on all issues decided therein." (*Id.*, Ex. D.) He further authorized Ms. Golinski to pursue any action she deemed fit against the OPM, including filing a mandamus action in the district court. (*Id.*)

On January 20, 2010, Ms. Golinski filed a mandamus action before this Court, seeking to have the OPM rescind its guidance to Blue Cross and Blue Shield Service Benefit Plan to deny Ms. Golinski's wife benefits as precluded by DOMA and to comply with Chief Judge Kozinski's prior orders in her administrative claim.

On January 26, 2010, Ms. Golinski moved for a preliminary injunction seeking compliance with Chief Judge Kozinski's order dated November 19, 2009, requiring that the OPM: (1) "rescind its guidance or directive to the Blue Cross and Blue Shield Service Benefit Plan," and (2) "cease at once its interference with the jurisdiction of this tribunal" and "<u>not</u> advise Ms. Golinski's health plan, the Blue Cross and Blue Shield Service Benefit plan, that providing coverage for Ms. Golinski's wife violates DOMA or any other federal law." (*Id.* at Ex. C, 15-16.)

On May 10, 2010, the OPM moved to dismiss the First Amended Complaint on the basis that this Court lacked jurisdiction to grant mandamus relief under these peculiar procedural circumstances.

While those motions were pending and after the parties submitted supplemental briefing on the issue of the constitutionality of DOMA, on February 23, 2011, at the direction of President Obama, Attorney General Eric Holder announced that the Justice Department would cease its legal defense of Section 3 of DOMA. Although it determined that the statute was unconstitutional and resolved not to continue to defend DOMA in pending court cases, the Justice Department indicated that it did intend to continue to enforce the law unless it was either repealed by Congress or the courts rendered a final judgment striking it down. (*See* Plaintiff's Notice of Supplemental Authority ("NSA") dated February 23, 2011, Ex. 2.)

On March 16, 2011, the Court granted the motion to dismiss on the basis that it lacked jurisdiction to issue mandamus relief. Finding that amendment would not necessarily be futile, the Court dismissed the matter with leave to amend.

On April 14, 2011, Ms. Golinski filed her Second Amended Complaint in which she directly challenges the discrimination against her as a lesbian married to someone of the same sex. (SAC at ¶ 1.) In her amended complaint, Ms. Golinski alleges an action for declaratory and injunctive relief pursuant to 28 U.S.C. Sections 2201-2202 and Federal Rule of Civil Procedure 57 and for review of an agency action pursuant to 5 U.S.C. Sections 701-706. (*Id.* at ¶ 7.) By her amended complaint, Ms. Golinski seeks a determination that Section 3 of DOMA, 1 U.S.C. Section 7, as applied to her, violates the United States Constitution by refusing to recognize lawful marriages for the purposes of application of the laws governing benefits for federal employees. (*Id.*) Ms. Golinski alleges that as a result of the violation of the Constitution, she has been denied, and will continue to be denied, legal protections and benefits under federal law that would be available to her if she were a heterosexual with a opposite-sex spouse. (*Id.*)

The majority of a five-member committee in Congress voted to defend DOMA and, on May 4, 2011, BLAG sought to intervene in this matter. On June 3, 2011, this Court issued an



United States District Court
For the Northern District of California

order granting BLAG's unopposed motion to intervene as a party-defendant for the limited purpose of defending the constitutionality of Section 3 of DOMA.

On June 3, 2011, BLAG moved to dismiss the Second Amended Complaint on the basis that Ms. Golinski fails to state a claim upon which relief may be granted because, as a matter of law, Section 3 of DOMA does not violate her rights under the equal protection component of the Due Process Clause of the Fifth Amendment. On the same date, the OPM moved to dismiss Ms. Golinski's claim as set forth in the Second Amended Complaint only insofar as any claims could reasonably be construed to assert a statutory claim as to the language of the Federal Health Benefits Act of 1959. On July 1, 2011, Ms. Golinski moved for summary judgment. On July 15, 2011, BLAG moved to strike extrinsic materials from the record on Ms. Golinski's opposition to the motion to dismiss. The Court heard oral argument on the motions on December 16, 2011.[1]

The Court shall address additional facts as necessary in the remainder of this order.

## ANALYSIS

### A. Legal Standards.

#### 1. Motion to Dismiss.

A motion to dismiss is proper under Federal Rule of Civil Procedure 12(b)(6) where the pleadings fail to state a claim upon which relief can be granted. The Court's "inquiry is limited to the allegations in the complaint, which are accepted as true and construed in the light most favorable to the plaintiff." *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008). Federal Rule of Civil Procedure 8(a) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Even under Rule 8(a)'s liberal pleading standard, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will

---

[1] Initially, BLAG moved to strike several declarations submitted by Ms. Golinski in response to the motion to dismiss. However, as the Court decides the motion for summary judgment and has therefore considered the full record, BLAG agreed to withdraw its motion to strike. The motion to strike is therefore DENIED as moot.



United States District Court
For the Northern District of California

not do." *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 555 (2007) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

Pursuant to *Twombly*, a plaintiff must not merely allege conduct that is conceivable but must instead allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. ... When a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quoting *Twombly*, 550 U.S. at 556-57) (internal quotation marks omitted). If the allegations are insufficient to state a claim, a court should grant leave to amend, unless amendment would be futile. *See, e.g., Reddy v. Litton Industries, Inc.*, 912 F.2d 291, 296 (9th Cir. 1990); *Cook, Perkiss and Liehe, Inc. v. Northern California Collection Service, Inc.*, 911 F.2d 242, 246-47 (9th Cir. 1990).

As a general rule, "a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion." *Branch v. Tunnell*, 14 F.3d 449, 453 (9th Cir. 1994), *overruled on other grounds, Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002) (citation omitted). The Court may consider the facts alleged in the complaint, documents attached to the complaint, documents relied upon but not attached to the complaint, when the authenticity of those documents is not questioned, and other matters of which the Court can take judicial notice. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009). Documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss. Such consideration does not convert the motion to dismiss into a motion for summary judgment. *See United States v. Ritchie*, 343 F.3d 903, 908 (9th Cir. 2003); *Branch*, 14 F.3d at 454.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

**2. Motion for Summary Judgment.**

A motion for summary judgment is guided by a different standard. Summary judgment is appropriate when the record demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if there is sufficient evidence for a reasonable fact finder to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). "[A]t the summary judgment stage the judge's function is not ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. A fact is "material" if it may affect the outcome of the case. *Id.* at 248. The party moving for summary judgment bears the initial responsibility of identifying those portions of the record which demonstrate the absence of a genuine issue of a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In the absence of such facts, "the moving party is entitled to a judgment as a matter of law." *Celotex,* 477 U.S. at 323.

Once the moving party meets this initial burden, the non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). If the non-moving party fails to make this showing, the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323.

**B. Defense of Marriage Act.**

This action presents a challenge to the constitutionality of Section 3 of DOMA as applied to Ms. Golinski, a lesbian woman married under California law, who is unable to secure federal health benefits for her same-sex spouse. Specifically, Ms. Golinski alleges that, by operation of Section 3 of DOMA, she has been denied certain marriage-based federal benefits that are available to similarly-situated opposite-sex couples, in violation of her rights to equal protection and due process as secured by the Due Process Clause of the Fifth Amendment.

In 1996, Congress enacted and President Clinton signed DOMA into law. Section 3 of DOMA, the only provision at issue in this matter, defines the terms "marriage" and "spouse" for purposes of federal law. Section 3 provides:

> In determining the meaning of any Act of Congress, or of any ruling, regulation, or interpretation of the various administrative bureaus and agencies of the United States, the word "marriage" means only a legal union between one man and one woman as husband and wife, and the word "spouse" refers only to a person of the opposite sex who is a husband or a wife.

1 U.S.C. § 7.

In large part, the enactment of DOMA can be understood as a direct legislative response to *Baehr v. Lewin*, a 1993 decision issued by the Hawaii Supreme Court, which indicated that same-sex couples may be entitled to marry under that state's constitution. 74 Haw. 530 (1993). The decision raised the possibility that, for the first time, same-sex couples could begin the process of obtaining state-sanctioned marriage licenses.

In debating the provisions of DOMA, the House referenced the *Baehr* decision as the beginning of an "orchestrated assault being waged against traditional heterosexual marriage" and expressed concern that the development "threaten[ed] to have very real consequences ... on federal law." H.R. Rep. No. 104-664 at 2-3 (1996), *reprinted in* 1996 U.S.C.C.A.N. 2905, 2906-07 ("H. Rep." or "House Report"). More specifically, the House Report warned that "a redefinition of marriage in Hawaii to include homosexual couples could make such couples eligible for a whole range of federal rights and benefits." *Id.* at 10. Although a later amendment to the Hawaii constitution withheld permitting same-sex marriage in the state, Congress, explicitly in reaction to the impending Hawaii decision, sought a means both (1) to "reserve[] each State's ability to decide" what should legally constitute a valid marriage under its own state laws, and (2) to "lay[] down clear rules" regarding what constitutes a marriage for purposes of federal law. *Id.* at 2.

In Section 2 of DOMA, Congress, by virtue of the express grant of authority under the second sentence of the Full Faith and Credit Clause, permitted a state to decline to give effect to the laws of other states respecting same-sex marriage. In enacting Section 3 of DOMA, the House Report explained that the statute codifies the definition of marriage set forth in "the



United States District Court
For the Northern District of California

standard law dictionary," for purposes of federal law. *Id.* at 29 (citing Black's Law Dictionary 972 (6th ed. 1990)).

The legislative history reveals that Congress acknowledged the constraints imposed by federalism on the determination of who may marry, which has always been uniquely the province of state law. Nonetheless, Congress asserted that it was not "supportive of (or even indifferent to) the notion of same-sex marriage," and it embraced DOMA as a step toward furthering Congress' interests in "defend[ing] the institution of traditional heterosexual marriage." *Id.* at 12. "Although DOMA drastically amended the eligibility criteria for a vast number of different federal benefits, rights, and privileges that depend upon marital status, the relevant committees did not engage in a meaningful examination of the scope or effect of the law." *Gill v. Office of Personnel Management*, 699 F. Supp. 2d 374, 379 (D. Mass. 2010).[2] Although drastically altering the benefits structure based on state definitions of marriage and the federalist balance in the area of domestic relations, Congress did not hear testimony from agency heads about the effect of DOMA on federal programs, or from historians, economists, or specialists in family or child welfare. *Id.*

It is clear and undisputed that the federal health benefits Ms. Golinski seeks in trying to add her wife as a beneficiary under her health benefits plan falls under the reach of DOMA. The Federal Employees Health Benefits Program ("FEHB") is a comprehensive program providing health insurance for federal civilian employees and their family members. 5 U.S.C. § 8905. The OPM administers the FEHB and negotiates contracts for coverage with potential carriers and sets the premiums for each plan. *Id.*, §§ 8902, 8903, 8906. A federal employee enrolled in the FEHB chooses a carrier and plan and may determine whether to enroll for an individual plan, named "self only," or for "self and family" coverage which, under the OPM's regulations, "includes all family members who are eligible to be covered by the enrollment." 5 C.F.R. § 890.302(a)(1). Under the FEHB, a "member of family" is defined as either "the

---

[2] In January 1997, the General Accounting Office issued a report clarifying the scope of DOMA's effect and concluded that the law implicated at least 1,049 federal laws, including those related to entitlement programs like Social Security, health benefits and taxation. A further study in 2004 found that 1,138 federal laws tied benefits, protections, rights, or responsibilities to marital status. *See Gill*, 699 F. Supp. 2d at 379.

spouse of an employee ... [or] an unmarried dependent child under 22 years of age." 5 U.S.C. § 8901(5). An employee enrolled under an individual plan may change to family coverage by submitting documentation to the employing office during the annual open season period or within sixty days of a change in family status, such as change in marital status. *Id.*, § 8905(f); 5 C.F.R. §§ 890.301(f), (g).

Within sixty days of her marriage, Ms. Golinski sought to enroll her wife as a beneficiary of the family health plan. The OPM found Ms. Cunninghis was ineligible to qualify as a member of the family because, under DOMA, she did not qualify as a spouse of an employee.[3] The question before the Court is whether Section 3 of DOMA, as applied to Ms. Golinski, violates constitutional principles of equal protection.

**C. Equal Protection Analysis and Standard of Review.**

The "Equal Protection Clause of the Fourteenth Amendment commands that no State shall deny to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985) (internal citations omitted). Although the Fifth Amendment to the United States Constitution does not contain an Equal Protection Clause, the Fifth Amendment's Due Process Clause includes an equal protection component. *See Bolling v. Sharpe*, 347 U.S. 497, 499-500 (1954); *see also Buckley v. Valeo*,

---

[3] At the administrative appeal from the denial of benefits, Chief Judge Kozinski found that the FEHB statute confers on the OPM the discretion to extend health benefits to same-sex couples by interpreting the terms "family members" and "member of the family" to set a floor, not a ceiling, to coverage eligibility. (SAC, Ex. B at 2-3.) The Court finds this reasoning unpersuasive.

Where the statute unambiguously defines a term such as "member of family" to mean spouse (or dependent child under 22 years old), that definition controls to the exclusion of any meaning that is not explicitly stated in the definition. *See Colautti v. Franklin*, 439 U.S. 379, 393 n.10 (1979); *see also TRW Inc. v. Andrews*, 534 U.S. 19, 28-29 (2001) (holding that, for purposes of statutory construction, expression of one thing is the exclusion of the other). DOMA offers the same clarity and defines "spouse" for the purposes of determining the meaning of federal legislation as "a person of the opposite sex who is a husband or a wife." 1 U.S.C. § 7. Confronted with such unambiguous statutory language, the Court is not persuaded that the FEHB statute could provide the OPM with the discretion to provide health benefits to same-sex couples. *See In re Levenson*, 587 F.3d 925, 930-31 (9th Cir. 2009); *Gill*, 699 F. Supp. 2d at 385-86. This disposes of Ms. Golinski's remaining statutory claim and the OPM's motion to dismiss that claim, to the extent it is still asserted, is GRANTED.



United States District Court
For the Northern District of California

424 U.S. 1, 93 (1976) ("Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment.").

"[T]he Constitution 'neither knows nor tolerates classes among citizens.'" *Romer v. Evans*, 517 U.S. 620, 623 (1996) (quoting *Plessy v. Ferguson*, 163 U.S. 537, 559 (1896) (Harlan, J., dissenting)). This principle embodies a commitment to neutrality where the rights of individual persons are at stake. *Dragovich v. United States Department of the Treasury*, 764 F. Supp. 2d 1178, 1188 (N.D. Cal. 2011) (citing *Romer*, 517 U.S. at 623.) It is because of this commitment to neutrality that legislative provisions which arbitrarily or irrationally create discrete classes cannot withstand constitutional scrutiny. *Romer*, 517 U.S. at 623. "Equal protection of the laws is not achieved through indiscriminate imposition of inequalities." *Sweatt v. Painter*, 339 U.S. 629, 635 (1950) (quoting *Shelley v. Kraemer*, 334 U.S. 1, 22 (1948)). "The guaranty of 'equal protection of the laws is a pledge of the protection of equal laws.'" *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541 (1942) (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886)).

However, courts must balance this mandate with the "practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons." *Romer*, 517 U.S. at 631 (citations omitted). The equal protection guarantee preserves a measure of power to the state and the federal government to enact legislation that classifies certain groups. *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 271-72 (1979). In an attempt to reconcile the promise of equal protection with the reality of lawmaking, courts apply the most searching constitutional scrutiny to those laws that burden a fundamental right or target a suspect class, such as those based on race, national origin, sex or religion. *Romer*, 517 U.S. at 631. To these groups of protected classifications, subject to a heightened scrutiny, the government is required to demonstrate that the classification is substantially related to an important governmental objective. *See Clark v. Jeter*, 486 U.S. 456, 461 (1988). Laws that do not burden a protected class or infringe on a constitutionally protected fundamental right are subject to rational basis review. *Romer*, 517 U.S. at 631. Under the rational basis review, a law must be rationally related to the furtherance of a



United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

legitimate governmental interest. *Id.* (citing *Heller v. Doe by Doe*, 509 U.S. 312, 319-320 (1993)).

In resolving an equal protection challenge, the Court "must first determine what classification has been created" by the legislation. *Aleman v. Glickman*, 217 F.3d 1191, 1195 (9th Cir. 2000); *see also Lazy Y Ranch*, 546 F.3d at 589. The plaintiff must show that the "law is applied in a discriminatory manner or imposes different burdens on different classes of people." *Lazy Y Ranch*, 546 F.3d at 589 (quoting *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1187 (9th Cir. 1995)). The Court must then ascertain the appropriate level of scrutiny to employ. *In re Kandu*, 315 B.R. 123, 142 (W.D. Wash. 2004).[4]

**1. Level of Scrutiny.**

Here, DOMA makes distinctions between legally married couples, by granting benefits to opposite-sex married couples but denying benefits to same-sex married couples. Accordingly, DOMA treats gay and lesbian individuals differently on the basis of their sexual orientation. In order to determine whether sexual orientation is considered a suspect or quasi-suspect class entitled to heightened scrutiny, the Court must look at various factors.[5] The

---

[4] Ms. Golinski challenges the application of DOMA because it discriminates both on the basis of sex and on the basis of sexual orientation. (Golinski Reply on Motion for Summary Judgment at 7-8.) Sexual orientation discrimination can take the form of sex discrimination. *See Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 996 (N.D. Cal. 2010) ("*Perry*"). Here, for example, Ms. Golinski is prohibited from marrying Ms. Cunninghis, a woman, because Ms. Golinski is a woman. If Ms. Golinski were a man, DOMA would not serve to withhold benefits from her. Thus, DOMA operates to restrict Ms. Golinski's access to federal benefits because of her sex. But DOMA also operates to restrict Ms. Golinski's access to federal benefits because of her sexual orientation; her desire to marry another woman arises only because she is a lesbian. Accordingly, the Court addresses the Equal Protection challenge on the basis of sexual orientation.

[5] The question of whether DOMA impacts a fundamental right is addressed briefly by the parties but it is not at issue here as it is undisputed that Ms. Golinski is already married under state law. The failure of the federal government to recognize Ms. Golinski's marriage and to provide benefits does not alter the fact that she is married under state law. Thus, *Baker v. Nelson*, 409 U.S. 810 (1972), which ostensibly addressed whether same-sex couples have a constitutional right to marry, is irrelevant here. *See Perry v. Brown*, --- F.3d ---, 2012 WL 372713, at *17 n.14 (9th Cir. 2012) ("*Perry II*").

However, it is established that there is a fundamental right to marry. *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 851 (1992) ("Our law affords constitutional protection to personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education.... These matters, involving

Supreme Court has considered: (1) the history of invidious discrimination against the class burdened by the legislation; (2) whether the characteristics that distinguish the class indicate a typical class member's ability to contribute to society; (3) whether the distinguishing characteristics are "immutable" or beyond the class members' control; and (4) the political power of the subject class. *See Varnum v. Brien*, 763 N.W.2d 862, 887-88 (Iowa 2009) (collecting cases).

No single factor for determining elevated scrutiny is dispositive. *See Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 321 (1976). The presence of any of the factors is a signal that the particular classification is "more likely than others to reflect deep-seated prejudice rather than legislative rationality in pursuit of some legitimate objective," thus requiring heightened scrutiny. *Plyler v. Doe*, 457 U.S. 202, 216 n.14 (1982). The Supreme Court has placed far greater weight on two factors:

> whether the group has been the subject of long-standing and invidious discrimination and whether the group's distinguishing characteristic bears no relation to the ability of the group members to perform or function in society. In circumstances in which a group has been subject to such discrimination and its distinguishing characteristic does not bear any relation to such ability, the court inevitably has employed heightened scrutiny in reviewing statutory classifications targeting those groups.

*Kerrigan v. Commissioner of Public Health*, 289 Conn. 135, 167-68 (2008).

---

the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment.") (citations omitted); *Turner v. Safley,* 482 U.S. 78, 95 (1987) ("[T]he decision to marry is a fundamental right."); *Zablocki v. Redhail,* 434 U.S. 374, 384 (1978) ("[T]he right to marry is of fundamental importance for all individuals."); *Loving v. Virginia,* 388 U.S. 1, 12 (1967) ("The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men."); *Griswold v. Connecticut,* 381 U.S. 479, 486 (1965) ("Marriage is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred. It is an association that promotes a way of life, not causes; a harmony in living, not political faiths; a bilateral loyalty, not commercial or social projects.").

The analysis of the fundamental right to marry has not depended upon the characteristics of the spouse. The Supreme Court cases addressing the fundamental right to marry do not define the fundamental right in narrow terms. In *Loving,* the Court defined the fundamental right as the right to marry, not the right to interracial marriage. 388 U.S. at 12. In *Turner,* the fundamental right was the right to marry, not the right to inmate marriage. 482 U.S. at 94-96. In *Zablocki,* the fundamental right was the right to marry, not the right of people owing child support to marry. 434 U.S. at 383-86.



United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

**2. Distinguishing *High Tech Gays* Finding on Standard of Review.**

Before the Court may assess the various factors that apply to determine the appropriate level of scrutiny to apply in this matter, the Court must address the holding in *High Tech Gays v. Defense Industrial Security Clearance Office*, which addresses the standard of review for classifications based on sexual orientation. 895 F.2d 563, 571 (9th Cir. 1990). In *HighTech Gays*, decided before the Supreme Court revised much of the underlying legal preconceptions upon which this case rests, the Ninth Circuit determined that the classification of homosexuals lacks the indicia of a suspect or quasi-suspect category. Accordingly, the Ninth Circuit held that the government need only come forth with a rational basis to sustain its classifications against the gay and lesbian minority. *Id.*

However, the foundations of the Ninth Circuit's decision in *High Tech Gays* have sustained serious erosion by virtue of more recent decisions by the Supreme Court. When the premise for a case's holding has been weakened, the precedential import of the case is subject to question. District courts are not governed by earlier appellate precedent that has been "undercut by higher authority to such an extent that it has been effectively overruled by such higher authority." *Miller v. Gammie*, 335 F.3d 889, 899 (9th Cir. 2003).

The linchpin of the reasoning in *High Tech Gays* was the precedent set by the Supreme Court in *Bowers v. Hardwick*, 478 U.S. 186, 190 (1986), which upheld the criminalization of private consensual homosexual conduct. In *High Tech Gays*, the Ninth Circuit concluded that, based on the holding in *Bowers*, "because homosexual conduct can ... be criminalized, homosexuals cannot constitute a suspect or quasi-suspect class entitled to greater than rational basis review for equal protection purposes." *High Tech Gays*, 895 F.2d at 571. Pursuant to Supreme Court precedent in *Bowers*, the Ninth Circuit agreed that "it cannot logically be asserted that discrimination against homosexuals is constitutionally infirm." *Id.* at 571 n.6 (quoting *Woodward v. United States*, 871 F.2d 1068, 1076 (Fed. Cir. 1989)). The court concluded that, under the holding of *Bowers*, it would be anomalous to define the conduct of members of a class as criminal and also find that, as a class, they were deserving of strict or

heightened scrutiny under the Equal Protection Clause. *See id.* (citing *Padula v. Webster*, 822 F.2d 97, 103 (D.C. Cir. 1987)).

However, since the decision in *High Tech Gays*, the Supreme Court has overruled *Bowers*, renounced its fundamental premise, and found that "*Bowers* was not correct when it was decided, and it is not correct today." *Lawrence v. Texas*, 539 U.S. 558, 578 (2003). The *Lawrence* Court found that majority's moral condemnation of the intimate practices of homosexual partners does not justify criminal prohibition and found those private consensual practices are safeguarded by the liberty protections afforded by the Due Process Clause of the Fourteenth Amendment. *Id.* at 574-75. Therefore, the reasoning in *High Tech Gays*, that laws discriminating against gay men and lesbians are not entitled to heightened scrutiny because homosexual conduct may be legitimately criminalized, cannot stand post-*Lawrence*.

In addition, the court in *High Tech Gays*, in performing the analysis of the issue of whether the legislature's classification based on homosexuality calls for heightened scrutiny, relied on the mistaken assumption that sexual orientation is merely "behavioral," rather than the sort of deeply rooted, immutable characteristic that warrants heightened protection from discrimination. *See High Tech Gays*, 895 F.2d at 573-74. The court found that "[h]omosexuality is not an immutable characteristic; it is behavioral and hence fundamentally different from traits such as race, gender, or alienage, which define already existing suspect and quasi-suspect classes. The behavior of such already recognized classes is irrelevant to their identification." *Id.* (internal citations omitted). The Supreme Court has since rejected this artificial distinction, noting that its more recent precedent "have declined to distinguish between status and conduct in th[e] context" of sexual orientation. *See Christian Legal Society v. Martinez,* 130 S. Ct. 2971, 2990 (2010). In *Lawrence,* the Court noted that "[w]hen homosexual *conduct* is made criminal by the law of the State, that declaration in and of itself is an invitation to subject homosexual *persons* to discrimination." 539 U.S. at 575 (emphasis added); *id.* at 583 (O'Connor, J., concurring in judgment) ("While it is true that the law applies only to conduct, the conduct targeted by this law is conduct that is closely correlated with being homosexual. Under such circumstances, [the] law is targeted at more than conduct. It is instead



United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

directed toward gay persons as a class."). Accordingly, the analysis of the Ninth Circuit in *High Tech Gays* on the appropriateness of applying heightened scrutiny to gay men and lesbians because their defining characteristic is immutable has been severely undermined by more recent and overriding precedent.

The Court finds that the outdated holding in *High Tech Gays*, subjecting gay men and lesbians to rational basis review, is no longer a binding precedent. *See Miller*, 335 F.3d at 900 (finding that where an intervening decision of a higher court is clearly irreconcilable with a Ninth Circuit decision, "district courts should consider themselves bound by the intervening higher authority and reject the prior opinion of [the Ninth Circuit] as having been effectively overruled.").

**3. The Question of Level of Scrutiny is Still Open.**

The Supreme Court and the Ninth Circuit have yet to issue binding rulings as to whether classifications based on sexual orientation are suspect (or quasi-suspect). *See Romer*, 517 U.S. at 620, 632-33 (finding that it was unnecessary to look beyond rational basis review because the state's attempt to strip gay people of all anti-discrimination protections was "a denial of equal protection in the most literal sense" and because it "confound[ed] and defie[d]" rational basis review."); *see also, e.g., Diaz v. Brewer*, 656 F.3d 1008, 1012 (9th Cir. 2011) ("We do not need to decide whether heightened scrutiny might be required."); *In re Levenson*, 587 F.3d at 931 (finding that although it is "likely that some form of heightened constitutional scrutiny applies ... [, because] the denial of benefits here cannot survive even rational basis review, the least searching form of constitutional scrutiny ... it is not necessary to determine whether or which form of heightened scrutiny is applicable to this claim."); *Perry II*, 2012 WL 372713, at *17 (finding that, as in *Romer*, the court need not apply heightened scrutiny where the proposed legislation fails rational basis scrutiny); *Dragovich*, 764 F. Supp. 2d at 1189 ("Because the Court finds that Plaintiffs state a claim under the rational basis standard, the question of whether Plaintiffs are members of a protected class need not be resolved here."). The majority of the Supreme Court in *Lawrence*, although it declared unconstitutional the laws infringing on the substantive liberty shared by gay people to engage in sexual intimacy, did not directly address

what standard of review applies to the classification of gay and lesbian individuals. *Lawrence*, 539 U.S. at 558. And the Ninth Circuit in *Witt v. Department of Air Force* merely found, in the context of military policy where judicial deference "is at its apogee," that the military's policy of "Don't Ask Don't Tell" would fail even rational basis review. 527 F.3d 806, 821 (9th Cir. 2008).

Because *Lawrence* overturned *Bowers* and in light of the lack of precedential value of *High Tech Gays*, no federal appellate court has meaningfully examined the appropriate level of scrutiny to apply to gay men and lesbians. Therefore, the Court finds the question of what level of scrutiny applies to classifications based on sexual orientation is still open.

**4. Heightened Scrutiny Should Apply.**

The Court undertakes to analyze the factors required to demonstrate whether a particular class is entitled to suspect or quasi-suspect status and therefore deserving of heightened scrutiny.

**a. History of discrimination against gay men and lesbians.**

The first factor courts consider is whether the class has suffered a history of discrimination. There is no dispute in the record that lesbians and gay men have experienced a long history of discrimination. (*See* Declaration of George Chauncey at ¶¶ 6-103; OPM Opp. Br. at 6-13.) There is also no dispute that courts have found that gay men and lesbians have experienced a history of discrimination. *See, e.g., High Tech Gays*, 895 F.2d at 573 (acknowledging that "homosexuals have suffered a history of discrimination"); *Witt*, 527 F.3d at 824-25 (noting that homosexuals have "experienced a history of purposeful unequal treatment"); *Perry v. Proposition 8 Official Proponents*, 587 F.3d 947, 954 (9th Cir. 2009) (addressing the difficulty in denying that gay men and lesbians have experienced discrimination in the past in light of the Ninth Circuit's ruling in *High Tech Gays*); *Perry*, 704 F. Supp. 2d at 981-82 (acknowledging extensive evidence of public and private discrimination against gay men and lesbians in California and throughout the United States); *see also In re Balas*, 449 B.R. 567, 576 (Bankr. C.D. Cal. 2011) (same).

United States District Court
For the Northern District of California

**b. Ability to contribute to society.**

Similarly, there is no dispute in the record or the law that sexual orientation has no relevance to a person's ability to contribute to society. *See Watkins v. U.S. Army*, 875 F.2d 699, 725 (9th Cir. 1989) ("Sexual orientation plainly has no relevance to a person's ability to perform or contribute to society.") (internal quotation marks omitted); *Perry*, 704 F. Supp. 2d at 1002 (concluding that "by every available metric, opposite-sex couples are not better than their same-sex counterparts; instead, as partners, parents and citizens, opposite-sex couples and same-sex couples are equal.").

**c. Defining or immutable characteristics.**

Another consideration courts find relevant in determining whether statutory provisions pertaining to a particular group are subject to heightened scrutiny includes whether the characteristic that defines the members of the class as a discrete group is immutable or otherwise not within the members' control. *See Lyng v. Castillo*, 477 U.S. 635, 638 (1986).

Ms. Golinski presents evidence that the characteristic of sexual orientation is immutable or highly resistant to change. (*See* Declaration of Lisa Diamond at ¶¶ 10, 13; Declaration of Letitia Anne Peplau at ¶¶ 21, 26; Rita Lin Reply Declaration ("Lin Reply Decl."), Ex. G.) Further, the consensus in the scientific community is that sexual orientation is an immutable characteristic. *See, e.g.,* G.M. Herek, et al. *Demographic, Psychological, and Social Characteristics of Self-Identified Lesbian, Gay, and Bisexual Adults*, 7, 176-200 (2010) (noting that in a national survey, 95 percent of gay men and 83 percent of lesbian women reported that they experienced "no choice at all" or "very little choice" about their sexual orientation); *see also Perry*, 704 F. Supp. 2d at 966 ("No credible evidence supports a finding that an individual may, through conscious decision, therapeutic intervention or any other method, change his or her sexual orientation.")

BLAG presents evidence demonstrating that there is some fluidity on the continuum of sexuality for some individuals who identify themselves as gay or lesbian. (*See* Declaration of Conor B. Dugan ("Dugan Decl."), Ex. B at 36:14-38, Ex. 4, Ex. E at 320.) The evidence indicates that a very small minority of the gay and lesbian population may experience a small

amount of choice in their sexuality. (*Id.*) However, the vast majority of those who self-reported as gay or lesbian did not experience attraction to the opposite sex at any time. (*See* Further Declaration of Letitia Anne Peplau at ¶ 6 ("data show that only 1/2 of 1% of the male participants and 1.3% of the female participants shifted from only opposite sex attraction to major attraction to the same sex or vice versa.")).

However, regardless of the evidence that a tiny percentage of gay men or lesbians may experience some flexibility along the continuum of their sexuality or the scientific consensus that sexual orientation is unchangeable, the Court finds persuasive the holding in the Ninth Circuit that sexual orientation is recognized as a defining and immutable characteristic because it is so fundamental to one's identity. "Sexual orientation and sexual identity are immutable; they are so fundamental to one's identity that a person should not be required to abandon them." *Hernandez-Montiel v. Immigration and Naturalization Service*, 225 F.3d 1084, 1093 (9th Cir. 2000), *overruled in part on other grounds by Thomas v. Gonzales*, 409 F.3d 1177 (9th Cir. 2005); *see also Karouni v. Gonzales*, 399 F.3d 1163, 1173 (9th Cir. 2005) (agreeing with *Hernandez-Montiel* and finding that homosexuality is "a fundamental aspect of ... human identity"); *Watkins*, 875 F.2d at 726 (Norris, J., concurring) (finding that the prong of suspectness inquiry is satisfied when the identifying trait is "so central to a person's identity that it would be abhorrent for government to penalize a person for refusing to change [it]"); *In re Marriage Cases*, 43 Cal.4th 757, 842 (2008) ("Because a person's sexual orientation is so integral an aspect of one's identity, it is not appropriate to require a person to repudiate or change his or her sexual orientation in order to avoid discriminatory treatment.") The Court finds that a person's sexual orientation is so fundamental to one's identity that a person should not be required to abandon it. Therefore, this factor weighs in favor of the application of heightened scrutiny.[6]

---

[6] In addition, immutability is not an absolute prerequisite to heightened scrutiny. The Supreme Court has granted suspect class status to groups whose distinguishing characteristic is not immutable. *See, e.g., Nyquist v. Mauclet*, 432 U.S. 1, 9 n.11 (1977) (rejecting immutability requirements in treating group of resident aliens as suspect class despite their ability to opt out of class voluntarily); *see also Miller v. Albright*, 523 U.S. 420, 431 (1998) (recognizing that because a child born out of wedlock may be "legitimated" by father, strictly



United States District Court
For the Northern District of California

Case3:10-cv-00257-JSW Document186 Filed02/22/12 Page21 of 43

United States District Court
For the Northern District of California

**d. Minority status and political powerlessness.**

The final consideration employed by courts to determine whether a subject group deserves heightened constitutional scrutiny is whether the subject group is "a minority or politically powerless." *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987); *see also San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 28 (1973) (concluding that a class comprising poor families exhibits none of the "traditional indicia of suspectness" because class is not "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process.") This factor examines relative political power and seeks to answer the question whether the "discrimination is unlikely to be soon rectified by legislative means." *City of Cleburne*, 473 U.S. at 440.[7]

There is no dispute in the record that gay men and lesbians are a minority of the population in the United States. (*See* Dugan Decl., Ex. A at 13:12-14, Ex. B at 19:2-7.) The only issue is whether the minority is politically vulnerable or lacking in power. The Court has reviewed the evidence submitted by the parties for consideration on this factor.

BLAG argues that the current Administration's reversal of position with regard to defending DOMA in various courts nationwide is evidence that gay and lesbian individuals have achieved political power. BLAG contends that the decision followed President Obama's receipt of a letter from the Human Rights Campaign seeking to change the Administration's position. (BLAG Opp. Br. at 12.) However, this contention is not supported by the evidence in

---

speaking illegitimacy is not an immutable characteristic); *see also New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) (per curiam) (finding religious identification and alienage, despite being changeable, to constitute suspect classes).

[7] In *High Tech Gays,* the Ninth Circuit briefly addressed the factor of political powerlessness: "legislatures have addressed and continue to address the discrimination suffered by homosexuals on account of their sexual orientation through the passage of anti-discrimination legislation. Thus, homosexuals are not without political power; they have the ability to and do 'attract the attention of lawmakers,' as evidenced by such legislation." 895 F.2d at 574 (citing *City of Cleburne*, 473 U.S. at 445). However, the very circumstance of gay men and lesbians being required to defend their interests against legislative action is a reflection of relative political weakness. (Declaration of Gary Segura ("Segura Decl.") at ¶ 14.) In addition, the standard is not whether a minority group is entirely powerless, but rather whether they suffer from relative political weakness. *See Rodriguez*, 411 U.S. at 28; *City of Cleburne*, 473 U.S. at 445.

the record. First, this letter was sent nearly two years prior to the announcement of the Administration's current opinion. (Lin Reply Decl., Ex. H at 166:16-167:13.) Second, the Department of Justice functions under an independent obligation to assess the constitutionality of a statute it has been tasked to defend. By its own terms, the announcement by the Department of Justice was based not on a political calculation, but rather was an independent assessment of the constitutionality of DOMA. (*See* NSA, Ex. 1 at 1-2.) The contention that a two-year-old letter from a gay rights advocacy group was the pivotal consideration in the Administration's reassessment of the law or that it demonstrates that gay men and lesbians have political power is speculative at best.

BLAG also argues that a "spate of recent news stories only confirms the conclusion that homosexuals are far from politically powerless." (BLAG Opp. Br. at 12.) BLAG lists the nomination of four openly-gay judges, the laws in several states legalizing gay marriage, and the campaign against Proposition 8 in California which garnered significant funding from proponents of same-sex marriage. (*Id.* at 12-15.)

The recent articles BLAG cites are exceptions and not the rule. While President Obama nominated four openly-gay judges, there are literally hundreds of federal judges nationwide. Only a handful of states have successfully passed legislation legalizing same-sex marriage, and only a few more have been required to afford equal marital rights to gay and lesbian individuals through judicial decisions. Thirty states have passed constitutional amendments banning same-sex marriage. (*See* OPM Opp. Br. at 15, citing National Conference of State Legislatures, *Same-Sex Marriage, Civil Unions and Domestic Partnerships, available at* http://www.ncsl.org/default.aspx?tabid_16430 (last updated February 13, 2012)). In contrast, when the Supreme Court ruled in *Loving*, interracial marriage was legal in thirty-four states. *See Loving*, 388 U.S. at 6. Moreover, there is no federal anti-discrimination legislation and no protection in most states from sexual orientation discrimination. (*See* OPM Opp. Br. at 6-12.) Finally, while the campaign against Proposition 8 may have raised significant funds, the majority of Californians still voted to alter the state constitution to strip gay and lesbian



United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

individuals of their rights. Placed in context, BLAG's evidence does not create a question of fact.

Despite the modest successes in remediating existing discrimination, the record demonstrates that gay men and lesbians continue to suffer discrimination "unlikely to be rectified by legislative means." *City of Cleburne*, 473 U.S. at 440. Even BLAG, in similar litigation, has admitted that "gay men and lesbians often must rely on judicial decisions to secure equal rights." (Lin Reply Decl., Exs. C and D at ¶ 32.) Ms. Golinski proffers the undisputed and extensive expert testimony of Gary Segura for the proposition that gay men and lesbians lack a meaningful degree of political power. (*See* Segura Decl. at ¶¶ 9-85.) In sum, the basic inability to bring about an end to discrimination and pervasive prejudice, to secure desired policy outcomes and to prevent undesirable outcomes on fundamental matters that directly impact their lives, is evidence of the relative political powerlessness of gay and lesbian individuals. (*Id.* at ¶ 28.)

Ms. Golinski also proffers the letter from the Attorney General to Congress regarding DOMA and the Department of Justice's determination that it would no longer provide a defense of a statute which it considered to be unconstitutional. (*See* NSA, Ex. 2.) In the letter, the Attorney General, speaking on behalf of the Executive, notes that "the adoption of the laws like those at issue in *Romer* and *Lawrence*, the longstanding ban on gay men and lesbians in the military, and the absence of federal protection for employment discrimination on the basis of sexual orientation show the group to have limited political power and 'ability to attract the [favorable] attention of the lawmakers.'" (*Id.* at 2, citing *City of Cleburne*, 473 U.S. at 445.)

The Court finds that the unequivocal evidence demonstrates that, although not completely politically powerless, the gay and lesbian community lacks meaningful political power. In 1985, in their dissent from a petition for writ of certiorari, Justices Brennan and Marshall found that "homosexuals constitute a significant and insular minority of this country's population. Because of the immediate and severe opprobrium often manifested against homosexuals once so identified publicly, members of this group are particularly powerless to pursue their rights openly in the political arena." *Rowland v. Mad River Local School District*,

470 U.S. 1009, 1014 (1985). The Court agrees and finds that, as a class, gay men and lesbians are a minority and have relatively limited political power to attract the favorable attention of lawmakers. *See City of Cleburne*, 473 U.S. at 445. Although this factor is not an absolute prerequisite for heightened scrutiny, the Court finds the evidence and the law support the conclusion that gay men and lesbians remain a politically vulnerable minority. *See Plyler*, 457 U.S. at 216 n.14; *Murgia*, 427 U.S. at 321.

Here, having analyzed the factors, the Court holds that the appropriate level of scrutiny to use when reviewing statutory classifications based on sexual orientation is heightened scrutiny. *See also In re Levenson*, 587 F.3d at 931 (holding that "some form of heightened constitutional scrutiny applies"); *Witt*, 527 F. 3d at 824-25 (Canby, J., concurring in part and dissenting in part) ("classifications against homosexuals are suspect in the equal protection sense" as gay and lesbian individuals have "experienced a history of purposeful unequal treatment [and] been subjected to unique disabilities on the basis of stereotyped characteristics not truly indicative of their abilities" and "they also exhibit obvious, immutable, or distinguishing characteristics that define them as a discrete group; and they are a minority."). In short, this Court holds that gay men and lesbians are a group deserving of heightened protection against the prejudices and power of an often-antagonistic majority. *See id.* at 825.

**5. Application of Heightened Scrutiny to Justifications Proffered for DOMA.**

Under heightened scrutiny, the proponents of the statute must establish, at a minimum, that the classification is "substantially related to an important governmental objective." *Clark*, 486 U.S. at 461. Moreover, under any form of heightened scrutiny, the statute may only be defended by reference to the actual legislative bases advanced to legitimate the statute or the "actual [governmental] purpose, not rationalizations for actions in fact differently grounded." *United States v. Virginia*, 518 U.S. 515, 535-36 (1996). The Court notes that the "historical background of the decision" to enact legislation and the "specific sequence of events leading up to the challenged decision" may shed light on the decisionmakers' purposes. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 267 (1977). Here, the legislative history is replete with expressed animus toward gay men and lesbians.



United States District Court
For the Northern District of California

The House Report on DOMA reflected Congress' "moral disapproval of homosexuality, and a moral conviction that heterosexuality better comports with traditional (especially Judeo-Christian) morality." H.R. Rep. No. 104-664 at 16 (footnote omitted). In his expression of these objectives, Henry Hyde, then-Chairman of the House Judiciary Committee, stated that "[m]ost people do not approve of homosexual conduct ... and they express their disapprobation through the law." 142 Cong. Rec. H7480 (daily ed. July 12, 1996).

In the floor debate, members of Congress repeatedly expressed their disapprobation of homosexuality, calling it "immoral," "depraved," "unnatural," "based on perversion," and "an attack upon God's principles." 142 Cong. Rec. H7444 (daily ed. July 11, 1996) (statement of Rep. Coburn); 142 Cong. Rec. H7486 (daily ed. July 12, 1996) (statement of Rep. Buyer); *id.* at H7494 (statement of Rep. Smith). Members of Congress argued that marriage by gay men and lesbians would "demean" and "trivialize" heterosexual marriage and might indeed be "the final blow to the American family." 142 Cong. Rec. H7276 (daily ed. July 11, 1996) (statement of Rep. Largent); 142 Cong. Rec. H7495 (daily ed. July 12, 1996) (statement of Rep. Lipinski) ("Allowing for gay marriages would be the final straw, it would devaluate the love between a man and a woman and weaken us as a Nation."). Senator Helms, in a statement prepared for the hearing, expressed his disapprobation: "[Those opposed to DOMA] are demanding that homosexuality be considered as just another lifestyle – these are the people who seek to force their agenda upon the vast majority of Americans who reject the homosexual lifestyle ... Homosexuals and lesbians boast that they are close to realizing their goal – legitimizing their behavior ... At the heart of this debate is the moral and spiritual survival of this Nation." 142 Cong. Rec. S10,110 (daily ed. Sept. 10, 1996); *see also* 142 Cong. Rec. H7275 (daily ed. July 11, 1996) (statement of Rep. Barr) (stating that marriage is "under direct assault by the homosexual extremists all across the country."). The House Report on the pending DOMA bill stated: "Civil laws that permit only heterosexual marriage reflect and honor a collective moral judgment about human sexuality. This judgment entails [a] moral disapproval of homosexuality." H.R. Rep. 104-664, at 15-16. The Report further stated that "same-sex



United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

marriage, if sanctified by the law, if approved by the law, legitimates a public union, a legal status that most people ... feel ought to be illegitimate." *Id.* at 16.

Despite the expressed animus against gay men and lesbians within the legislative history of DOMA, Congress also specifically identified four governmental interests to be advanced by the statute: (1) encouraging responsible procreation and child-rearing; (2) defending and nurturing the institution of traditional, heterosexual marriage; (3) defending traditional notions of morality; and (4) preserving scarce government resources. *See* H.R. Rep. No. 104-664, at 12-18.

**a. Responsible procreation and child-rearing.**

The first reason proffered by Congress when enacting DOMA was to encourage responsible procreation and child-rearing.

Ms. Golinski presents evidence that it is "beyond scientific dispute" that same-sex parents are equally capable at parenting as opposite-sex parents. (*See* Declaration of Michael Lamb ("Lamb Decl.") at ¶ 14.) The evidence presented by Professor Lamb demonstrates that parents' genders are irrelevant to children's developmental outcomes. (*See id.* at ¶¶ 28, 38; Reply Declaration of Michael Lamb ("Lamb Reply Decl.") at ¶¶ 8, 19, 28.) More than thirty years of scholarship resulting in over fifty peer-reviewed empirical reports have overwhelmingly demonstrated that children raised by same-sex parents are as likely to be emotionally healthy, and educationally and socially successful as those raised by opposite-sex parents. (*See* Lamb Decl. at ¶¶ 29-32.) "There is ... no empirical support for the notion that the presence of both male and female role models in the home promotes children's adjustment or well-being." (*Id.* at ¶ 14.) "Since the enactment of DOMA, a consensus has developed among the medical, psychological and social welfare communities that children raised by gay and lesbian parents are just as likely to be well-adjusted as those raised by heterosexual parents." *Gill*, 699 F. Supp. 2d at 388; *see also Perry*, 704 F. Supp. 2d at 1000 ("The evidence does not support a finding that California has an interest in preferring opposite-sex parents over same-sex parents. Indeed, the evidence shows beyond any doubt that parents' genders are irrelevant to children's developmental outcomes."); *Varnum*, 763 N.W.2d at 899 n.26 ("The research

appears to strongly support the conclusion that same-sex couples foster the same wholesome environment as opposite-sex couples and suggests that the traditional notion that children need a mother and a father to be raised into healthy, well-adjusted adults is based more on stereotype than anything else.").

BLAG argues that there are flaws in the studies proffered by Ms. Golinski's expert, Professor Lamb, comparing gay or lesbian parents to opposite-sex parents, based on methodological challenges. The first alleged flaw is that there have been fewer studies of gay male parents than there have been of lesbian family research. (*See* Lamb Reply Decl. at ¶ 7; *see also* Lin Reply Decl., Ex. K at 76:6-17.) Whether this is the case does not impact the validity of the studies performed. (*See* Lamb Reply Decl. at ¶ 8.) The second flaw as argued by BLAG is that there are fewer studies on adolescents than on younger children. However, it remains undisputed that "there are several ... studies that have looked at adolescent offspring living with same-sex parents" and those studies have "uniformly reported positive outcomes." (*See id.* at ¶¶ 9-10; *see also* Lin Reply Decl., Ex. K at 82:15-83:21.) The third criticism is that Professor Lamb indicates the need for further studies. This does not impact the validity of the studies already performed. (*See* Lamb Reply Decl. at ¶ 12.) The Court finds that these criticisms of the studies relied upon by Professor Lamb do not alter their validity. "[A]t the summary judgment stage the judge's function is not ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby,* 477 U.S. at 249. The Court finds BLAG's critique does not create an issue of fact.

Further, BLAG cites three sources for the proposition that same-sex parenting is inferior to opposite-sex parenting. One is an article from Slate.com in which the author contends that the existing science is methodologically flawed and ideologically skewed. (*See* Ann Hulbert, *The Gay Science: What Do We Know About the Effects of Same-Sex Parenting?*, Slate (Mar. 12, 2004), *available at* http://www.slate.com/id/2097048/.) This is a three-page, non-scientific article by an author with no professional expertise in child development, published by a popular online magazine without peer review. (*See* Lamb Reply Decl. at ¶ 15.) Another reference by BLAG is an article criticizing the sampling size in the studies relied upon by Professor Lamb.

United States District Court
For the Northern District of California

As Professor Lamb explains, such sampling is typical of psychological research and a number of the studies he relied upon do use representative sampling. (*See id.* at ¶ 16.) The last source is an unpublished piece by Professor Loren Marks in which he criticizes a brief issued by the American Psychological Association in 2005 concluding that social science research indicates that gay parents provide a home environment equally likely to support children's psychological and social growth. (*See* BLAG Opp. Br., Ex. 2.) The critique is neither a study nor published in a peer-reviewed journal and its questionable analysis is based on outdated and selectively-chosen data. (*See* Lamb Reply Decl. at ¶¶ 20-27.) The piece also ignores many of the studies relied upon by Professor Lamb regarding the conclusion that parents' sexual orientation is unrelated to their children's adjustment. (*See id.* at ¶¶ 21-27.) Having reviewed the evidence presented, the Court concludes that all three publications merely criticize the studies relied upon Professor Lamb. As stated above, the criticism merely goes to the weight of Ms. Golinski's evidence. The publications do not present any independent affirmative evidence necessary to create a genuine issue of disputed fact regarding whether same-sex married couples function as responsible parents.

Furthermore, to the extent Congress was interested merely in encouraging responsible procreation and child-rearing by opposite-sex married couples, a desire to encourage opposite-sex couples to procreate and raise their own children well would not provide a legitimate reason for denying federal recognition of same-sex marriages. The denial of recognition and withholding of marital benefits to same-sex couples does nothing to support opposite-sex parenting, but rather merely serves to endanger children of same-sex parents by denying them "'the immeasurable advantages that flow from the assurance of a stable family structure,' when afforded equal recognition under federal law." *Gill*, 699 F. Supp. 2d at 389 (quoting *Goodridge v. Department of Public Health*, 440 Mass. 309, 335 (2003)). It is undisputed that same-sex parents can and do have and adopt children. The denial of federal recognition of valid same-sex marriages under state law does not alter parental rights under state law. Rather, the passage of DOMA only serves to undermine providing a stable environment for children of same-sex married couples whose children would otherwise be raised in a household bestowed with all of

United States District Court
For the Northern District of California

the federal benefits of marriage, including financial support and social recognition. (*See* Lamb Decl. at ¶ 42.)

Furthermore, an interest in promoting procreation within marriage cannot provide a legitimate reason to exclude same-sex marriages from federal recognition. The ability to procreate cannot and has never been a precondition to marriage. *See Lawrence,* 539 U.S. at 605 (Scalia, J., dissenting) (stating "what justification could there possibly be for denying the benefits of marriage to homosexual couples ... [s]urely not the encouragement of procreation, since the sterile and the elderly are allowed to marry"). "While it is certainly true that many, perhaps most, married couples have children together (assisted or unassisted), it is the exclusive and permanent commitment of the marriage partners to one another, not the begetting of children, that is the sine qua non of civil marriage." *Dragovich*, 764 F. Supp. 2d at 1190 (citing *Goodridge*, 440 Mass. at 332). The federal government has never considered withdrawing its recognition of marriage based on an ability or inability to procreate. *See id.*; *see also Gill*, 699 F. Supp. 2d at 389. Even if this could be considered a legitimate interest, denying federal recognition of and withholding federal benefits from legally married same-sex couples does nothing to encourage or discourage opposite-sex couples from having children within marriage.

Accordingly, the Court finds that the first proffered reason for the passage of DOMA – to encourage responsible procreation and child-rearing – does not provide a justification that is substantially related to an important governmental objective.

**b. Nurturing the institution of traditional, opposite-sex marriage.**

The second reason proffered by Congress when passing DOMA, was its asserted interest in defending and nurturing traditional, opposite-sex marriage. Tradition alone, however, cannot form an adequate justification for a law. *See Williams v. Illinois*, 399 U.S. 235, 239 (1970); *Romer,* 517 U.S. at 635; *Lawrence,* 539 U.S. at 579. The "ancient lineage" of a classification does not render it legitimate. *Heller*, 509 U.S. at 327. Instead, the government must have an interest separate and apart from the fact of tradition itself.

In addition, the ostensible governmental objective of fostering opposite-sex marriages remains unaffected by the passage of DOMA. DOMA does nothing to encourage same-sex

married individuals to marry members of the opposite sex because they are already married to a member of the same sex. Nor does the denial of benefits to same-sex couples do anything to encourage opposite-sex couples to get married. *See Gill*, 699 F. Supp. 2d at 389; *see also In re Levenson*, 587 F.3d at 932 ("gays and lesbians will not be encouraged to enter into marriages with members of the opposite sex by the government's denial of benefits to same-sex spouses, and the denial will not discourage same-sex couples from entering into same-sex marriages; so, the denial cannot be said to 'nurture' or 'defend' the institution of heterosexual marriage."); *see also Perry*, 704 F. Supp. 2d at 972 ("Permitting same-sex couples to marry will not affect the number of opposite-sex couples who marry, divorce, cohabit, have children outside of marriage or otherwise affect the stability of opposite-sex marriages.").

Accordingly, the Court does not find that the second proffered reason for the passage of DOMA – to defend and nurture the institution of traditional, opposite-sex marriage – provides a justification that is substantially related to an important governmental objective.

**c. Defending traditional notions of morality.**

The third reason proffered by Congress when passing DOMA was its asserted interest in defending traditional notions of morality. Basing legislation on moral disapproval of same-sex couples does not pass any level of scrutiny. "The animus toward, and moral rejection of, homosexuality and same-sex relationships are apparent in the Congressional record." *See Dragovich*, 764 F. Supp. 2d at 1190. "[M]oral condemnation of homosexuality [does not] provide the requisite justification for the DOMA's section three. The 'bare desire to harm a politically unpopular group' is not a legitimate [governmental] interest." *Id.* (quoting *Romer*, 517 U.S. at 634-35). The condemnation of homosexuality as immoral

> has been shaped by religious beliefs, conceptions of right and acceptable behavior, and respect for the traditional family. For many persons these are not trivial concerns but profound and deep convictions accepted as ethical and moral principles to which they aspire and which thus determine the course of their lives. ... The issue is whether the majority may use the power of the [government] to enforce these views on the whole society through operation of the ... law.

*Lawrence*, 539 U.S. at 571. The Court concludes it can not. The imposition of subjective moral beliefs of a majority upon a minority cannot provide a justification for the legislation. The obligation of the Court is "to define the liberty of all, not to mandate our own moral code."

United States District Court
For the Northern District of California

*Casey*, 505 U.S. at 850. "Moral disapproval of a group cannot be a legitimate governmental interest under the Equal Protection Clause because legal classifications must not be 'drawn for the purpose of disadvantaging the group burdened by the law.'" *Lawrence*, 539 U.S. at 582 (O'Connor, J., concurring) (quoting *Romer*, 517 U.S. at 633). "[T]he fact that the governing majority ... has traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law prohibiting the practice; neither history nor tradition could save a law prohibiting miscegenation from constitutional attack." *Lawrence*, 539 U.S. at 577-78.

Accordingly, the Court does not find that the third proffered reason for the passage of DOMA – to defend traditional notions of morality – provides a justification that is substantially related to an important governmental objective.

**d. Preserving scarce government resources.**

The final reason proffered by Congress for passing DOMA was the preservation of scarce government resources. However, there is no evidence in the record to demonstrate that the provision of federal benefits to same-sex married couples would adversely affect the government fisc. In addition, the preservation of government resources cannot, as a matter of law, justify barring some arbitrarily chosen group from a government program. *Plyler*, 457 U.S. at 227, 229. "[A]lhough efficacious administration of governmental programs is not without some importance, 'the Constitution recognizes higher values than speed and efficiency.'" *Frontiero v. Richardson*, 411 U.S. 677, 690 (1973) (citing *Stanley v. Illinois*, 405 U.S. 645, 656 (1972)). Under heightened scrutiny, convenience and economic efficiency in the administration of governmental programs do not legitimize differential treatment. *See id.* at 690-91.

Accordingly, the Court does not find that the fourth proffered reason for the passage of DOMA – to preserve scarce government resources – provides a justification that is substantially related to an important governmental objective.

The Court concludes that, based on the justifications proffered by Congress for its passage of DOMA, the statute fails to satisfy heightened scrutiny and is unconstitutional as applied to Ms. Golinski.

United States District Court
For the Northern District of California

**D. In the Alternative, DOMA Fails Under Rational Basis Review.**

Although the Court finds that DOMA is subject to and fails to satisfy heightened scrutiny, it notes that numerous courts have found that the statute fails even rational basis review.

**1. Standards for Rational Basis Scrutiny.**

Where a law neither burdens a fundamental right nor targets a suspect class, a court shall uphold the legislative classification so long as it bears a rational relation to some legitimate end. *Heller*, 509 U.S. at 319-320. Under the rational basis standard of review, legislative enactments are accorded a strong presumption of validity. *Id.* Courts "are compelled under rational-basis review to accept a legislature's generalizations even where there is an imperfect fit between means and ends." *Id.* (internal citations omitted). Indeed, a court applying rational basis review may "go so far as to hypothesize about potential motivations of the legislature, in order to find a legitimate government interest sufficient to justify the challenged provision." *Gill*, 699 F. Supp. 2d at 387 (citing *Shaw v. Oregon Public Employees' Retirement Board*, 887 F.2d 947, 948-49 (9th Cir. 1989) (internal quotation omitted)). "In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993). Rational basis review is "a paradigm of judicial restraint" and "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Id.* at 313-14. "Nor does it authorize 'the judiciary [to] sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines.'" *Heller*, 509 U.S. at 319 (quoting *Dukes*, 427 U.S. at 303).

"'[T]he burden of establishing the unconstitutionality of a statute rests on him who assails it.'" *Baker v. Carr*, 369 U.S. 186, 266 (1962) (quoting *Metropolitan Casualty Ins. Co. v. Brownell*, 294 U.S. 580, 584 (1935)). The burden is to "'negative every conceivable basis which might support it,' whether or not the basis has a foundation in the record." *Heller*, 509

United States District Court
For the Northern District of California

U.S. at 320-21 (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)). "A classification does not fail rational-basis review because it 'is not made with mathematical nicety or because in practice it results in some inequality.'" *Id.* at 321 (quoting *Dandridge v. Williams*, 397 U.S. 471, 485 (1970)). "The problems of government are practical ones and may justify, if they do not require, rough accommodations – illogical, it may be, and unscientific." *Id.* (citing *Metropolis Theatre Co. v. City of Chicago*, 228 U.S. 61, 69-70 (1913)). "A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." *Id.* (citing *McGowan v. Maryland*, 366 U.S. 420, 426 (1961)).

However, rational review is not "toothless." *Mathews v. de Castro*, 429 U.S. 181, 185 (1976). "A statutory classification fails rational-basis review only when it 'rests on grounds wholly irrelevant to the achievement of the State's objective.'" *Heller*, 509 U.S. at 324 (quoting *Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 71 (1978)). Rational basis review requires that the legislation not be enacted for arbitrary or improper purposes. In order for a law to be legitimate, it must be "properly cognizable" by the government asserting it and "relevant to interests" it "has the authority to implement." *City of Cleburne*, 473 U.S. at 441. The law must bear a logical relationship to the purpose it purports to advance. *Romer*, 517 U.S. at 632-33; *see also Gill*, 699 F. Supp. 2d at 387. "[E]ven in the ordinary equal protection case calling for the most deferential of standards, [courts] insist on knowing the relation between the classification adopted and the object to be attained." *Gill*, 699 F. Supp. 2d at 387 (quoting *Romer*, 517 U.S. at 633). Lastly, the justification for the law may not rely on factual assumptions that exceed the bounds of rational speculation. *Lewis v. Thompson*, 252 F.3d 567, 590 (2d Cir. 2001) (citing *Heller*, 509 U.S. at 320 (holding that speculation, while permissible, must be "rational")).

When applying rational basis review to a classification that adversely affects an unpopular group, courts apply a "more searching" rational basis review. *Diaz*, 656 F.3d at 1012. With these protections, courts may thereby "ensure that classifications are not drawn for the purpose of disadvantaging the group burdened by the law." *Romer*, 517 U.S. at 633 (citing *Railroad Retirement Board v. Fritz*, 449 U.S. 166, 181 (1980) (Stevens, J., concurring) ("If the

United States District Court
For the Northern District of California

adverse impact on the disfavored class is an apparent aim of the legislature, its impartiality would be suspect.")).

**2. Application of Rational Basis Review to Justifications Proffered by Congress.**

The Court has already addressed the four interests proffered by Congress during the passage of DOMA and found them not to be substantially related to an important governmental objective. Similarly, under the rational basis review, the Court finds that none of Congress' proffered justifications constitute a rational relation in furtherance of some legitimate governmental end. *See Romer*, 517 U.S. at 631 (citing *Heller*, 509 U.S. at 319-320).

Specifically, the Court finds that Congress' justification of promoting traditional notions of morality does not satisfy rational basis scrutiny. *See Lawrence*, 539 U.S. at 582 (holding that "[m]oral disapproval of [homosexuals], like a bare desire to harm the group, is an interest that is insufficient to satisfy rational basis review under the Equal Protection Clause.") Also, if the denial of benefits is designed to defend traditional notions of morality by discouraging same-sex marriage, "it does so *only* by punishing same-sex couples who exercise their rights under state law, and thus exhibits the 'bare desire to harm' same-sex couples." *In re Levenson*, 587 F.3d at 932 (emphasis in original). This is forbidden by the Constitution. *See Romer,* 517 U.S. at 634-35. "Discouraging gay marriage serves only to force gay couples to live in a 'state of sin' rather than in a lawfully-recognized 'state of connubial bliss' that encourages a long-enduring permanent relationship that, in turn, serves as the basis of a state-recognized family." *In re Levenson*, 587 F.3d at 932. The promotion of morality is not a cognizable governmental interest furthered by the denial of federal benefits and protections.

Similarly, the Court does not find the justification of preserving the government fisc satisfies rational basis review. *See Lyng v. International Union*, 485 U.S. 360, 376-77 (1988) (holding that previous cases make "clear that something more than an invocation of the public fisc is necessary to demonstrate the rationality of selecting [one group], rather than some other group, to suffer the burden of cost-cutting legislation."). Ostensible savings to the government

United States District Court
For the Northern District of California

fisc that depends upon "distinguishing between homosexual and heterosexual [couples], similarly situated, ... cannot survive rational basis review." *See Diaz*, 656 F.3d at 1014.[8]

**a. Responsible procreation and child-rearing.**

In arguing its defense of DOMA, BLAG, for the most part, eschews the justifications proffered by Congress for the legislation. However, the group does reiterate the legislative justifications of encouraging responsible procreation and child-rearing and the government's interest in defending and nurturing the institution of traditional, heterosexual marriage.

The Court does not find the justification of encouraging responsible procreation and child-rearing survives rational basis scrutiny. Even if the Court were to accept as true, which it does not, that opposite-sex parenting is somehow superior to same-sex parenting, DOMA is not rationally related to this alleged governmental interest.

Under rational basis review, although the fit between the classification and the stated government interest need not be perfect, the classification must be "narrow enough in scope and grounded in sufficient factual context ... to ascertain some relation between the classification and the purpose it serve[s]." *Romer*, 517 U.S. at 632-33. Rational basis review invalidates a measure whose "sheer breadth" is "discontinuous with the reasons offered for it." *Id.* at 632, 635 (rejecting justifications where "[t]he breadth of the [measure] is so far removed from these particular justifications that we find it impossible to credit them"); *see also Eisenstadt v. Baird*, 405 U.S. 438, 449 (1972) (rejecting justification of law discriminating between married and unmarried individuals in access to contraceptives as "so riddled with exceptions" that the interest claimed by the government "cannot reasonably be regarded as its aim").

---

[8] During oral argument, counsel for BLAG argued that another possible justification for DOMA, somewhat related to protection of the public fisc, is "to rationally maintain bargains that were decided upon by previous Congresses. ... There were bargains made, and there were calculus [sic] made in terms of ... what benefits are we going to give, what burdens are we going to put on people." (Transcript at 59.) The decision of where and how to protect the government fisc and to protect the bargains struck by previous Congresses does not independently constitute a rational basis upon which to differentiate among classes of citizens. *See Diaz*, 656 F.3d at 1014; *see also Plyler*, 457 U.S. at 227, 229 (holding that preservation of government resources cannot, as a matter of law, justify barring some arbitrarily chosen group from a government program). There must be some rational basis upon which to decide not to expend public resources for a particular group.

DOMA has no effect on who may become a parent under federal or state law. Moreover, whether a same-sex couple is entitled to marriage benefits has no rational relation to that couple's or an opposite-sex couple's ability to procreate. Significantly, to reiterate, the ability to procreate has never been a precondition to marriage in any jurisdiction. *See Lawrence*, 539 U.S. at 605 (Scalia, J. dissenting).[9] Here, there is simply no connection between the ability (or capacity) to become a parent and the designation of federal entitlements based on a definition of marriage that excludes legally married couples who are capable of becoming parents.

Denying federal benefits to same-sex married couples has no rational effect on the procreation and child-rearing practices of opposite-sex married (or unmarried) couples. *See Perry II*, 2012, WL 372713, at *21 ("There is no rational reason to think that taking away the designation of 'marriage' from same-sex couples would advance the goal of encouraging ... opposite-sex couples to procreate more responsibly.") To the extent some people may have a bias in favor of preferring biological parents over other couples, there is no such recognition of this distinction under federal or state law. *See id.* There has been no showing that DOMA alters any state or federal law governing childbearing, procreation or family structure. Given the state of the law, the rationale of promoting responsible child-rearing finds no "'footing in the realities of the subject addressed by the legislation,' and thus cannot be credited as rational." *Perry II*, 2012 WL 372713, at *20 (citing *Heller*, 509 U.S. at 321).

Accordingly, the Court finds that Congress' stated justification of encouraging responsible procreation and child-rearing bears no rational relationship to the classification which burdens same-sex married couples.

---

[9] During oral argument, counsel for BLAG argued that an additional reason for the passage of DOMA was the fact that opposite-sex married couples could "have accidental pregnancies" or "can make babies spontaneously." (Transcript at 63-64.) BLAG did not, however, articulate how the fact that opposite-sex couples can have accidental pregnancies constitutes an interest supporting the passage of DOMA. Although the generation of children may be biologically more spontaneous with opposite-sex couples, married or unmarried, the Court remains perplexed how the uniformly deliberate decision of same-sex married couples to become parents can be perceived as a justification against supporting their procreation and child-rearing efforts.



United States District Court
For the Northern District of California

**b. Nurturing the institution of traditional, opposite-sex marriage.**

BLAG contends that the institution of opposite-sex marriage is deeply rooted in American law, embedded in history and tradition, and has been defined both by Black's Law Dictionary and the Bible. (BLAG Motion to Dismiss at 23-24, citing *Marsh v. Chambers*, 463 U.S. 783, 792 (1983) (holding that traditional marriage "is deeply embedded in the history and tradition of this country" and "has become part of the fabric of our society") and *Baker v. Nelson*, 191 N.W.2d 185, 186 (Minn. 1971) (holding that the "institution of marriage as a union of man and woman, uniquely involving the procreation and rearing of children within a family, is as old as the book of Genesis.")).

Again, the argument that the definition of marriage should remain the same for the definition's sake is a circular argument, not a rational justification. Simply stating what has always been does not address the reasons for it. The mere fact that prior law, history, tradition, the dictionary and the Bible have defined a term does not give that definition a rational basis, it merely states what has been. Tradition, standing alone, does not provide a rational basis for the law. *Williams*, 399 U.S. at 239. Simply, the "ancient lineage" of the law does not render it rational. *See Heller*, 509 U.S. at 327.

BLAG argues, but does not explain how denying marriage benefits only to same-sex couples will somehow make marriage between opposite-sex couples better. The proffered justification may derive from strongly-held religious or fundamentally traditional beliefs, but still does not provide a legally recognizable rational basis for sustaining a law that actively discriminates against legally married couples. The exclusion of same-sex couples from the federal definition of marriage does nothing to encourage or strengthen opposite-sex marriages. *See Perry II*, 2012 WL 372713, at *23 (holding that "the argument that withdrawing the designation of 'marriage' from same-sex couples could on its own promote the strength or stability of opposite-sex marital relationships lacks any such footing in reality"); *see also Perry*, 704 F. Supp. 2d at 972 ("Permitting same-sex couples to marry will not affect the number of opposite-sex couples who marry, divorce, cohabit, have children outside of marriage or otherwise affect the stability of opposite-sex marriages"); *In re Levenson*, 587 F.3d at 932 (this

governmental interest "is largely irrelevant to the rational basis analysis here because the same-sex couples who seek the benefits are already married. Also, gays and lesbians will not be encouraged to enter into marriages with members of the opposite sex by the government's denial of benefits to same-sex spouses, and the denial will not discourage same-sex couples from entering into same-sex marriages; so the denial cannot be said to 'nurture' or 'defend' the institution of heterosexual marriage.").

Accordingly, the Court finds that Congress' stated justification of nurturing the institution of traditional, opposite-sex marriage bears no rational relationship to the classification which burdens same-sex married couples.

**3. Application of Rational Basis Review to Alternative Justifications Proffered by BLAG.**

BLAG does not rely exclusively on the stated legislative justifications advanced by Congress during its passage of DOMA. A court may "hypothesize the motivations of the ... legislature to find a legitimate objective promoted by the provision under attack." *Shaw*, 887 F.2d at 948-49 (internal quotation marks and citation omitted). "[I]t is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." *Beach Communications*, 508 U.S. at 313. In this regard, BLAG has proffered several additional hypothetical rational bases for passing DOMA.

**a. Congressional caution in defining a legislative term and maintaining the status quo.**

BLAG contends that Congress could have had a rational basis for the passage of DOMA by preserving the status quo in the federal definition of marriage while waiting for the states to "tinker with the substantive centuries-old definition of marriage." (BLAG Opp. Br. on Motion for Summary Judgment at 22.) To the extent this argument is premised upon preserving a traditional definition of marriage for its own sake, the Court has already rejected this argument. As the court found in *Gill*, "[s]taying the course is not an end in and of itself, but rather a means to an end." *Gill*, 699 F. Supp. 2d at 390-94. The long history of discrimination against gay men and lesbians does not provide a rational basis for continuing it.



United States District Court
For the Northern District of California

Moreover, DOMA does not preserve the status quo. The passage of DOMA marks a stark departure from tradition and a blatant disregard of the well-accepted concept of federalism in the area of domestic relations. *See Gill*, 699 F. Supp. 2d at 392 (finding that DOMA "mark[ed] the first time the federal government has ever attempted to legislatively mandate a uniform federal definition of marriage – or any other core concept of domestic relations, for that matter"); *see also Dragovich*, 764 F. Supp. 2d at 1189 ("[S]ection three of DOMA was a preemptive strike to bar federal legal recognition of same-sex marriages should certain states decide to allow them, rather than a law that furthered the status quo, which gave the states authority to define marriage for themselves.").

The status quo prior to the passage of DOMA was federal recognition of the individual states' authority to define marriage. "The whole subject of the domestic relations ... belongs to the laws of the States and not to the laws of the United States." *Elk Grove Unified School District v. Newdow*, 542 U.S. 1, 12 (2004) (citation omitted); *see also Sosna v. Iowa*, 419 U.S. 393, 404 (1975) (holding that "domestic relations" have "long been regarded as a virtually exclusive province of the States" and "[t]he State ... has absolute right" to regulate marriage) (citations omitted); *Ankenbrandt v. Richards*, 504 U.S. 689, 703, 716 (1992) ("declarations of status, *e.g.*, marriage, annulment, divorce, custody, and paternity," lie at the "core" of domestic relations law reserved to the states) (Blackmun, J., concurring).

Prior to the enactment of DOMA, the federal government had not attempted to craft its own federal definition of marriage, "notwithstanding the occurrence of other similarly politically-charged, protracted, and fluid debates at the state level as to who should be permitted to marry." *Gill*, 699 F. Supp. 2d at 392. Congress accepted without revision the patchwork of different state marriage definitions regarding, for example, age requirements or marriage among related persons. (*See e.g.,* Declaration of Nancy Cott ("Cott Decl.") at ¶¶ 26, 51-52, 56-57.) The federal government has continued to defer to the states during unprecedented, hotly-contested shifts in state marriage law, especially in the area of interracial marriage. (*Id.* at ¶¶

United States District Court
For the Northern District of California

57.) The strong tradition of federalism mandated that the federal government refrain from inserting itself in the business of domestic relations.[10]

The Court finds that the passage of DOMA, rather than maintaining the status quo in the arena of domestic relations, stands in stark contrast to it. Accordingly, the Court finds that Congressional caution in defining a legislative term and maintaining the status quo does not constitute a rational basis.

**b. Congressional caution in area of social divisiveness.**

BLAG also contends that Congress should remain cautious, especially in an area of so much social divisiveness, by holding the purported federal definition of marriage steady while waiting to see how the states tinker with new definitions. The Court finds the contention similar to arguments that were advanced in support of antimiscegenation laws. Proponents similarly argued that the long-standing tradition of the separation of the races provided justification for prohibiting interracial marriage. The lower court in *Loving* found that God had created the races and placed them on separate continents in order that there "would be no cause for such [interracial] marriages." 388 U.S. at 3. It was, at the time, a strongly-held belief among proponents of antimiscegenation laws that mixing the races was against God's will, flaunted a long history of tradition and, at its core, endangered the institution of marriage. *See id.* However, in its holding in *Loving*, the Supreme Court found that although interracial marriage was a socially divisive issue and proponents of antimiscegenation held traditional and

---

[10] BLAG contends that Congress has previously enacted laws which create unique federal definitions of marriage, for instance in the area federal tax regulations, Social Security, immigration or federal benefits. However, in each instance, the federal government accepted the state definitions of marriage and merely superimposed further requirements for falling within the federal entitlement statute. *See, e.g.*, 42 U.S.C. § 416 (requiring marriage of at least one year to obtain certain Social Security benefits); 8 U.S.C. § 1186a(b)(1) (discrediting marriages entered into merely to obtain immigration status). These federal requirements do not purport to redefine or create a federal definition of marriage, but rather impose additional criteria to further particular legislative goals.

In addition, BLAG cites examples in which Congress legislated in the area of domestic relations, such as when it banned polygamy in the Utah Territory, when it promoted and supported marriages of former slaves after the Civil War, and legislation in the context of treatment of Indians tribes. However, in each of those unique historical instances, Congress was acting in the role of the state in the absence of a secure state government. (*See, e.g.*, Cott Decl. at ¶¶ 75-79.) DOMA marks a radical departure from the tradition of federalism in the area of domestic relations. *See Gill*, 699 F. Supp. 2d at 392.

religious beliefs about the erosion of the traditional concept of marriage, Virginia's racial classification violated the equal protection guarantee. *Id.* at 11-12.

More recently, in *Romer*, the Supreme Court addressed a proposed amendment to the Colorado state constitution that would prohibit all legislative, executive, or judicial action designed to protect discrimination against homosexuals. One of the arguments in support of the state amendment was that it was an attempt to withdraw "a deeply divisive social and political issue from elected representatives and place its resolution squarely in the hands of the people." (*See* Brief for Petitioner filed April 21, 1995 in *Romer v. Evans*, No. 94-1039 (Supreme Court), 1995 WL 17008429, at *10.) Proponents contended that it was important to ensure that "the deeply divisive issue of homosexuality does not serve to seriously fragment Colorado's body politic." (*See id.*, at *47.) Proponents argued that it required some leeway in this socially divisive atmosphere to handle the "sensitive and core political choices" in matters regarding discrimination against homosexuals calmly over time. (*Id.*) The Supreme Court, however, flatly rejected this argument as providing a rational basis and found that the proposed amendment to the Colorado state constitution was unconstitutional. *Romer*, 517 U.S. at 620.

Here, too, this Court finds that Congress cannot, like an ostrich, merely bury its head in the sand and wait for danger to pass, especially at the risk of permitting continued constitutional injury upon legally married couples. The fact that the issue is socially divisive does nothing to relieve the judiciary of its obligation to examine the constitutionality of the discriminating classifications in the law.

Accordingly, the Court finds that Congressional caution in the area of social divisiveness does not constitute a rational basis.

**c. Consistency.**

BLAG also contends that Congress could have rationally sought to base eligibility for federal benefits on a traditional definition of marriage in order "to avoid the arbitrariness and inconsistency in such eligibility ... and not depend[] on the vagaries of state law." (BLAG Motion to Dismiss at 24.) However, as explained above, in all of the years preceding the passage of DOMA, Congress relied on the various states' definitions of marriage without



United States District Court
For the Northern District of California

incident. All couples married under state law were entitled to federal benefits, even if the particulars of the states' definitions were variable. The passage of DOMA actually undermined administrative consistency by requiring that the federal government, for the first time, discern which state definitions of marriage are entitled to federal recognition and which are not.

Accordingly, the Court finds that consistency does not constitute a rational basis.

**d. Any other possible basis.**

The Court finds that neither Congress' claimed legislative justifications nor any of the proposed reasons proffered by BLAG constitute bases rationally related to any of the alleged governmental interests. Further, after concluding that neither the law nor the record can sustain any of the interests suggested, the Court, having tried on its own, cannot conceive of any additional interests that DOMA might further. *See Diaz*, 656 F.3d at 1015.

## CONCLUSION

For the foregoing reasons, the Court HEREBY DENIES BLAG's motion to dismiss; DENIES as moot BLAG's motion to strike; GRANTS Ms. Golinski's motion for summary judgment; and GRANTS the OPM's motion to dismiss.

The Court has found that DOMA unconstitutionally discriminates against same-sex married couples. Even though animus is clearly present in its legislative history, the Court, having examined that history, the arguments made in its support, and the effects of the law, is persuaded that something short of animus may have motivated DOMA's passage:

> Prejudice, we are beginning to understand, rises not from malice or hostile animus alone. It may result as well from insensitivity caused by simple want of careful, rational reflection or from some instinctive mechanism to guard against people who appear to be different in some respects from ourselves.

*Board of Trustees of University of Alabama v. Garrett*, 531 U.S. 356, 374-75 (2001) (Kennedy, J., concurring).

This case was presented by an employee of the judicial branch against the executive branch, which ultimately determined it could not legitimately support the law. The law was then defended by the legislative branch. The judicial branch is tasked with determining whether this federal law is unconstitutional. That is the courts' authority and responsibility. "It is emphatically the province and duty of the judicial department to say what the law is" and,

Case3:10-cv-00257-JSW Document186 Filed02/22/12 Page43 of 43

where it is so, to declare legislation unconstitutional. *See Marbury v. Madison*, 1 Cranch 137, 177 (1803). As Supreme Court Chief Justice John G. Roberts said during his confirmation hearings: "Judges are like umpires. Umpires don't make the rules, they apply them. ... it's [the judge's] job to call balls and strikes, and not to pitch or bat." *Confirmation Hearing on the Nomination of John G. Roberts, Jr. to be Chief Justice of the United States: Hearing Before the S. Comm. on the Judiciary*, 109th Cong. 56 (2005) (statement of John G. Roberts, Jr., Nominee).

In this matter, the Court finds that DOMA, as applied to Ms. Golinski, violates her right to equal protection of the law under the Fifth Amendment to the United States Constitution by, without substantial justification or rational basis, refusing to recognize her lawful marriage to prevent provision of health insurance coverage to her spouse.

Accordingly, the Court issues a permanent injunction enjoining defendants, and those acting at their direction or on their behalf, from interfering with the enrollment of Ms. Golinski's wife in her family health benefits plan. The Clerk is directed to enter judgment in favor of Ms. Golinski and against defendants the Office of Personnel Management and its director John Berry as set out herein pursuant to Federal Rule of Civil Procedure 58.

**IT IS SO ORDERED.**

Dated: February 22, 2012

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE

United States District Court
For the Northern District of California