UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF CONNECTICUT

CIVIL ACTION
NO. 310 CV 1750 (VLB)

---

JOANNE PEDERSEN & ANN MEITZEN,                )
GERALD V. PASSARO II,                         )
LYNDA DEFORGE & RAQUEL ARDIN,                 )
JANET GELLER & JOANNE MARQUIS,                )
SUZANNE & GERALDINE ARTIS,                    )
BRADLEY KLEINERMAN & JAMES GEHRE, and         )
DAMON SAVOY & JOHN WEISS,                     )
                                              )
        Plaintiffs,                           )
                                              )
v.                                            )
                                              )
OFFICE OF PERSONNEL MANAGEMENT,               )
TIMOTHY F. GEITHNER, in his official capacity )
as the Secretary of the Treasury, and        )
HILDA L. SOLIS, in her official capacity as the )
Secretary of Labor,                           )
MICHAEL J. ASTRUE, in his official capacity   )
as the Commissioner of the Social Security    )
Administration,                               )
UNITED STATES POSTAL SERVICE,                 )
JOHN E. POTTER, in his official capacity as   )
The Postmaster General of the United States of )
America,                                      )
DOUGLAS H. SHULMAN, in his official           )
capacity as the Commissioner of Internal      )
Revenue,                                      )
ERIC H. HOLDER, JR., in his official capacity )
as the United States Attorney General,        )
JOHN WALSH, in his official capacity as Acting )
Comptroller of the Currency, and              )
THE UNITED STATES OF AMERICA,                 )
                                              )
        Defendants.                           )
                                              )

---

March 2, 2012

**CITATION OF ADDITIONAL AUTHORITY REGARDING PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT**

Plaintiffs respectfully bring to the Court's attention the decision of the District Court for the Northern District of California in Golinski v. Office of Personnel Management, C 10-00257 JSW (N.D. Cal. Feb. 22, 2012), which was decided recently and which is pertinent to the above-captioned matter.  A copy is attached for the court's convenience.

Joanne Pedersen & Ann Meitzen
Gerald V. Passaro, II
Raquel Ardin & Lynda Deforge
Janet Geller & Joanne Marquis
Suzanne & Geraldine Artis
Bradley Kleinerman & James Gehre And
Damon Savoy & John Weiss

By their attorneys,


BY _____

Karen L. Dowd, Fed. Bar ID#CT09857
Horton, Shields & Knox, P.C.
90 Gillett Street
Hartford, CT 06105
(860) 522-8338; *Fax* (860) 728-0401
kdowd@hortonshieldsknox.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

KAREN GOLINSKI,

        Plaintiff,

   v.

UNITED STATES OFFICE OF PERSONNEL
MANAGEMENT and JOHN BERRY, Director
of the United States Office of Personnel
Management, in his official capacity,

        Defendants.

No. C 10-00257 JSW

**ORDER**

Now before the Court are the motion to dismiss and the motion to strike filed by
Intervenor-Defendant the Bipartisan Legal Advisory Group of the United States House of
Representatives ("BLAG") and the motion for summary judgment filed by Plaintiff Karen
Golinski ("Ms. Golinski"). Defendants the United States Office of Personnel Management
("the OPM") and John Berry, its director, also filed a motion to dismiss and a response to
BLAG's motion to dismiss. These motions compel the Court to determine whether the Defense
of Marriage Act ("DOMA"), 1 U.S.C. Section 7, as applied to Ms. Golinski, violates the United
States Constitution by refusing to recognize lawful marriages in the application of laws
governing benefits for federal employees. Having considered the parties' papers, relevant legal
authority, and the record in this case, the Court HEREBY DENIES BLAG's motion to dismiss;
DENIES as moot BLAG's motion to strike; GRANTS Ms. Golinski's motion for summary
judgment; and GRANTS the OPM's motion to dismiss.

United States District Court

For the Northern District of California

### BACKGROUND

The pertinent facts are not in dispute. Ms. Golinski is a staff attorney in the Motions Unit of the Office of Staff Attorneys in the United States Court of Appeals for the Ninth Circuit. (Second Amended Complaint ("SAC") at ¶ 18.) Ms. Golinski has been partners with Amy Cunninghis ("Ms. Cunninghis") for over twenty years. They registered as domestic partners with the City and County of San Francisco in 1995, and with the State of California in 2003. (*Id.* at ¶¶ 15-17.) On August 21, 2008, they were legally married under the laws of the State of California. (*Id.* at ¶ 17.)

Shortly after they married, Ms. Golinski sought to enroll Ms. Cunninghis in her existing family coverage health insurance plan, Blue Cross and Blue Shield Service Benefit Plan, which she purchases through her employer and which already covers the couple's adopted minor child. (*Id.* at ¶¶ 19, 22.) The Administrative Office of the United States Courts ("AO") refused to process her request on the basis that Ms. Golinski and her spouse are both women. (*Id.* at ¶ 23.) Finding that she could not secure comparable health insurance coverage, on October 2, 2008, Ms. Golinski filed a complaint under the Ninth Circuit's Employment Dispute Resolution ("EDR") Plan, and contended that the refusal to grant her health benefits was a violation of the Plan's nondiscrimination provision. (*Id.* at ¶ 48.) The EDR Plan specifically prohibits employment discrimination based on, among other things, sex or sexual orientation. (*Id.* at ¶ 47.)

By orders dated November 24, 2008 and January 13, 2009, Chief Judge Alex Kozinski, sitting in his administrative capacity as arbiter of the Judicial Council, found that Ms. Golinski had suffered discrimination under the Court's EDR Plan and ordered the AO to process her health benefit election forms. (*Id.*, Exs. A, B.) Chief Judge Kozinski found that the denial of health benefits was based solely on the grounds of sex and sexual orientation, in direct violation of the EDR Plan's non-discrimination provision covering Ninth Circuit employees. (*Id.*, Ex. B at 1-2.) Chief Judge Kozinski found that, regardless of the language in DOMA, the OPM had the discretion to extend health benefits to Ms. Golinski's same-sex spouse by interpreting the terms "family members" and "member of the family" to set a floor, not a ceiling, to coverage

United States District Court
For the Northern District of California

1  eligibility. (*Id.* at 2-3.) Chief Judge Kozinski ordered the AO "to submit Karen Golinski's

2  Health Benefits Election form 2089 ... to the appropriate insurance carrier. Any future health

3  benefit forms are also to be processed without regard to the sex of the listed spouse." (*Id.*, Ex.

4  B at 7.)

5        The AO complied, but the OPM instructed Ms. Golinski's insurance carrier not to

6  comply with the Ninth Circuit Judicial Council's remedial order. The OPM directed the AO

7  and the Blue Cross and Blue Shield Service Benefit Plan not to process Ms. Golinski's request

8  on the basis that federal law, specifically Section 3 of DOMA, defines spouse as a member of

9  the opposite sex and, accordingly, proscribes the enrollment of Ms. Golinski's same-sex spouse

10  in her health benefits program.

11        In response, on November 19, 2009, Chief Judge Kozinski issued another order

12  addressing the OPM's conduct. The Chief Judge, again sitting as an administrator, held that he

13  had the authority, under both the Ninth Circuit's EDR Plan and the separation of powers

14  doctrine, to interpret the laws applicable to judicial employees in a manner that would displace

15  "any contrary interpretation by an agency or an officer of the Executive." (*Id.*, Ex. C at 14-15.)

16  Chief Judge Kozinski held that allowing the OPM to interfere with his orders would be

17  tantamount to permitting it to exercise "dominance over logistics to destroy [the Judiciary's]

18  autonomy." (*Id.* at 11.) The Chief Judge further held that "[o]rdering enrollment is proper and

19  within my jurisdiction because Congress intended [the EDR] tribunal to be the sole forum for

20  adjudicating complaints of workplace discrimination by employees of the Judiciary. With that

21  responsibility must come power equal to the task." (*Id.* at 9.)

22        Chief Judge Kozinski granted Ms. Golinski both back pay and prospective relief. The

23  injunctive relief required that the OPM "rescind its guidance or directive to the Blue Cross and

24  Blue Shield Service Benefit plan and any other plan that Ms. Golinski's wife is not eligible to

25  be enrolled as her spouse under the terms of the Federal Employees Health Benefits Program

26  because of her sex or sexual orientation, or that the plans would violate their contracts with the

27  OPM by enrolling Ms. Golinski's wife as a beneficiary" and "[c]ease at once its interference

28  with the jurisdiction of this tribunal. Specifically, OPM shall <u>not</u> advise Ms. Golinski's health

1    plan, the Blue Cross and Blue Shield Service Benefit Plan, that providing coverage for Ms.

2    Golinski's wife violates DOMA or any other federal law.  Nor shall OPM interfere in any way

3    with the delivery of health benefits to Ms. Golinski's wife on the basis of her sex or sexual

4    orientation." (*Id.* at 15-16 (emphasis in original).)

5          The Chief Judge, in his order dated November 19, 2009, also invited the OPM to

6    "appeal so much of this order as concerns it using the procedures outlines in the [EDR] plan."

7    (*Id.* at 16.)  In response, the OPM did not appeal the order, but instead issued a press release

8    indicating that it was under no obligation to comply with the administrative order and, although

9    in favor of its repeal, indicated that the Executive agency was tasked with enforcing DOMA,

10   which prohibits same-sex spouses of federal employees from enrolling in the federal health

11   benefits program. (*Id.*, Ex. F.)

12         In his final administrative order, dated December 22, 2009, Chief Judge Kozinski stated

13   that the time for appeal had expired, thus rendering his prior orders in the matter "final and

14   preclusive on all issues decided therein." (*Id.*, Ex. D.)  He further authorized Ms. Golinski to

15   pursue any action she deemed fit against the OPM, including filing a mandamus action in the

16   district court. (*Id.*)

17         On January 20, 2010, Ms. Golinski filed a mandamus action before this Court, seeking

18   to have the OPM rescind its guidance to Blue Cross and Blue Shield Service Benefit Plan to

19   deny Ms. Golinski's wife benefits as precluded by DOMA and to comply with Chief Judge

20   Kozinski's prior orders in her administrative claim.

21         On January 26, 2010, Ms. Golinski moved for a preliminary injunction seeking

22   compliance with Chief Judge Kozinski's order dated November 19, 2009, requiring that the

23   OPM: (1) "rescind its guidance or directive to the Blue Cross and Blue Shield Service Benefit

24   Plan," and (2) "cease at once its interference with the jurisdiction of this tribunal" and "not

25   advise Ms. Golinski's health plan, the Blue Cross and Blue Shield Service Benefit plan, that

26   providing coverage for Ms. Golinski's wife violates DOMA or any other federal law." (*Id.* at

27   Ex. C, 15-16.)

28

United States District Court
For the Northern District of California

4

United States District Court
For the Northern District of California

1       On May 10, 2010, the OPM moved to dismiss the First Amended Complaint on the basis

2   that this Court lacked jurisdiction to grant mandamus relief under these peculiar procedural

3   circumstances.

4       While those motions were pending and after the parties submitted supplemental briefing

5   on the issue of the constitutionality of DOMA, on February 23, 2011, at the direction of

6   President Obama, Attorney General Eric Holder announced that the Justice Department would

7   cease its legal defense of Section 3 of DOMA. Although it determined that the statute was

8   unconstitutional and resolved not to continue to defend DOMA in pending court cases, the

9   Justice Department indicated that it did intend to continue to enforce the law unless it was either

10   repealed by Congress or the courts rendered a final judgment striking it down. (*See* Plaintiff's

11   Notice of Supplemental Authority ("NSA") dated February 23, 2011, Ex. 2.)

12       On March 16, 2011, the Court granted the motion to dismiss on the basis that it lacked

13   jurisdiction to issue mandamus relief. Finding that amendment would not necessarily be futile,

14   the Court dismissed the matter with leave to amend.

15       On April 14, 2011, Ms. Golinski filed her Second Amended Complaint in which she

16   directly challenges the discrimination against her as a lesbian married to someone of the same

17   sex. (SAC at ¶ 1.) In her amended complaint, Ms. Golinski alleges an action for declaratory

18   and injunctive relief pursuant to 28 U.S.C. Sections 2201-2202 and Federal Rule of Civil

19   Procedure 57 and for review of an agency action pursuant to 5 U.S.C. Sections 701-706. (*Id.* at

20   ¶ 7.) By her amended complaint, Ms. Golinski seeks a determination that Section 3 of DOMA,

21   1 U.S.C. Section 7, as applied to her, violates the United States Constitution by refusing to

22   recognize lawful marriages for the purposes of application of the laws governing benefits for

23   federal employees. (*Id.*) Ms. Golinski alleges that as a result of the violation of the

24   Constitution, she has been denied, and will continue to be denied, legal protections and benefits

25   under federal law that would be available to her if she were a heterosexual with a opposite-sex

26   spouse. (*Id.*)

27       The majority of a five-member committee in Congress voted to defend DOMA and, on

28   May 4, 2011, BLAG sought to intervene in this matter. On June 3, 2011, this Court issued an

1    order granting BLAG's unopposed motion to intervene as a party-defendant for the limited

2    purpose of defending the constitutionality of Section 3 of DOMA.

3          On June 3, 2011, BLAG moved to dismiss the Second Amended Complaint on the basis

4    that Ms. Golinski fails to state a claim upon which relief may be granted because, as a matter of

5    law, Section 3 of DOMA does not violate her rights under the equal protection component of

6    the Due Process Clause of the Fifth Amendment. On the same date, the OPM moved to dismiss

7    Ms. Golinski's claim as set forth in the Second Amended Complaint only insofar as any claims

8    could reasonably be construed to assert a statutory claim as to the language of the Federal

9    Health Benefits Act of 1959. On July 1, 2011, Ms. Golinski moved for summary judgment. On

10   July 15, 2011, BLAG moved to strike extrinsic materials from the record on Ms. Golinski's

11   opposition to the motion to dismiss. The Court heard oral argument on the motions on

12   December 16, 2011.[1]

13          The Court shall address additional facts as necessary in the remainder of this order.

14                                    **ANALYSIS**

15   **A.     Legal Standards.**

16          **1.     Motion to Dismiss.**

17          A motion to dismiss is proper under Federal Rule of Civil Procedure 12(b)(6) where the

18   pleadings fail to state a claim upon which relief can be granted. The Court's "inquiry is limited

19   to the allegations in the complaint, which are accepted as true and construed in the light most

20   favorable to the plaintiff." *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008).

21   Federal Rule of Civil Procedure 8(a) requires only "a short and plain statement of the claim

22   showing that the pleader is entitled to relief." Even under Rule 8(a)'s liberal pleading standard,

23   "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more

24   than labels and conclusions, and a formulaic recitation of the elements of a cause of action will

25

26

27          [1] Initially, BLAG moved to strike several declarations submitted by Ms. Golinski in
     response to the motion to dismiss. However, as the Court decides the motion for summary
28   judgment and has therefore considered the full record, BLAG agreed to withdraw its motion
     to strike. The motion to strike is therefore DENIED as moot.

1    not do." *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 555 (2007) (citing *Papasan v.*

2    *Allain*, 478 U.S. 265, 286 (1986)).

3         Pursuant to *Twombly*, a plaintiff must not merely allege conduct that is conceivable but

4    must instead allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at

5    570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the

6    court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

7    *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at

8    556). "The plausibility standard is not akin to a probability requirement, but it asks for more

9    than a sheer possibility that a defendant has acted unlawfully. ... When a complaint pleads facts

10   that are merely consistent with a defendant's liability, it stops short of the line between

11   possibility and plausibility of entitlement to relief." *Id.* (quoting *Twombly*, 550 U.S. at 556-57)

12   (internal quotation marks omitted). If the allegations are insufficient to state a claim, a court

13   should grant leave to amend, unless amendment would be futile. *See, e.g., Reddy v. Litton*

14   *Industries, Inc.*, 912 F.2d 291, 296 (9th Cir. 1990); *Cook, Perkiss and Liehe, Inc. v. Northern*

15   *California Collection Service, Inc.*, 911 F.2d 242, 246-47 (9th Cir. 1990).

16        As a general rule, "a district court may not consider any material beyond the pleadings

17   in ruling on a Rule 12(b)(6) motion." *Branch v. Tunnell*, 14 F.3d 449, 453 (9th Cir. 1994),

18   *overruled on other grounds, Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002)

19   (citation omitted). The Court may consider the facts alleged in the complaint, documents

20   attached to the complaint, documents relied upon but not attached to the complaint, when the

21   authenticity of those documents is not questioned, and other matters of which the Court can take

22   judicial notice. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009).

23   Documents whose contents are alleged in a complaint and whose authenticity no party

24   questions, but which are not physically attached to the pleading, may be considered in ruling on

25   a Rule 12(b)(6) motion to dismiss. Such consideration does not convert the motion to dismiss

26   into a motion for summary judgment. *See United States v. Ritchie*, 343 F.3d 903, 908 (9th Cir.

27   2003); *Branch*, 14 F.3d at 454.

28

**United States District Court**
For the Northern District of California

2. **Motion for Summary Judgment.**

A motion for summary judgment is guided by a different standard. Summary judgment is appropriate when the record demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if there is sufficient evidence for a reasonable fact finder to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). "[A]t the summary judgment stage the judge's function is not ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. A fact is "material" if it may affect the outcome of the case. *Id.* at 248. The party moving for summary judgment bears the initial responsibility of identifying those portions of the record which demonstrate the absence of a genuine issue of a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In the absence of such facts, "the moving party is entitled to a judgment as a matter of law." *Celotex,* 477 U.S. at 323.

Once the moving party meets this initial burden, the non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). If the non-moving party fails to make this showing, the moving party is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 323.

**B.    Defense of Marriage Act.**

This action presents a challenge to the constitutionality of Section 3 of DOMA as applied to Ms. Golinski, a lesbian woman married under California law, who is unable to secure federal health benefits for her same-sex spouse. Specifically, Ms. Golinski alleges that, by operation of Section 3 of DOMA, she has been denied certain marriage-based federal benefits that are available to similarly-situated opposite-sex couples, in violation of her rights to equal protection and due process as secured by the Due Process Clause of the Fifth Amendment.

8

In 1996, Congress enacted and President Clinton signed DOMA into law. Section 3 of DOMA, the only provision at issue in this matter, defines the terms "marriage" and "spouse" for purposes of federal law. Section 3 provides:

> In determining the meaning of any Act of Congress, or of any ruling, regulation, or interpretation of the various administrative bureaus and agencies of the United States, the word "marriage" means only a legal union between one man and one woman as husband and wife, and the word "spouse" refers only to a person of the opposite sex who is a husband or a wife.

1 U.S.C. § 7.

In large part, the enactment of DOMA can be understood as a direct legislative response to *Baehr v. Lewin*, a 1993 decision issued by the Hawaii Supreme Court, which indicated that same-sex couples may be entitled to marry under that state's constitution. 74 Haw. 530 (1993). The decision raised the possibility that, for the first time, same-sex couples could begin the process of obtaining state-sanctioned marriage licenses.

In debating the provisions of DOMA, the House referenced the *Baehr* decision as the beginning of an "orchestrated assault being waged against traditional heterosexual marriage" and expressed concern that the development "threaten[ed] to have very real consequences ... on federal law." H.R. Rep. No. 104-664 at 2-3 (1996), *reprinted in* 1996 U.S.C.C.A.N. 2905, 2906-07 ("H. Rep." or "House Report"). More specifically, the House Report warned that "a redefinition of marriage in Hawaii to include homosexual couples could make such couples eligible for a whole range of federal rights and benefits." *Id.* at 10. Although a later amendment to the Hawaii constitution withheld permitting same-sex marriage in the state, Congress, explicitly in reaction to the impending Hawaii decision, sought a means both (1) to "reserve[] each State's ability to decide" what should legally constitute a valid marriage under its own state laws, and (2) to "lay[] down clear rules" regarding what constitutes a marriage for purposes of federal law. *Id.* at 2.

In Section 2 of DOMA, Congress, by virtue of the express grant of authority under the second sentence of the Full Faith and Credit Clause, permitted a state to decline to give effect to the laws of other states respecting same-sex marriage. In enacting Section 3 of DOMA, the House Report explained that the statute codifies the definition of marriage set forth in "the

9

1  standard law dictionary," for purposes of federal law. *Id.* at 29 (citing Black's Law Dictionary

2  972 (6th ed. 1990)).

3        The legislative history reveals that Congress acknowledged the constraints imposed by

4  federalism on the determination of who may marry, which has always been uniquely the

5  province of state law. Nonetheless, Congress asserted that it was not "supportive of (or even

6  indifferent to) the notion of same-sex marriage," and it embraced DOMA as a step toward

7  furthering Congress' interests in "defend[ing] the institution of traditional heterosexual

8  marriage." *Id.* at 12. "Although DOMA drastically amended the eligibility criteria for a vast

9  number of different federal benefits, rights, and privileges that depend upon marital status, the

10 relevant committees did not engage in a meaningful examination of the scope or effect of the

11 law." *Gill v. Office of Personnel Management*, 699 F. Supp. 2d 374, 379 (D. Mass. 2010).[2]

12 Although drastically altering the benefits structure based on state definitions of marriage and

13 the federalist balance in the area of domestic relations, Congress did not hear testimony from

14 agency heads about the effect of DOMA on federal programs, or from historians, economists, or

15 specialists in family or child welfare. *Id.*

16        It is clear and undisputed that the federal health benefits Ms. Golinski seeks in trying to

17 add her wife as a beneficiary under her health benefits plan falls under the reach of DOMA.

18 The Federal Employees Health Benefits Program ("FEHB") is a comprehensive program

19 providing health insurance for federal civilian employees and their family members. 5 U.S.C. §

20 8905. The OPM administers the FEHB and negotiates contracts for coverage with potential

21 carriers and sets the premiums for each plan. *Id.*, §§ 8902, 8903, 8906. A federal employee

22 enrolled in the FEHB chooses a carrier and plan and may determine whether to enroll for an

23 individual plan, named "self only," or for "self and family" coverage which, under the OPM's

24 regulations, "includes all family members who are eligible to be covered by the enrollment." 5

25 C.F.R. § 890.302(a)(1). Under the FEHB, a "member of family" is defined as either "the

26

27        [2] In January 1997, the General Accounting Office issued a report clarifying the
scope of DOMA's effect and concluded that the law implicated at least 1,049 federal laws,
including those related to entitlement programs like Social Security, health benefits and

28 taxation. A further study in 2004 found that 1,138 federal laws tied benefits, protections,
rights, or responsibilities to marital status. *See Gill*, 699 F. Supp. 2d at 379.

United States District Court
For the Northern District of California

1  spouse of an employee ... [or] an unmarried dependent child under 22 years of age." 5 U.S.C. §

2  8901(5).  An employee enrolled under an individual plan may change to family coverage by

3  submitting documentation to the employing office during the annual open season period or

4  within sixty days of a change in family status, such as change in marital status. *Id.*, § 8905(f); 5

5  C.F.R. §§ 890.301(f), (g).

6       Within sixty days of her marriage, Ms. Golinski sought to enroll her wife as a

7  beneficiary of the family health plan.  The OPM found Ms. Cunninghis was ineligible to qualify

8  as a member of the family because, under DOMA, she did not qualify as a spouse of an

9  employee.[3]  The question before the Court is whether Section 3 of DOMA, as applied to Ms.

10  Golinski, violates constitutional principles of equal protection.

11  **C.**    **Equal Protection Analysis and Standard of Review.**

12       The "Equal Protection Clause of the Fourteenth Amendment commands that no State

13  shall deny to any person within its jurisdiction the equal protection of the laws, which is

14  essentially a direction that all persons similarly situated should be treated alike." *City of*

15  *Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985) (internal citations omitted).

16  Although the Fifth Amendment to the United States Constitution does not contain an Equal

17  Protection Clause, the Fifth Amendment's Due Process Clause includes an equal protection

18  component. *See Bolling v. Sharpe*, 347 U.S. 497, 499-500 (1954); *see also Buckley v. Valeo*,

19

20      [3] At the administrative appeal from the denial of benefits, Chief Judge Kozinski
found that the FEHB statute confers on the OPM the discretion to extend health benefits to

21  same-sex couples by interpreting the terms "family members" and "member of the family" to
set a floor, not a ceiling, to coverage eligibility. (SAC, Ex. B at 2-3.)  The Court finds this

22  reasoning unpersuasive.

23      Where the statute unambiguously defines a term such as "member of family" to mean
spouse (or dependent child under 22 years old), that definition controls to the exclusion of

24  any meaning that is not explicitly stated in the definition. *See Colautti v. Franklin*, 439 U.S.
379, 393 n.10 (1979); *see also TRW Inc. v. Andrews*, 534 U.S. 19, 28-29 (2001) (holding

25  that, for purposes of statutory construction, expression of one thing is the exclusion of the
other).  DOMA offers the same clarity and defines "spouse" for the purposes of determining

26  the meaning of federal legislation as "a person of the opposite sex who is a husband or a
wife." 1 U.S.C. § 7.  Confronted with such unambiguous statutory language, the Court is not

27  persuaded that the FEHB statute could provide the OPM with the discretion to provide health
benefits to same-sex couples. *See In re Levenson*, 587 F.3d 925, 930-31 (9th Cir. 2009);

28  *Gill*, 699 F. Supp. 2d at 385-86.  This disposes of Ms. Golinski's remaining statutory claim
and the OPM's motion to dismiss that claim, to the extent it is still asserted, is GRANTED.

11

1    424 U.S. 1, 93 (1976) ("Equal protection analysis in the Fifth Amendment area is the same as

2    that under the Fourteenth Amendment.").

3        "[T]he Constitution 'neither knows nor tolerates classes among citizens.'" *Romer v.*

4    *Evans*, 517 U.S. 620, 623 (1996) (quoting *Plessy v. Ferguson*, 163 U.S. 537, 559 (1896)

5    (Harlan, J., dissenting)). This principle embodies a commitment to neutrality where the rights

6    of individual persons are at stake. *Dragovich v. United States Department of the Treasury*, 764

7    F. Supp. 2d 1178, 1188 (N.D. Cal. 2011) (citing *Romer*, 517 U.S. at 623.) It is because of this

8    commitment to neutrality that legislative provisions which arbitrarily or irrationally create

9    discrete classes cannot withstand constitutional scrutiny. *Romer*, 517 U.S. at 623. "Equal

10   protection of the laws is not achieved through indiscriminate imposition of inequalities."

11   *Sweatt v. Painter*, 339 U.S. 629, 635 (1950) (quoting *Shelley v. Kraemer*, 334 U.S. 1, 22

12   (1948)). "The guaranty of 'equal protection of the laws is a pledge of the protection of equal

13   laws.'" *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541 (1942) (quoting *Yick Wo v.*

14   *Hopkins*, 118 U.S. 356, 369 (1886)).

15       However, courts must balance this mandate with the "practical necessity that most

16   legislation classifies for one purpose or another, with resulting disadvantage to various groups

17   or persons." *Romer*, 517 U.S. at 631 (citations omitted). The equal protection guarantee

18   preserves a measure of power to the state and the federal government to enact legislation that

19   classifies certain groups. *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256,

20   271-72 (1979). In an attempt to reconcile the promise of equal protection with the reality of

21   lawmaking, courts apply the most searching constitutional scrutiny to those laws that burden a

22   fundamental right or target a suspect class, such as those based on race, national origin, sex or

23   religion. *Romer*, 517 U.S. at 631. To these groups of protected classifications, subject to a

24   heightened scrutiny, the government is required to demonstrate that the classification is

25   substantially related to an important governmental objective. *See Clark v. Jeter*, 486 U.S. 456,

26   461 (1988). Laws that do not burden a protected class or infringe on a constitutionally

27   protected fundamental right are subject to rational basis review. *Romer*, 517 U.S. at 631.

28   Under the rational basis review, a law must be rationally related to the furtherance of a

**United States District Court**
For the Northern District of California

1   legitimate governmental interest. *Id.* (citing *Heller v. Doe by Doe*, 509 U.S. 312, 319-320

2   (1993)).

3         In resolving an equal protection challenge, the Court "must first determine what

4   classification has been created" by the legislation. *Aleman v. Glickman*, 217 F.3d 1191, 1195

5   (9th Cir. 2000); *see also Lazy Y Ranch*, 546 F.3d at 589. The plaintiff must show that the "law

6   is applied in a discriminatory manner or imposes different burdens on different classes of

7   people." *Lazy Y Ranch*, 546 F.3d at 589 (quoting *Freeman v. City of Santa Ana*, 68 F.3d 1180,

8   1187 (9th Cir. 1995)). The Court must then ascertain the appropriate level of scrutiny to

9   employ. *In re Kandu*, 315 B.R. 123, 142 (W.D. Wash. 2004).[4]

10        **1.    Level of Scrutiny.**

11        Here, DOMA makes distinctions between legally married couples, by granting benefits

12   to opposite-sex married couples but denying benefits to same-sex married couples.

13   Accordingly, DOMA treats gay and lesbian individuals differently on the basis of their sexual

14   orientation. In order to determine whether sexual orientation is considered a suspect or quasi-

15   suspect class entitled to heightened scrutiny, the Court must look at various factors.[5] The

16   ───────────────────────

17        [4] Ms. Golinski challenges the application of DOMA because it discriminates both on
18   the basis of sex and on the basis of sexual orientation. (Golinski Reply on Motion for
     Summary Judgment at 7-8.) Sexual orientation discrimination can take the form of sex
19   discrimination. *See Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 996 (N.D. Cal. 2010)
     ("*Perry*"). Here, for example, Ms. Golinski is prohibited from marrying Ms. Cunninghis, a
20   woman, because Ms. Golinski is a woman. If Ms. Golinski were a man, DOMA would not
     serve to withhold benefits from her. Thus, DOMA operates to restrict Ms. Golinski's access
21   to federal benefits because of her sex. But DOMA also operates to restrict Ms. Golinski's
     access to federal benefits because of her sexual orientation; her desire to marry another
22   woman arises only because she is a lesbian. Accordingly, the Court addresses the Equal
     Protection challenge on the basis of sexual orientation.

23        [5] The question of whether DOMA impacts a fundamental right is addressed briefly by
24   the parties but it is not at issue here as it is undisputed that Ms. Golinski is already married
     under state law. The failure of the federal government to recognize Ms. Golinski's marriage
25   and to provide benefits does not alter the fact that she is married under state law. Thus,
     *Baker v. Nelson*, 409 U.S. 810 (1972), which ostensibly addressed whether same-sex couples
26   have a constitutional right to marry, is irrelevant here. *See Perry v. Brown*, --- F.3d ---, 2012
     WL 372713, at *17 n.14 (9th Cir. 2012) ("*Perry II*").

27        However, it is established that there is a fundamental right to marry. *Planned
28   Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 851 (1992) ("Our law
     affords constitutional protection to personal decisions relating to marriage, procreation,
     contraception, family relationships, child rearing, and education.... These matters, involving

1   Supreme Court has considered: (1) the history of invidious discrimination against the class

2   burdened by the legislation; (2) whether the characteristics that distinguish the class indicate a

3   typical class member's ability to contribute to society; (3) whether the distinguishing

4   characteristics are "immutable" or beyond the class members' control; and (4) the political

5   power of the subject class. *See Varnum v. Brien*, 763 N.W.2d 862, 887-88 (Iowa 2009)

6   (collecting cases).

7        No single factor for determining elevated scrutiny is dispositive. *See Massachusetts*

8   *Board of Retirement v. Murgia*, 427 U.S. 307, 321 (1976). The presence of any of the factors is

9   a signal that the particular classification is "more likely than others to reflect deep-seated

10  prejudice rather than legislative rationality in pursuit of some legitimate objective," thus

11  requiring heightened scrutiny. *Plyler v. Doe*, 457 U.S. 202, 216 n.14 (1982). The Supreme

12  Court has placed far greater weight on two factors:

13          whether the group has been the subject of long-standing and invidious
            discrimination and whether the group's distinguishing characteristic bears no
14          relation to the ability of the group members to perform or function in society. In
            circumstances in which a group has been subject to such discrimination and its
15          distinguishing characteristic does not bear any relation to such ability, the court
            inevitably has employed heightened scrutiny in reviewing statutory classifications
16          targeting those groups.

17  *Kerrigan v. Commissioner of Public Health*, 289 Conn. 135, 167-68 (2008).

18

19  _____

20  the most intimate and personal choices a person may make in a lifetime, choices central to
    personal dignity and autonomy, are central to the liberty protected by the Fourteenth
21  Amendment.") (citations omitted); *Turner v. Safley*, 482 U.S. 78, 95 (1987) ("[T]he decision
    to marry is a fundamental right."); *Zablocki v. Redhail*, 434 U.S. 374, 384 (1978) ("[T]he
22  right to marry is of fundamental importance for all individuals."); *Loving v. Virginia*, 388
    U.S. 1, 12 (1967) ("The freedom to marry has long been recognized as one of the vital
23  personal rights essential to the orderly pursuit of happiness by free men."); *Griswold v.*
    *Connecticut*, 381 U.S. 479, 486 (1965) ("Marriage is a coming together for better or for
24  worse, hopefully enduring, and intimate to the degree of being sacred. It is an association
    that promotes a way of life, not causes; a harmony in living, not political faiths; a bilateral
25  loyalty, not commercial or social projects.").

26       The analysis of the fundamental right to marry has not depended upon the
    characteristics of the spouse. The Supreme Court cases addressing the fundamental right to
27  marry do not define the fundamental right in narrow terms. In *Loving*, the Court defined the
    fundamental right as the right to marry, not the right to interracial marriage. 388 U.S. at 12.
28  In *Turner*, the fundamental right was the right to marry, not the right to inmate marriage.
    482 U.S. at 94-96. In *Zablocki*, the fundamental right was the right to marry, not the right of
    people owing child support to marry. 434 U.S. at 383-86.

14

**United States District Court**

For the Northern District of California

1    **2.    Distinguishing *High Tech Gays* Finding on Standard of Review.**

2    Before the Court may assess the various factors that apply to determine the appropriate

3    level of scrutiny to apply in this matter, the Court must address the holding in *High Tech Gays*

4    *v. Defense Industrial Security Clearance Office*, which addresses the standard of review for

5    classifications based on sexual orientation.  895 F.2d 563, 571 (9th Cir. 1990).  In *HighTech*

6    *Gays*, decided before the Supreme Court revised much of the underlying legal preconceptions

7    upon which this case rests, the Ninth Circuit determined that the classification of homosexuals

8    lacks the indicia of a suspect or quasi-suspect category.  Accordingly, the Ninth Circuit held

9    that the government need only come forth with a rational basis to sustain its classifications

10   against the gay and lesbian minority.  *Id.*

11   However, the foundations of the Ninth Circuit's decision in *High Tech Gays* have

12   sustained serious erosion by virtue of more recent decisions by the Supreme Court.  When the

13   premise for a case's holding has been weakened, the precedential import of the case is subject to

14   question.  District courts are not governed by earlier appellate precedent that has been "undercut

15   by higher authority to such an extent that it has been effectively overruled by such higher

16   authority."  *Miller v. Gammie*, 335 F.3d 889, 899 (9th Cir. 2003).

17   The linchpin of the reasoning in *High Tech Gays* was the precedent set by the Supreme

18   Court in *Bowers v. Hardwick*, 478 U.S. 186, 190 (1986), which upheld the criminalization of

19   private consensual homosexual conduct.  In *High Tech Gays*, the Ninth Circuit concluded that,

20   based on the holding in *Bowers*, "because homosexual conduct can ... be criminalized,

21   homosexuals cannot constitute a suspect or quasi-suspect class entitled to greater than rational

22   basis review for equal protection purposes."  *High Tech Gays*, 895 F.2d at 571.  Pursuant to

23   Supreme Court precedent in *Bowers*, the Ninth Circuit agreed that "it cannot logically be

24   asserted that discrimination against homosexuals is constitutionally infirm."  *Id.* at 571 n.6

25   (quoting *Woodward v. United States*, 871 F.2d 1068, 1076 (Fed. Cir. 1989)).  The court

26   concluded that, under the holding of *Bowers*, it would be anomalous to define the conduct of

27   members of a class as criminal and also find that, as a class, they were deserving of strict or

28

United States District Court
For the Northern District of California

15

1    heightened scrutiny under the Equal Protection Clause. *See id.* (citing *Padula v. Webster*, 822

2    F.2d 97, 103 (D.C. Cir. 1987)).

3           However, since the decision in *High Tech Gays*, the Supreme Court has overruled

4    *Bowers*, renounced its fundamental premise, and found that "*Bowers* was not correct when it

5    was decided, and it is not correct today." *Lawrence v. Texas*, 539 U.S. 558, 578 (2003).  The

6    *Lawrence* Court found that majority's moral condemnation of the intimate practices of

7    homosexual partners does not justify criminal prohibition and found those private consensual

8    practices are safeguarded by the liberty protections afforded by the Due Process Clause of the

9    Fourteenth Amendment.  *Id.* at 574-75.  Therefore, the reasoning in *High Tech Gays*, that laws

10   discriminating against gay men and lesbians are not entitled to heightened scrutiny because

11   homosexual conduct may be legitimately criminalized, cannot stand post-*Lawrence*.

12          In addition, the court in *High Tech Gays*, in performing the analysis of the issue of

13   whether the legislature's classification based on homosexuality calls for heightened scrutiny,

14   relied on the mistaken assumption that sexual orientation is merely "behavioral," rather than the

15   sort of deeply rooted, immutable characteristic that warrants heightened protection from

16   discrimination.  *See High Tech Gays*, 895 F.2d at 573-74.  The court found that

17   "[h]omosexuality is not an immutable characteristic; it is behavioral and hence fundamentally

18   different from traits such as race, gender, or alienage, which define already existing suspect and

19   quasi-suspect classes.  The behavior of such already recognized classes is irrelevant to their

20   identification." *Id.* (internal citations omitted).  The Supreme Court has since rejected this

21   artificial distinction, noting that its more recent precedent "have declined to distinguish between

22   status and conduct in th[e] context" of sexual orientation.  *See Christian Legal Society v.*

23   *Martinez*, 130 S. Ct. 2971, 2990 (2010).  In *Lawrence*, the Court noted that "[w]hen

24   homosexual *conduct* is made criminal by the law of the State, that declaration in and of itself is

25   an invitation to subject homosexual *persons* to discrimination." 539 U.S. at 575 (emphasis

26   added); *id.* at 583 (O'Connor, J., concurring in judgment) ("While it is true that the law applies

27   only to conduct, the conduct targeted by this law is conduct that is closely correlated with being

28   homosexual.  Under such circumstances, [the] law is targeted at more than conduct.  It is instead

**United States District Court**
For the Northern District of California

16

1  directed toward gay persons as a class.").  Accordingly, the analysis of the Ninth Circuit in

2  *High Tech Gays* on the appropriateness of applying heightened scrutiny to gay men and lesbians

3  because their defining characteristic is immutable has been severely undermined by more recent

4  and overriding precedent.

5       The Court finds that the outdated holding in *High Tech Gays*, subjecting gay men and

6  lesbians to rational basis review, is no longer a binding precedent.  *See Miller*, 335 F.3d at 900

7  (finding that where an intervening decision of a higher court is clearly irreconcilable with a

8  Ninth Circuit decision, "district courts should consider themselves bound by the intervening

9  higher authority and reject the prior opinion of [the Ninth Circuit] as having been effectively

10  overruled.").

11       **3.    The Question of Level of Scrutiny is Still Open.**

12       The Supreme Court and the Ninth Circuit have yet to issue binding rulings as to whether

13  classifications based on sexual orientation are suspect (or quasi-suspect).  *See Romer*, 517 U.S.

14  at 620, 632-33 (finding that it was unnecessary to look beyond rational basis review because the

15  state's attempt to strip gay people of all anti-discrimination protections was "a denial of equal

16  protection in the most literal sense" and because it "confound[ed] and defie[d]" rational basis

17  review."); *see also, e.g., Diaz v. Brewer*, 656 F.3d 1008, 1012 (9th Cir. 2011) ("We do not need

18  to decide whether heightened scrutiny might be required."); *In re Levenson*, 587 F.3d at 931

19  (finding that although it is "likely that some form of heightened constitutional scrutiny applies

20  ... [, because] the denial of benefits here cannot survive even rational basis review, the least

21  searching form of constitutional scrutiny ... it is not necessary to determine whether or which

22  form of heightened scrutiny is applicable to this claim."); *Perry II*, 2012 WL 372713, at *17

23  (finding that, as in *Romer*, the court need not apply heightened scrutiny where the proposed

24  legislation fails rational basis scrutiny); *Dragovich*, 764 F. Supp. 2d at 1189 ("Because the

25  Court finds that Plaintiffs state a claim under the rational basis standard, the question of whether

26  Plaintiffs are members of a protected class need not be resolved here.").  The majority of the

27  Supreme Court in *Lawrence*, although it declared unconstitutional the laws infringing on the

28  substantive liberty shared by gay people to engage in sexual intimacy, did not directly address

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    what standard of review applies to the classification of gay and lesbian individuals. *Lawrence*,

2    539 U.S. at 558. And the Ninth Circuit in *Witt v. Department of Air Force* merely found, in the

3    context of military policy where judicial deference "is at its apogee," that the military's policy

4    of "Don't Ask Don't Tell" would fail even rational basis review. 527 F.3d 806, 821 (9th Cir.

5    2008).

6        Because *Lawrence* overturned *Bowers* and in light of the lack of precedential value of

7    *High Tech Gays*, no federal appellate court has meaningfully examined the appropriate level of

8    scrutiny to apply to gay men and lesbians. Therefore, the Court finds the question of what level

9    of scrutiny applies to classifications based on sexual orientation is still open.

10       **4.    Heightened Scrutiny Should Apply.**

11       The Court undertakes to analyze the factors required to demonstrate whether a particular

12   class is entitled to suspect or quasi-suspect status and therefore deserving of heightened

13   scrutiny.

14       **a.    History of discrimination against gay men and lesbians.**

15       The first factor courts consider is whether the class has suffered a history of

16   discrimination. There is no dispute in the record that lesbians and gay men have experienced a

17   long history of discrimination. (*See* Declaration of George Chauncey at ¶¶ 6-103; OPM Opp.

18   Br. at 6-13.) There is also no dispute that courts have found that gay men and lesbians have

19   experienced a history of discrimination. *See, e.g., High Tech Gays*, 895 F.2d at 573

20   (acknowledging that "homosexuals have suffered a history of discrimination"); *Witt*, 527 F.3d

21   at 824-25 (noting that homosexuals have "experienced a history of purposeful unequal

22   treatment"); *Perry v. Proposition 8 Official Proponents*, 587 F.3d 947, 954 (9th Cir. 2009)

23   (addressing the difficulty in denying that gay men and lesbians have experienced discrimination

24   in the past in light of the Ninth Circuit's ruling in *High Tech Gays*); *Perry*, 704 F. Supp. 2d at

25   981-82 (acknowledging extensive evidence of public and private discrimination against gay

26   men and lesbians in California and throughout the United States); *see also In re Balas*, 449 B.R.

27   567, 576 (Bankr. C.D. Cal. 2011) (same).

28

United States District Court
For the Northern District of California

**b.      Ability to contribute to society.**

Similarly, there is no dispute in the record or the law that sexual orientation has no relevance to a person's ability to contribute to society. *See Watkins v. U.S. Army*, 875 F.2d 699, 725 (9th Cir. 1989) ("Sexual orientation plainly has no relevance to a person's ability to perform or contribute to society.") (internal quotation marks omitted); *Perry*, 704 F. Supp. 2d at 1002 (concluding that "by every available metric, opposite-sex couples are not better than their same-sex counterparts; instead, as partners, parents and citizens, opposite-sex couples and same-sex couples are equal.").

**c.      Defining or immutable characteristics.**

Another consideration courts find relevant in determining whether statutory provisions pertaining to a particular group are subject to heightened scrutiny includes whether the characteristic that defines the members of the class as a discrete group is immutable or otherwise not within the members' control. *See Lyng v. Castillo*, 477 U.S. 635, 638 (1986).

Ms. Golinski presents evidence that the characteristic of sexual orientation is immutable or highly resistant to change. (*See* Declaration of Lisa Diamond at ¶¶ 10, 13; Declaration of Letitia Anne Peplau at ¶¶ 21, 26; Rita Lin Reply Declaration ("Lin Reply Decl."), Ex. G.) Further, the consensus in the scientific community is that sexual orientation is an immutable characteristic. *See, e.g.,* G.M. Herek, et al. *Demographic, Psychological, and Social Characteristics of Self-Identified Lesbian, Gay, and Bisexual Adults*, 7, 176-200 (2010) (noting that in a national survey, 95 percent of gay men and 83 percent of lesbian women reported that they experienced "no choice at all" or "very little choice" about their sexual orientation); *see also Perry*, 704 F. Supp. 2d at 966 ("No credible evidence supports a finding that an individual may, through conscious decision, therapeutic intervention or any other method, change his or her sexual orientation.")

BLAG presents evidence demonstrating that there is some fluidity on the continuum of sexuality for some individuals who identify themselves as gay or lesbian. (*See* Declaration of Conor B. Dugan ("Dugan Decl."), Ex. B at 36:14-38, Ex. 4, Ex. E at 320.) The evidence indicates that a very small minority of the gay and lesbian population may experience a small

United States District Court

For the Northern District of California

1  amount of choice in their sexuality. (*Id.*) However, the vast majority of those who self-reported

2  as gay or lesbian did not experience attraction to the opposite sex at any time. (*See* Further

3  Declaration of Letitia Anne Peplau at ¶ 6 ("data show that only 1/2 of 1% of the male

4  participants and 1.3% of the female participants shifted from only opposite sex attraction to

5  major attraction to the same sex or vice versa.")).

6       However, regardless of the evidence that a tiny percentage of gay men or lesbians may

7  experience some flexibility along the continuum of their sexuality or the scientific consensus

8  that sexual orientation is unchangeable, the Court finds persuasive the holding in the Ninth

9  Circuit that sexual orientation is recognized as a defining and immutable characteristic because

10  it is so fundamental to one's identity. "Sexual orientation and sexual identity are immutable;

11  they are so fundamental to one's identity that a person should not be required to abandon them."

12  *Hernandez-Montiel v. Immigration and Naturalization Service*, 225 F.3d 1084, 1093 (9th Cir.

13  2000), *overruled in part on other grounds by Thomas v. Gonzales*, 409 F.3d 1177 (9th Cir.

14  2005); *see also Karouni v. Gonzales*, 399 F.3d 1163, 1173 (9th Cir. 2005) (agreeing with

15  *Hernandez-Montiel* and finding that homosexuality is "a fundamental aspect of ... human

16  identity"); *Watkins*, 875 F.2d at 726 (Norris, J., concurring) (finding that the prong of

17  suspectness inquiry is satisfied when the identifying trait is "so central to a person's identity

18  that it would be abhorrent for government to penalize a person for refusing to change [it]"); *In*

19  *re Marriage Cases*, 43 Cal.4th 757, 842 (2008) ("Because a person's sexual orientation is so

20  integral an aspect of one's identity, it is not appropriate to require a person to repudiate or

21  change his or her sexual orientation in order to avoid discriminatory treatment.") The Court

22  finds that a person's sexual orientation is so fundamental to one's identity that a person should

23  not be required to abandon it. Therefore, this factor weighs in favor of the application of

24  heightened scrutiny.[6]

25

26       [6] In addition, immutability is not an absolute prerequisite to heightened scrutiny. The
Supreme Court has granted suspect class status to groups whose distinguishing characteristic
27  is not immutable. *See, e.g., Nyquist v. Mauclet*, 432 U.S. 1, 9 n.11 (1977) (rejecting
immutability requirements in treating group of resident aliens as suspect class despite their
28  ability to opt out of class voluntarily); *see also Miller v. Albright*, 523 U.S. 420, 431 (1998)
(recognizing that because a child born out of wedlock may be "legitimated" by father, strictly

United States District Court
For the Northern District of California

1

**d.      Minority status and political powerlessness.**

2      The final consideration employed by courts to determine whether a subject group

3  deserves heightened constitutional scrutiny is whether the subject group is "a minority or

4  politically powerless." *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987); *see also San Antonio*

5  *Independent School District v. Rodriguez*, 411 U.S. 1, 28 (1973) (concluding that a class

6  comprising poor families exhibits none of the "traditional indicia of suspectness" because class

7  is not "saddled with such disabilities, or subjected to such a history of purposeful unequal

8  treatment, or relegated to such a position of political powerlessness as to command

9  extraordinary protection from the majoritarian political process.")  This factor examines relative

10  political power and seeks to answer the question whether the "discrimination is unlikely to be

11  soon rectified by legislative means." *City of Cleburne*, 473 U.S. at 440.[7]

12      There is no dispute in the record that gay men and lesbians are a minority of the

13  population in the United States. (*See* Dugan Decl., Ex. A at 13:12-14, Ex. B at 19:2-7.)  The

14  only issue is whether the minority is politically vulnerable or lacking in power.  The Court has

15  reviewed the evidence submitted by the parties for consideration on this factor.

16      BLAG argues that the current Administration's reversal of position with regard to

17  defending DOMA in various courts nationwide is evidence that gay and lesbian individuals

18  have achieved political power.  BLAG contends that the decision followed President Obama's

19  receipt of a letter from the Human Rights Campaign seeking to change the Administration's

20  position. (BLAG Opp. Br. at 12.)  However, this contention is not supported by the evidence in

21  _____

22  speaking illegitimacy is not an immutable characteristic); *see also New Orleans v. Dukes*,
427 U.S. 297, 303 (1976) (per curiam) (finding religious identification and alienage, despite
23  being changeable, to constitute suspect classes).

24      [7] In *High Tech Gays*, the Ninth Circuit briefly addressed the factor of political
powerlessness: "legislatures have addressed and continue to address the discrimination
25  suffered by homosexuals on account of their sexual orientation through the passage of anti-
discrimination legislation.  Thus, homosexuals are not without political power; they have the
26  ability to and do 'attract the attention of lawmakers,' as evidenced by such legislation."  895
F.2d at 574 (citing *City of Cleburne*, 473 U.S. at 445).  However, the very circumstance of
27  gay men and lesbians being required to defend their interests against legislative action is a
reflection of relative political weakness. (Declaration of Gary Segura ("Segura Decl.") at ¶
28  14.)  In addition, the standard is not whether a minority group is entirely powerless, but
rather whether they suffer from relative political weakness. *See Rodriguez*, 411 U.S. at 28;
*City of Cleburne*, 473 U.S. at 445.

United States District Court

For the Northern District of California

1   the record.  First, this letter was sent nearly two years prior to the announcement of the

2   Administration's current opinion.  (Lin Reply Decl., Ex. H at 166:16-167:13.)  Second, the

3   Department of Justice functions under an independent obligation to assess the constitutionality

4   of a statute it has been tasked to defend.  By its own terms, the announcement by the

5   Department of Justice was based not on a political calculation, but rather was an independent

6   assessment of the constitutionality of DOMA.  (*See* NSA, Ex. 1 at 1-2.)  The contention that a

7   two-year-old letter from a gay rights advocacy group was the pivotal consideration in the

8   Administration's reassessment of the law or that it demonstrates that gay men and lesbians have

9   political power is speculative at best.

10          BLAG also argues that a "spate of recent news stories only confirms the conclusion that

11   homosexuals are far from politically powerless."  (BLAG Opp. Br. at 12.)  BLAG lists the

12   nomination of four openly-gay judges, the laws in several states legalizing gay marriage, and

13   the campaign against Proposition 8 in California which garnered significant funding from

14   proponents of same-sex marriage.  (*Id.* at 12-15.)

15          The recent articles BLAG cites are exceptions and not the rule.  While President Obama

16   nominated four openly-gay judges, there are literally hundreds of federal judges nationwide.

17   Only a handful of states have successfully passed legislation legalizing same-sex marriage, and

18   only a few more have been required to afford equal marital rights to gay and lesbian individuals

19   through judicial decisions.  Thirty states have passed constitutional amendments banning same-

20   sex marriage.  (*See* OPM Opp. Br. at 15, citing National Conference of State Legislatures,

21   *Same-Sex Marriage, Civil Unions and Domestic Partnerships, available*

22   *at* http://www.ncsl.org/default.aspx?tabid_16430 (last updated February 13, 2012)).  In contrast,

23   when the Supreme Court ruled in *Loving*, interracial marriage was legal in thirty-four states.

24   *See Loving*, 388 U.S. at 6.  Moreover, there is no federal anti-discrimination legislation and no

25   protection in most states from sexual orientation discrimination.  (*See* OPM Opp. Br. at 6-12.)

26   Finally, while the campaign against Proposition 8 may have raised significant funds, the

27   majority of Californians still voted to alter the state constitution to strip gay and lesbian

28

1    individuals of their rights.  Placed in context, BLAG's evidence does not create a question of

2    fact.

3           Despite the modest successes in remediating existing discrimination, the record

4    demonstrates that gay men and lesbians continue to suffer discrimination "unlikely to be

5    rectified by legislative means." *City of Cleburne*, 473 U.S. at 440.  Even BLAG, in similar

6    litigation, has admitted that "gay men and lesbians often must rely on judicial decisions to

7    secure equal rights." (Lin Reply Decl., Exs. C and D at ¶ 32.)  Ms. Golinski proffers the

8    undisputed and extensive expert testimony of Gary Segura for the proposition that gay men and

9    lesbians lack a meaningful degree of political power. (*See* Segura Decl. at ¶¶ 9-85.)  In sum, the

10   basic inability to bring about an end to discrimination and pervasive prejudice, to secure desired

11   policy outcomes and to prevent undesirable outcomes on fundamental matters that directly

12   impact their lives, is evidence of the relative political powerlessness of gay and lesbian

13   individuals. (*Id.* at ¶ 28.)

14          Ms. Golinski also proffers the letter from the Attorney General to Congress regarding

15   DOMA and the Department of Justice's determination that it would no longer provide a defense

16   of a statute which it considered to be unconstitutional. (*See* NSA, Ex. 2.)  In the letter, the

17   Attorney General, speaking on behalf of the Executive, notes that "the adoption of the laws like

18   those at issue in *Romer* and *Lawrence*, the longstanding ban on gay men and lesbians in the

19   military, and the absence of federal protection for employment discrimination on the basis of

20   sexual orientation show the group to have limited political power and 'ability to attract the

21   [favorable] attention of the lawmakers.'" (*Id.* at 2, citing *City of Cleburne*, 473 U.S. at 445.)

22          The Court finds that the unequivocal evidence demonstrates that, although not

23   completely politically powerless, the gay and lesbian community lacks meaningful political

24   power.  In 1985, in their dissent from a petition for writ of certiorari, Justices Brennan and

25   Marshall found that "homosexuals constitute a significant and insular minority of this country's

26   population.  Because of the immediate and severe opprobrium often manifested against

27   homosexuals once so identified publicly, members of this group are particularly powerless to

28   pursue their rights openly in the political arena." *Rowland v. Mad River Local School District*,

United States District Court

For the Northern District of California

23

United States District Court

For the Northern District of California

1  470 U.S. 1009, 1014 (1985).  The Court agrees and finds that, as a class, gay men and lesbians

2  are a minority and have relatively limited political power to attract the favorable attention of

3  lawmakers.  *See City of Cleburne*, 473 U.S. at 445.  Although this factor is not an absolute

4  prerequisite for heightened scrutiny, the Court finds the evidence and the law support the

5  conclusion that gay men and lesbians remain a politically vulnerable minority.  *See Plyler*, 457

6  U.S. at 216 n.14; *Murgia*, 427 U.S. at 321.

7        Here, having analyzed the factors, the Court holds that the appropriate level of scrutiny

8  to use when reviewing statutory classifications based on sexual orientation is heightened

9  scrutiny.  *See also In re Levenson*, 587 F.3d at 931 (holding that "some form of heightened

10  constitutional scrutiny applies"); *Witt*, 527 F. 3d at 824-25 (Canby, J., concurring in part and

11  dissenting in part) ("classifications against homosexuals are suspect in the equal protection

12  sense" as gay and lesbian individuals have "experienced a history of purposeful unequal

13  treatment [and] been subjected to unique disabilities on the basis of stereotyped characteristics

14  not truly indicative of their abilities" and "they also exhibit obvious, immutable, or

15  distinguishing characteristics that define them as a discrete group; and they are a minority.").  In

16  short, this Court holds that gay men and lesbians are a group deserving of heightened protection

17  against the prejudices and power of an often-antagonistic majority.  *See id.* at 825.

18        **5.        Application of Heightened Scrutiny to Justifications Proffered for DOMA.**

19        Under heightened scrutiny, the proponents of the statute must establish, at a minimum,

20  that the classification is "substantially related to an important governmental objective."  *Clark*,

21  486 U.S. at 461.  Moreover, under any form of heightened scrutiny, the statute may only be

22  defended by reference to the actual legislative bases advanced to legitimate the statute or the

23  "actual [governmental] purpose, not rationalizations for actions in fact differently grounded."

24  *United States v. Virginia*, 518 U.S. 515, 535-36 (1996).  The Court notes that the "historical

25  background of the decision" to enact legislation and the "specific sequence of events leading up

26  to the challenged decision" may shed light on the decisionmakers' purposes.  *See Village of

27  Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 267 (1977).

28  Here, the legislative history is replete with expressed animus toward gay men and lesbians.

<div style="writing-mode: vertical">**United States District Court**
For the Northern District of California</div>

1   The House Report on DOMA reflected Congress' "moral disapproval of homosexuality,
2   and a moral conviction that heterosexuality better comports with traditional (especially Judeo-
3   Christian) morality." H.R. Rep. No. 104-664 at 16 (footnote omitted).  In his expression of
4   these objectives, Henry Hyde, then-Chairman of the House Judiciary Committee, stated that
5   "[m]ost people do not approve of homosexual conduct ... and they express their disapprobation
6   through the law." 142 Cong. Rec. H7480 (daily ed. July 12, 1996).

7   In the floor debate, members of Congress repeatedly expressed their disapprobation of
8   homosexuality, calling it "immoral," "depraved," "unnatural," "based on perversion," and "an
9   attack upon God's principles." 142 Cong. Rec. H7444 (daily ed. July 11, 1996) (statement of
10  Rep. Coburn); 142 Cong. Rec. H7486 (daily ed. July 12, 1996) (statement of Rep. Buyer); *id*. at
11  H7494 (statement of Rep. Smith).  Members of Congress argued that marriage by gay men and
12  lesbians would "demean" and "trivialize" heterosexual marriage and might indeed be "the final
13  blow to the American family." 142 Cong. Rec. H7276 (daily ed. July 11, 1996) (statement of
14  Rep. Largent); 142 Cong. Rec. H7495 (daily ed. July 12, 1996) (statement of Rep. Lipinski)
15  ("Allowing for gay marriages would be the final straw, it would devaluate the love between a
16  man and a woman and weaken us as a Nation."). Senator Helms, in a statement prepared for the
17  hearing, expressed his disapprobation: "[Those opposed to DOMA] are demanding that
18  homosexuality be considered as just another lifestyle – these are the people who seek to force
19  their agenda upon the vast majority of Americans who reject the homosexual lifestyle ...
20  Homosexuals and lesbians boast that they are close to realizing their goal – legitimizing their
21  behavior ... At the heart of this debate is the moral and spiritual survival of this Nation." 142
22  Cong. Rec. S10,110 (daily ed. Sept. 10, 1996); *see also* 142 Cong. Rec. H7275 (daily ed. July
23  11, 1996) (statement of Rep. Barr) (stating that marriage is "under direct assault by the
24  homosexual extremists all across the country."). The House Report on the pending DOMA bill
25  stated: "Civil laws that permit only heterosexual marriage reflect and honor a collective moral
26  judgment about human sexuality.  This judgment entails [a] moral disapproval of
27  homosexuality." H.R. Rep. 104-664, at 15-16. The Report further stated that "same-sex
28

1    marriage, if sanctified by the law, if approved by the law, legitimates a public union, a legal

2    status that most people ... feel ought to be illegitimate." *Id.* at 16.

3         Despite the expressed animus against gay men and lesbians within the legislative history

4    of DOMA, Congress also specifically identified four governmental interests to be advanced by

5    the statute: (1) encouraging responsible procreation and child-rearing; (2) defending and

6    nurturing the institution of traditional, heterosexual marriage; (3) defending traditional notions

7    of morality; and (4) preserving scarce government resources. *See* H.R. Rep. No. 104-664, at

8    12-18.

9         **a.      Responsible procreation and child-rearing.**

10        The first reason proffered by Congress when enacting DOMA was to encourage

11   responsible procreation and child-rearing.

12        Ms. Golinski presents evidence that it is "beyond scientific dispute" that same-sex

13   parents are equally capable at parenting as opposite-sex parents. (*See* Declaration of Michael

14   Lamb ("Lamb Decl.") at ¶ 14.) The evidence presented by Professor Lamb demonstrates that

15   parents' genders are irrelevant to children's developmental outcomes. (*See id.* at ¶¶ 28, 38;

16   Reply Declaration of Michael Lamb ("Lamb Reply Decl.") at ¶¶ 8, 19, 28.) More than thirty

17   years of scholarship resulting in over fifty peer-reviewed empirical reports have

18   overwhelmingly demonstrated that children raised by same-sex parents are as likely to be

19   emotionally healthy, and educationally and socially successful as those raised by opposite-sex

20   parents. (*See* Lamb Decl. at ¶¶ 29-32.) "There is ... no empirical support for the notion that the

21   presence of both male and female role models in the home promotes children's adjustment or

22   well-being." (*Id.* at ¶ 14.) "Since the enactment of DOMA, a consensus has developed among

23   the medical, psychological and social welfare communities that children raised by gay and

24   lesbian parents are just as likely to be well-adjusted as those raised by heterosexual parents."

25   *Gill*, 699 F. Supp. 2d at 388; *see also Perry*, 704 F. Supp. 2d at 1000 ("The evidence does not

26   support a finding that California has an interest in preferring opposite-sex parents over same-

27   sex parents. Indeed, the evidence shows beyond any doubt that parents' genders are irrelevant

28   to children's developmental outcomes."); *Varnum*, 763 N.W.2d at 899 n.26 ("The research

United States District Court
For the Northern District of California

1   appears to strongly support the conclusion that same-sex couples foster the same wholesome

2   environment as opposite-sex couples and suggests that the traditional notion that children need

3   a mother and a father to be raised into healthy, well-adjusted adults is based more on stereotype

4   than anything else.").

5        BLAG argues that there are flaws in the studies proffered by Ms. Golinski's expert,

6   Professor Lamb, comparing gay or lesbian parents to opposite-sex parents, based on

7   methodological challenges.  The first alleged flaw is that there have been fewer studies of gay

8   male parents than there have been of lesbian family research.  (*See* Lamb Reply Decl. at ¶ 7; *see*

9   *also* Lin Reply Decl., Ex. K at 76:6-17.)  Whether this is the case does not impact the validity of

10  the studies performed.  (*See* Lamb Reply Decl. at ¶ 8.)  The second flaw as argued by BLAG is

11  that there are fewer studies on adolescents than on younger children.  However, it remains

12  undisputed that "there are several ... studies that have looked at adolescent offspring living with

13  same-sex parents" and those studies have "uniformly reported positive outcomes." (*See id.* at

14  ¶¶ 9-10; *see also* Lin Reply Decl., Ex. K at 82:15-83:21.)  The third criticism is that Professor

15  Lamb indicates the need for further studies.  This does not impact the validity of the studies

16  already performed.  (*See* Lamb Reply Decl. at ¶ 12.)  The Court finds that these criticisms of the

17  studies relied upon by Professor Lamb do not alter their validity.  "[A]t the summary judgment

18  stage the judge's function is not ... to weigh the evidence and determine the truth of the matter

19  but to determine whether there is a genuine issue for trial." *Liberty Lobby,* 477 U.S. at 249.

20  The Court finds BLAG's critique does not create an issue of fact.

21        Further, BLAG cites three sources for the proposition that same-sex parenting is inferior

22  to opposite-sex parenting.  One is an article from Slate.com in which the author contends that

23  the existing science is methodologically flawed and ideologically skewed.  (*See* Ann Hulbert,

24  *The Gay Science:  What Do We Know About the Effects of Same-Sex Parenting?*, Slate (Mar.

25  12, 2004), *available at* http://www.slate.com/id/2097048/.)  This is a three-page, non-scientific

26  article by an author with no professional expertise in child development, published by a popular

27  online magazine without peer review.  (*See* Lamb Reply Decl. at ¶ 15.)  Another reference by

28  BLAG is an article criticizing the sampling size in the studies relied upon by Professor Lamb.

1    As Professor Lamb explains, such sampling is typical of psychological research and a number

2    of the studies he relied upon do use representative sampling. (*See id.* at ¶ 16.) The last source

3    is an unpublished piece by Professor Loren Marks in which he criticizes a brief issued by the

4    American Psychological Association in 2005 concluding that social science research indicates

5    that gay parents provide a home environment equally likely to support children's psychological

6    and social growth. (*See* BLAG Opp. Br., Ex. 2.) The critique is neither a study nor published

7    in a peer-reviewed journal and its questionable analysis is based on outdated and selectively-

8    chosen data. (*See* Lamb Reply Decl. at ¶¶ 20-27.) The piece also ignores many of the studies

9    relied upon by Professor Lamb regarding the conclusion that parents' sexual orientation is

10   unrelated to their children's adjustment. (*See id.* at ¶¶ 21-27.) Having reviewed the evidence

11   presented, the Court concludes that all three publications merely criticize the studies relied upon

12   Professor Lamb. As stated above, the criticism merely goes to the weight of Ms. Golinski's

13   evidence. The publications do not present any independent affirmative evidence necessary to

14   create a genuine issue of disputed fact regarding whether same-sex married couples function as

15   responsible parents.

16        Furthermore, to the extent Congress was interested merely in encouraging responsible

17   procreation and child-rearing by opposite-sex married couples, a desire to encourage opposite-

18   sex couples to procreate and raise their own children well would not provide a legitimate reason

19   for denying federal recognition of same-sex marriages. The denial of recognition and

20   withholding of marital benefits to same-sex couples does nothing to support opposite-sex

21   parenting, but rather merely serves to endanger children of same-sex parents by denying them

22   "'the immeasurable advantages that flow from the assurance of a stable family structure,' when

23   afforded equal recognition under federal law." *Gill*, 699 F. Supp. 2d at 389 (quoting *Goodridge*

24   *v. Department of Public Health*, 440 Mass. 309, 335 (2003)). It is undisputed that same-sex

25   parents can and do have and adopt children. The denial of federal recognition of valid same-sex

26   marriages under state law does not alter parental rights under state law. Rather, the passage of

27   DOMA only serves to undermine providing a stable environment for children of same-sex

28   married couples whose children would otherwise be raised in a household bestowed with all of

**United States District Court**
For the Northern District of California

1  the federal benefits of marriage, including financial support and social recognition.  (*See* Lamb

2  Decl. at ¶ 42.)

3  　　Furthermore, an interest in promoting procreation within marriage cannot provide a

4  legitimate reason to exclude same-sex marriages from federal recognition.  The ability to

5  procreate cannot and has never been a precondition to marriage.  *See Lawrence,* 539 U.S. at 605

6  (Scalia, J., dissenting) (stating "what justification could there possibly be for denying the

7  benefits of marriage to homosexual couples ... [s]urely not the encouragement of procreation,

8  since the sterile and the elderly are allowed to marry").  "While it is certainly true that many,

9  perhaps most, married couples have children together (assisted or unassisted), it is the exclusive

10  and permanent commitment of the marriage partners to one another, not the begetting of

11  children, that is the sine qua non of civil marriage."  *Dragovich*, 764 F. Supp. 2d at 1190 (citing

12  *Goodridge,* 440 Mass. at 332).  The federal government has never considered withdrawing its

13  recognition of marriage based on an ability or inability to procreate.  *See id.; see also Gill,* 699

14  F. Supp. 2d at 389.  Even if this could be considered a legitimate interest, denying federal

15  recognition of and withholding federal benefits from legally married same-sex couples does

16  nothing to encourage or discourage opposite-sex couples from having children within marriage.

17  　　Accordingly, the Court finds that the first proffered reason for the passage of DOMA –

18  to encourage responsible procreation and child-rearing – does not provide a justification that is

19  substantially related to an important governmental objective.

20  　　　　**b.　　Nurturing the institution of traditional, opposite-sex marriage.**

21  　　The second reason proffered by Congress when passing DOMA, was its asserted interest

22  in defending and nurturing traditional, opposite-sex marriage.  Tradition alone, however, cannot

23  form an adequate justification for a law.  *See Williams v. Illinois*, 399 U.S. 235, 239 (1970);

24  *Romer,* 517 U.S. at 635; *Lawrence,* 539 U.S. at 579.  The "ancient lineage" of a classification

25  does not render it legitimate.  *Heller,* 509 U.S. at 327.  Instead, the government must have an

26  interest separate and apart from the fact of tradition itself.

27  　　In addition, the ostensible governmental objective of fostering opposite-sex marriages

28  remains unaffected by the passage of DOMA.  DOMA does nothing to encourage same-sex

1  married individuals to marry members of the opposite sex because they are already married to a

2  member of the same sex.  Nor does the denial of benefits to same-sex couples do anything to

3  encourage opposite-sex couples to get married.  *See Gill*, 699 F. Supp. 2d at 389; *see also In re*

4  *Levenson*, 587 F.3d at 932 ("gays and lesbians will not be encouraged to enter into marriages

5  with members of the opposite sex by the government's denial of benefits to same-sex spouses,

6  and the denial will not discourage same-sex couples from entering into same-sex marriages; so,

7  the denial cannot be said to 'nurture' or 'defend' the institution of heterosexual marriage."); *see*

8  *also Perry*, 704 F. Supp. 2d at 972 ("Permitting same-sex couples to marry will not affect the

9  number of opposite-sex couples who marry, divorce, cohabit, have children outside of marriage

10  or otherwise affect the stability of opposite-sex marriages.").

11       Accordingly, the Court does not find that the second proffered reason for the passage of

12  DOMA – to defend and nurture the institution of traditional, opposite-sex marriage – provides a

13  justification that is substantially related to an important governmental objective.

14       **c.     Defending traditional notions of morality.**

15       The third reason proffered by Congress when passing DOMA was its asserted interest in

16  defending traditional notions of morality.  Basing legislation on moral disapproval of same-sex

17  couples does not pass any level of scrutiny.  "The animus toward, and moral rejection of,

18  homosexuality and same-sex relationships are apparent in the Congressional record."  *See*

19  *Dragovich*, 764 F. Supp. 2d at 1190.  "[M]oral condemnation of homosexuality [does not]

20  provide the requisite justification for the DOMA's section three.  The 'bare desire to harm a

21  politically unpopular group' is not a legitimate [governmental] interest."  *Id.* (quoting *Romer*,

22  517 U.S. at 634-35).  The condemnation of homosexuality as immoral

    has been shaped by religious beliefs, conceptions of right and acceptable
23  behavior, and respect for the traditional family.  For many persons these are not
    trivial concerns but profound and deep convictions accepted as ethical and moral
24  principles to which they aspire and which thus determine the course of their
    lives. ... The issue is whether the majority may use the power of the [government]
25  to enforce these views on the whole society through operation of the ... law.

26  *Lawrence*, 539 U.S. at 571.  The Court concludes it can not.  The imposition of subjective moral

27  beliefs of a majority upon a minority cannot provide a justification for the legislation.  The

28  obligation of the Court is "to define the liberty of all, not to mandate our own moral code."

*United States District Court*
For the Northern District of California

*Casey*, 505 U.S. at 850. "Moral disapproval of a group cannot be a legitimate governmental interest under the Equal Protection Clause because legal classifications must not be 'drawn for the purpose of disadvantaging the group burdened by the law.'" *Lawrence*, 539 U.S. at 582 (O'Connor, J., concurring) (quoting *Romer*, 517 U.S. at 633). "[T]he fact that the governing majority ... has traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law prohibiting the practice; neither history nor tradition could save a law prohibiting miscegenation from constitutional attack." *Lawrence*, 539 U.S. at 577-78.

Accordingly, the Court does not find that the third proffered reason for the passage of DOMA – to defend traditional notions of morality – provides a justification that is substantially related to an important governmental objective.

**d.     Preserving scarce government resources.**

The final reason proffered by Congress for passing DOMA was the preservation of scarce government resources. However, there is no evidence in the record to demonstrate that the provision of federal benefits to same-sex married couples would adversely affect the government fisc. In addition, the preservation of government resources cannot, as a matter of law, justify barring some arbitrarily chosen group from a government program. *Plyler*, 457 U.S. at 227, 229. "[A]lthough efficacious administration of governmental programs is not without some importance, 'the Constitution recognizes higher values than speed and efficiency.'" *Frontiero v. Richardson*, 411 U.S. 677, 690 (1973) (citing *Stanley v. Illinois*, 405 U.S. 645, 656 (1972)). Under heightened scrutiny, convenience and economic efficiency in the administration of governmental programs do not legitimize differential treatment. *See id.* at 690-91.

Accordingly, the Court does not find that the fourth proffered reason for the passage of DOMA – to preserve scarce government resources – provides a justification that is substantially related to an important governmental objective.

The Court concludes that, based on the justifications proffered by Congress for its passage of DOMA, the statute fails to satisfy heightened scrutiny and is unconstitutional as applied to Ms. Golinski.

**D.      In the Alternative, DOMA Fails Under Rational Basis Review.**

Although the Court finds that DOMA is subject to and fails to satisfy heightened scrutiny, it notes that numerous courts have found that the statute fails even rational basis review.

**1.      Standards for Rational Basis Scrutiny.**

Where a law neither burdens a fundamental right nor targets a suspect class, a court shall uphold the legislative classification so long as it bears a rational relation to some legitimate end. *Heller*, 509 U.S. at 319-320. Under the rational basis standard of review, legislative enactments are accorded a strong presumption of validity. *Id.* Courts "are compelled under rational-basis review to accept a legislature's generalizations even where there is an imperfect fit between means and ends." *Id.* (internal citations omitted). Indeed, a court applying rational basis review may "go so far as to hypothesize about potential motivations of the legislature, in order to find a legitimate government interest sufficient to justify the challenged provision." *Gill*, 699 F. Supp. 2d at 387 (citing *Shaw v. Oregon Public Employees' Retirement Board*, 887 F.2d 947, 948-49 (9th Cir. 1989) (internal quotation omitted)). "In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993). Rational basis review is "a paradigm of judicial restraint" and "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Id.* at 313-14. "Nor does it authorize 'the judiciary [to] sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines.'" *Heller*, 509 U.S. at 319 (quoting *Dukes*, 427 U.S. at 303).

"'[T]he burden of establishing the unconstitutionality of a statute rests on him who assails it.'" *Baker v. Carr*, 369 U.S. 186, 266 (1962) (quoting *Metropolitan Casualty Ins. Co. v. Brownell*, 294 U.S. 580, 584 (1935)). The burden is to "'negative every conceivable basis which might support it,' whether or not the basis has a foundation in the record." *Heller*, 509

United States District Court
For the Northern District of California

1    U.S. at 320-21 (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)).

2    "A classification does not fail rational-basis review because it 'is not made with mathematical

3    nicety or because in practice it results in some inequality.'" *Id.* at 321 (quoting *Dandridge v.*

4    *Williams*, 397 U.S. 471, 485 (1970)). "The problems of government are practical ones and may

5    justify, if they do not require, rough accommodations – illogical, it may be, and unscientific."

6    *Id.* (citing *Metropolis Theatre Co. v. City of Chicago*, 228 U.S. 61, 69-70 (1913)). "A statutory

7    discrimination will not be set aside if any state of facts reasonably may be conceived to justify

8    it." *Id.* (citing *McGowan v. Maryland*, 366 U.S. 420, 426 (1961)).

9          However, rational review is not "toothless." *Mathews v. de Castro*, 429 U.S. 181, 185

10   (1976). "A statutory classification fails rational-basis review only when it 'rests on grounds

11   wholly irrelevant to the achievement of the State's objective.'" *Heller*, 509 U.S. at 324

12   (quoting *Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 71 (1978)). Rational basis review

13   requires that the legislation not be enacted for arbitrary or improper purposes. In order for a law

14   to be legitimate, it must be "properly cognizable" by the government asserting it and "relevant

15   to interests" it "has the authority to implement." *City of Cleburne*, 473 U.S. at 441. The law

16   must bear a logical relationship to the purpose it purports to advance. *Romer*, 517 U.S. at 632-

17   33; *see also Gill*, 699 F. Supp. 2d at 387. "[E]ven in the ordinary equal protection case calling

18   for the most deferential of standards, [courts] insist on knowing the relation between the

19   classification adopted and the object to be attained." *Gill*, 699 F. Supp. 2d at 387 (quoting

20   *Romer*, 517 U.S. at 633). Lastly, the justification for the law may not rely on factual

21   assumptions that exceed the bounds of rational speculation. *Lewis v. Thompson*, 252 F.3d 567,

22   590 (2d Cir. 2001) (citing *Heller*, 509 U.S. at 320 (holding that speculation, while permissible,

23   must be "rational")).

24         When applying rational basis review to a classification that adversely affects an

25   unpopular group, courts apply a "more searching" rational basis review. *Diaz*, 656 F.3d at

26   1012. With these protections, courts may thereby "ensure that classifications are not drawn for

27   the purpose of disadvantaging the group burdened by the law." *Romer*, 517 U.S. at 633 (citing

28   *Railroad Retirement Board v. Fritz*, 449 U.S. 166, 181 (1980) (Stevens, J., concurring) ("If the

United States District Court

For the Northern District of California

1    adverse impact on the disfavored class is an apparent aim of the legislature, its impartiality

2    would be suspect.")).

3       **2.     Application of Rational Basis Review to Justifications Proffered by Congress.**

4

5         The Court has already addressed the four interests proffered by Congress during the

6    passage of DOMA and found them not to be substantially related to an important governmental

7    objective. Similarly, under the rational basis review, the Court finds that none of Congress'

8    proffered justifications constitute a rational relation in furtherance of some legitimate

9    governmental end. *See Romer*, 517 U.S. at 631 (citing *Heller*, 509 U.S. at 319-320).

10        Specifically, the Court finds that Congress' justification of promoting traditional notions

11    of morality does not satisfy rational basis scrutiny. *See Lawrence*, 539 U.S. at 582 (holding that

12    "[m]oral disapproval of [homosexuals], like a bare desire to harm the group, is an interest that is

13    insufficient to satisfy rational basis review under the Equal Protection Clause.") Also, if the

14    denial of benefits is designed to defend traditional notions of morality by discouraging same-sex

15    marriage, "it does so *only* by punishing same-sex couples who exercise their rights under state

16    law, and thus exhibits the 'bare desire to harm' same-sex couples." *In re Levenson*, 587 F.3d at

17    932 (emphasis in original). This is forbidden by the Constitution. *See Romer,* 517 U.S. at 634-

18    35. "Discouraging gay marriage serves only to force gay couples to live in a 'state of sin' rather

19    than in a lawfully-recognized 'state of connubial bliss' that encourages a long-enduring

20    permanent relationship that, in turn, serves as the basis of a state-recognized family." *In re*

21    *Levenson*, 587 F.3d at 932. The promotion of morality is not a cognizable governmental

22    interest furthered by the denial of federal benefits and protections.

23        Similarly, the Court does not find the justification of preserving the government fisc

24    satisfies rational basis review. *See Lyng v. International Union*, 485 U.S. 360, 376-77 (1988)

25    (holding that previous cases make "clear that something more than an invocation of the public

26    fisc is necessary to demonstrate the rationality of selecting [one group], rather than some other

27    group, to suffer the burden of cost-cutting legislation."). Ostensible savings to the government

28

United States District Court
For the Northern District of California

1   fisc that depends upon "distinguishing between homosexual and heterosexual [couples],

2   similarly situated, ... cannot survive rational basis review." *See Diaz*, 656 F.3d at 1014.[8]

### a.   Responsible procreation and child-rearing.

4   In arguing its defense of DOMA, BLAG, for the most part, eschews the justifications

5   proffered by Congress for the legislation.  However, the group does reiterate the legislative

6   justifications of encouraging responsible procreation and child-rearing and the government's

7   interest in defending and nurturing the institution of traditional, heterosexual marriage.

8   The Court does not find the justification of encouraging responsible procreation and

9   child-rearing survives rational basis scrutiny.  Even if the Court were to accept as true, which it

10   does not, that opposite-sex parenting is somehow superior to same-sex parenting, DOMA is not

11   rationally related to this alleged governmental interest.

12   Under rational basis review, although the fit between the classification and the stated

13   government interest need not be perfect, the classification must be "narrow enough in scope and

14   grounded in sufficient factual context ... to ascertain some relation between the classification

15   and the purpose it serve[s]." *Romer*, 517 U.S. at 632-33.  Rational basis review invalidates a

16   measure whose "sheer breadth" is "discontinuous with the reasons offered for it." *Id.* at 632,

17   635 (rejecting justifications where "[t]he breadth of the [measure] is so far removed from these

18   particular justifications that we find it impossible to credit them"); *see also Eisenstadt v. Baird*,

19   405 U.S. 438, 449 (1972) (rejecting justification of law discriminating between married and

20   unmarried individuals in access to contraceptives as "so riddled with exceptions" that the

21   interest claimed by the government "cannot reasonably be regarded as its aim").

22

23

24   [8] During oral argument, counsel for BLAG argued that another possible justification for DOMA, somewhat related to protection of the public fisc, is "to rationally maintain bargains that were decided upon by previous Congresses. ... There were bargains made, and there were calculus [sic] made in terms of ... what benefits are we going to give, what burdens are we going to put on people." (Transcript at 59.)  The decision of where and how to protect the government fisc and to protect the bargains struck by previous Congresses does not independently constitute a rational basis upon which to differentiate among classes of citizens. *See Diaz*, 656 F.3d at 1014; *see also Plyler*, 457 U.S. at 227, 229 (holding that preservation of government resources cannot, as a matter of law, justify barring some arbitrarily chosen group from a government program).  There must be some rational basis upon which to decide not to expend public resources for a particular group.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1    DOMA has no effect on who may become a parent under federal or state law.

2    Moreover, whether a same-sex couple is entitled to marriage benefits has no rational relation to

3    that couple's or an opposite-sex couple's ability to procreate. Significantly, to reiterate, the

4    ability to procreate has never been a precondition to marriage in any jurisdiction. *See*

5    *Lawrence*, 539 U.S. at 605 (Scalia, J. dissenting).[9] Here, there is simply no connection between

6    the ability (or capacity) to become a parent and the designation of federal entitlements based on

7    a definition of marriage that excludes legally married couples who are capable of becoming

8    parents.

9    Denying federal benefits to same-sex married couples has no rational effect on the

10   procreation and child-rearing practices of opposite-sex married (or unmarried) couples. *See*

11   *Perry II*, 2012, WL 372713, at *21 ("There is no rational reason to think that taking away the

12   designation of 'marriage' from same-sex couples would advance the goal of encouraging ...

13   opposite-sex couples to procreate more responsibly.") To the extent some people may have a

14   bias in favor of preferring biological parents over other couples, there is no such recognition of

15   this distinction under federal or state law. *See id.* There has been no showing that DOMA

16   alters any state or federal law governing childbearing, procreation or family structure. Given

17   the state of the law, the rationale of promoting responsible child-rearing finds no "'footing in

18   the realities of the subject addressed by the legislation,' and thus cannot be credited as rational."

19   *Perry II*, 2012 WL 372713, at *20 (citing *Heller*, 509 U.S. at 321).

20   Accordingly, the Court finds that Congress' stated justification of encouraging

21   responsible procreation and child-rearing bears no rational relationship to the classification

22   which burdens same-sex married couples.

23

24

25   [9] During oral argument, counsel for BLAG argued that an additional reason for the passage of DOMA was the fact that opposite-sex married couples could "have accidental pregnancies" or "can make babies spontaneously." (Transcript at 63-64.) BLAG did not,

26   however, articulate how the fact that opposite-sex couples can have accidental pregnancies constitutes an interest supporting the passage of DOMA. Although the generation of

27   children may be biologically more spontaneous with opposite-sex couples, married or unmarried, the Court remains perplexed how the uniformly deliberate decision of same-sex

28   married couples to become parents can be perceived as a justification against supporting their procreation and child-rearing efforts.

**b.**     **Nurturing the institution of traditional, opposite-sex marriage.**

BLAG contends that the institution of opposite-sex marriage is deeply rooted in American law, embedded in history and tradition, and has been defined both by Black's Law Dictionary and the Bible. (BLAG Motion to Dismiss at 23-24, citing *Marsh v. Chambers*, 463 U.S. 783, 792 (1983) (holding that traditional marriage "is deeply embedded in the history and tradition of this country" and "has become part of the fabric of our society") and *Baker v. Nelson*, 191 N.W.2d 185, 186 (Minn. 1971) (holding that the "institution of marriage as a union of man and woman, uniquely involving the procreation and rearing of children within a family, is as old as the book of Genesis.")).

Again, the argument that the definition of marriage should remain the same for the definition's sake is a circular argument, not a rational justification. Simply stating what has always been does not address the reasons for it. The mere fact that prior law, history, tradition, the dictionary and the Bible have defined a term does not give that definition a rational basis, it merely states what has been. Tradition, standing alone, does not provide a rational basis for the law. *Williams*, 399 U.S. at 239. Simply, the "ancient lineage" of the law does not render it rational. *See Heller*, 509 U.S. at 327.

BLAG argues, but does not explain how denying marriage benefits only to same-sex couples will somehow make marriage between opposite-sex couples better. The proffered justification may derive from strongly-held religious or fundamentally traditional beliefs, but still does not provide a legally recognizable rational basis for sustaining a law that actively discriminates against legally married couples. The exclusion of same-sex couples from the federal definition of marriage does nothing to encourage or strengthen opposite-sex marriages. *See Perry II*, 2012 WL 372713, at *23 (holding that "the argument that withdrawing the designation of 'marriage' from same-sex couples could on its own promote the strength or stability of opposite-sex marital relationships lacks any such footing in reality"); *see also Perry*, 704 F. Supp. 2d at 972 ("Permitting same-sex couples to marry will not affect the number of opposite-sex couples who marry, divorce, cohabit, have children outside of marriage or otherwise affect the stability of opposite-sex marriages"); *In re Levenson*, 587 F.3d at 932 (this

<div style="writing-mode: vertical-rl">**United States District Court**<br>For the Northern District of California</div>

1  governmental interest "is largely irrelevant to the rational basis analysis here because the same-

2  sex couples who seek the benefits are already married. Also, gays and lesbians will not be

3  encouraged to enter into marriages with members of the opposite sex by the government's

4  denial of benefits to same-sex spouses, and the denial will not discourage same-sex couples

5  from entering into same-sex marriages; so the denial cannot be said to 'nurture' or 'defend' the

6  institution of heterosexual marriage.").

7      Accordingly, the Court finds that Congress' stated justification of nurturing the

8  institution of traditional, opposite-sex marriage bears no rational relationship to the

9  classification which burdens same-sex married couples.

10      **3.**    **Application of Rational Basis Review to Alternative Justifications Proffered**

11          **by BLAG.**

12      BLAG does not rely exclusively on the stated legislative justifications advanced by

13  Congress during its passage of DOMA. A court may "hypothesize the motivations of the ...

14  legislature to find a legitimate objective promoted by the provision under attack." *Shaw*, 887

15  F.2d at 948-49 (internal quotation marks and citation omitted). "[I]t is entirely irrelevant for

16  constitutional purposes whether the conceived reason for the challenged distinction actually

17  motivated the legislature." *Beach Communications*, 508 U.S. at 313. In this regard, BLAG has

18  proffered several additional hypothetical rational bases for passing DOMA.

19      **a.**    **Congressional caution in defining a legislative term and maintaining**

        **the status quo.**

20      BLAG contends that Congress could have had a rational basis for the passage of DOMA

21  by preserving the status quo in the federal definition of marriage while waiting for the states to

22  "tinker with the substantive centuries-old definition of marriage." (BLAG Opp. Br. on Motion

23  for Summary Judgment at 22.) To the extent this argument is premised upon preserving a

24  traditional definition of marriage for its own sake, the Court has already rejected this argument.

25  As the court found in *Gill*, "[s]taying the course is not an end in and of itself, but rather a means

26  to an end." *Gill*, 699 F. Supp. 2d at 390-94. The long history of discrimination against gay men

27  and lesbians does not provide a rational basis for continuing it.

28

1    Moreover, DOMA does not preserve the status quo. The passage of DOMA marks a
2    stark departure from tradition and a blatant disregard of the well-accepted concept of federalism
3    in the area of domestic relations. *See Gill*, 699 F. Supp. 2d at 392 (finding that DOMA
4    "mark[ed] the first time the federal government has ever attempted to legislatively mandate a
5    uniform federal definition of marriage – or any other core concept of domestic relations, for that
6    matter"); *see also Dragovich*, 764 F. Supp. 2d at 1189 ("[S]ection three of DOMA was a
7    preemptive strike to bar federal legal recognition of same-sex marriages should certain states
8    decide to allow them, rather than a law that furthered the status quo, which gave the states
9    authority to define marriage for themselves.").
10    The status quo prior to the passage of DOMA was federal recognition of the individual
11    states' authority to define marriage. "The whole subject of the domestic relations ... belongs to
12    the laws of the States and not to the laws of the United States." *Elk Grove Unified School*
13    *District v. Newdow*, 542 U.S. 1, 12 (2004) (citation omitted); *see also Sosna v. Iowa*, 419 U.S.
14    393, 404 (1975) (holding that "domestic relations" have "long been regarded as a virtually
15    exclusive province of the States" and "[t]he State ... has absolute right" to regulate marriage)
16    (citations omitted); *Ankenbrandt v. Richards*, 504 U.S. 689, 703, 716 (1992) ("declarations of
17    status, *e.g.*, marriage, annulment, divorce, custody, and paternity," lie at the "core" of domestic
18    relations law reserved to the states) (Blackmun, J., concurring).
19    Prior to the enactment of DOMA, the federal government had not attempted to craft its
20    own federal definition of marriage, "notwithstanding the occurrence of other similarly
21    politically-charged, protracted, and fluid debates at the state level as to who should be permitted
22    to marry." *Gill*, 699 F. Supp. 2d at 392. Congress accepted without revision the patchwork of
23    different state marriage definitions regarding, for example, age requirements or marriage among
24    related persons. (*See e.g.*, Declaration of Nancy Cott ("Cott Decl.") at ¶¶ 26, 51-52, 56-57.)
25    The federal government has continued to defer to the states during unprecedented, hotly-
26    contested shifts in state marriage law, especially in the area of interracial marriage. (*Id.* at ¶¶

27
28

United States District Court
For the Northern District of California

39

United States District Court
For the Northern District of California

1   57.)  The strong tradition of federalism mandated that the federal government refrain from

2   inserting itself in the business of domestic relations.[10]

3        The Court finds that the passage of DOMA, rather than maintaining the status quo in the

4   arena of domestic relations, stands in stark contrast to it.  Accordingly, the Court finds that

5   Congressional caution in defining a legislative term and maintaining the status quo does not

6   constitute a rational basis.

7        **b.**     **Congressional caution in area of social divisiveness.**

8        BLAG also contends that Congress should remain cautious, especially in an area of so

9   much social divisiveness, by holding the purported federal definition of marriage steady while

10   waiting to see how the states tinker with new definitions.  The Court finds the contention

11   similar to arguments that were advanced in support of antimiscegenation laws.  Proponents

12   similarly argued that the long-standing tradition of the separation of the races provided

13   justification for prohibiting interracial marriage.  The lower court in *Loving* found that God had

14   created the races and placed them on separate continents in order that there "would be no cause

15   for such [interracial] marriages."  388 U.S. at 3.  It was, at the time, a strongly-held belief

16   among proponents of antimiscegenation laws that mixing the races was against God's will,

17   flaunted a long history of tradition and, at its core, endangered the institution of marriage.  *See*

18   *id.*  However, in its holding in *Loving*, the Supreme Court found that although interracial

19   marriage was a socially divisive issue and proponents of antimiscegenation held traditional and

20

21        [10] BLAG contends that Congress has previously enacted laws which create unique
federal definitions of marriage, for instance in the area federal tax regulations, Social

22   Security, immigration or federal benefits.  However, in each instance, the federal government
accepted the state definitions of marriage and merely superimposed further requirements for

23   falling within the federal entitlement statute.  *See, e.g.,* 42 U.S.C. § 416 (requiring marriage
of at least one year to obtain certain Social Security benefits); 8 U.S.C. § 1186a(b)(1)

24   (discrediting marriages entered into merely to obtain immigration status).  These federal
requirements do not purport to redefine or create a federal definition of marriage, but rather

25   impose additional criteria to further particular legislative goals.

26        In addition, BLAG cites examples in which Congress legislated in the area of
domestic relations, such as when it banned polygamy in the Utah Territory, when it promoted

27   and supported marriages of former slaves after the Civil War, and legislation in the context
of treatment of Indians tribes.  However, in each of those unique historical instances,

28   Congress was acting in the role of the state in the absence of a secure state government.
(*See, e.g.,* Cott Decl. at ¶¶ 75-79.)  DOMA marks a radical departure from the tradition of
federalism in the area of domestic relations.  *See Gill,* 699 F. Supp. 2d at 392.

1   religious beliefs about the erosion of the traditional concept of marriage, Virginia's racial

2   classification violated the equal protection guarantee. *Id.* at 11-12.

3           More recently, in *Romer*, the Supreme Court addressed a proposed amendment to the

4   Colorado state constitution that would prohibit all legislative, executive, or judicial action

5   designed to protect discrimination against homosexuals. One of the arguments in support of the

6   state amendment was that it was an attempt to withdraw "a deeply divisive social and political

7   issue from elected representatives and place its resolution squarely in the hands of the people."

8   (*See* Brief for Petitioner filed April 21, 1995 in *Romer v. Evans*, No. 94-1039 (Supreme Court),

9   1995 WL 17008429, at *10.)  Proponents contended that it was important to ensure that "the

10  deeply divisive issue of homosexuality does not serve to seriously fragment Colorado's body

11  politic." (*See id.*, at *47.)  Proponents argued that it required some leeway in this socially

12  divisive atmosphere to handle the "sensitive and core political choices" in matters regarding

13  discrimination against homosexuals calmly over time. (*Id.*) The Supreme Court, however,

14  flatly rejected this argument as providing a rational basis and found that the proposed

15  amendment to the Colorado state constitution was unconstitutional. *Romer*, 517 U.S. at 620.

16          Here, too, this Court finds that Congress cannot, like an ostrich, merely bury its head in

17  the sand and wait for danger to pass, especially at the risk of permitting continued constitutional

18  injury upon legally married couples. The fact that the issue is socially divisive does nothing to

19  relieve the judiciary of its obligation to examine the constitutionality of the discriminating

20  classifications in the law.

21          Accordingly, the Court finds that Congressional caution in the area of social

22  divisiveness does not constitute a rational basis.

23          **c.      Consistency.**

24          BLAG also contends that Congress could have rationally sought to base eligibility for

25  federal benefits on a traditional definition of marriage in order "to avoid the arbitrariness and

26  inconsistency in such eligibility ... and not depend[] on the vagaries of state law." (BLAG

27  Motion to Dismiss at 24.)  However, as explained above, in all of the years preceding the

28  passage of DOMA, Congress relied on the various states' definitions of marriage without

41

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1     incident. All couples married under state law were entitled to federal benefits, even if the

2     particulars of the states' definitions were variable. The passage of DOMA actually undermined

3     administrative consistency by requiring that the federal government, for the first time, discern

4     which state definitions of marriage are entitled to federal recognition and which are not.

5           Accordingly, the Court finds that consistency does not constitute a rational basis.

6           **d.**     **Any other possible basis.**

7           The Court finds that neither Congress' claimed legislative justifications nor any of the

8     proposed reasons proffered by BLAG constitute bases rationally related to any of the alleged

9     governmental interests. Further, after concluding that neither the law nor the record can sustain

10     any of the interests suggested, the Court, having tried on its own, cannot conceive of any

11     additional interests that DOMA might further. *See Diaz*, 656 F.3d at 1015.

12                        **CONCLUSION**

13           For the foregoing reasons, the Court HEREBY DENIES BLAG's motion to dismiss;

14     DENIES as moot BLAG's motion to strike; GRANTS Ms. Golinski's motion for summary

15     judgment; and GRANTS the OPM's motion to dismiss.

16           The Court has found that DOMA unconstitutionally discriminates against same-sex

17     married couples. Even though animus is clearly present in its legislative history, the Court,

18     having examined that history, the arguments made in its support, and the effects of the law, is

19     persuaded that something short of animus may have motivated DOMA's passage:

20             Prejudice, we are beginning to understand, rises not from malice or hostile
21             animus alone. It may result as well from insensitivity caused by simple want of
             careful, rational reflection or from some instinctive mechanism to guard against
22             people who appear to be different in some respects from ourselves.

23     *Board of Trustees of University of Alabama v. Garrett*, 531 U.S. 356, 374-75 (2001) (Kennedy,

      J., concurring).
24

25           This case was presented by an employee of the judicial branch against the executive

26     branch, which ultimately determined it could not legitimately support the law. The law was

27     then defended by the legislative branch. The judicial branch is tasked with determining whether

28     this federal law is unconstitutional. That is the courts' authority and responsibility. "It is

    emphatically the province and duty of the judicial department to say what the law is" and,

1   where it is so, to declare legislation unconstitutional. *See Marbury v. Madison*, 1 Cranch 137,

2   177 (1803). As Supreme Court Chief Justice John G. Roberts said during his confirmation

3   hearings: "Judges are like umpires. Umpires don't make the rules, they apply them. ... it's [the

4   judge's] job to call balls and strikes, and not to pitch or bat." *Confirmation Hearing on the*

5   *Nomination of John G. Roberts, Jr. to be Chief Justice of the United States: Hearing Before the*

6   *S. Comm. on the Judiciary*, 109th Cong. 56 (2005) (statement of John G. Roberts, Jr.,

7   Nominee).

8         In this matter, the Court finds that DOMA, as applied to Ms. Golinski, violates her right

9   to equal protection of the law under the Fifth Amendment to the United States Constitution by,

10   without substantial justification or rational basis, refusing to recognize her lawful marriage to

11   prevent provision of health insurance coverage to her spouse.

12         Accordingly, the Court issues a permanent injunction enjoining defendants, and those

13   acting at their direction or on their behalf, from interfering with the enrollment of Ms.

14   Golinski's wife in her family health benefits plan. The Clerk is directed to enter judgment in

15   favor of Ms. Golinski and against defendants the Office of Personnel Management and its

16   director John Berry as set out herein pursuant to Federal Rule of Civil Procedure 58.

17

18         **IT IS SO ORDERED.**

19   Dated:  February 22, 2012

20                                                  JEFFREY S. WHITE
                                                    UNITED STATES DISTRICT JUDGE
21

22

23

24

25

26

27

28

*(sidebar, left margin)* United States District Court
For the Northern District of California

## C E R T I F I C A T I O N

I hereby certify that on March 2, 2012, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system, or by mail to those listed below who are unable to accept electronic filing, as indicated on the Notice of Electronic Filing.   Parties may access this filing through the Court's CM/ECF System.


**KAREN L. DOWD**