# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOANNE PEDERSEN, et al.,<br>    Plaintiffs, | : | |
| | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 3:10-cv-1750 (VLB) |
| OFFICE OF PERSONNEL | : | |
| MANAGEMENT, et al., | : | |
|     Defendants, | : | |
| | : | |
| v. | : | |
| | : | |
| BIPARTISAN LEGAL ADVISORY GROUP | : | |
| OF THE UNITED STATES HOUSE OF | : | |
| REPRESENTATIVES , | : | |
|     Intervenor-Defendant. | : | July 31, 2012 |

## MEMORANDUM OF DECISION GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT [Dkt. #60] AND DENYING INTERVENOR-DEFENDANT'S MOTION TO DISMISS [Dkt. #80]

Plaintiffs, homosexual individuals legally married to individuals of the same sex under the laws of the States of Connecticut, Vermont, and New Hampshire, bring this suit challenging Section 3 of the Defense of Marriage Act, Pub. L. No. 104-199, 110 Stat. 2419 (1996), codified at, 1 U.S.C. §7, ("DOMA"), as a violation of the Fifth Amendment's guarantee of Equal Protection. Plaintiffs' Complaint requests declaratory and injunctive relief, seeking a judgment declaring Section 3 of DOMA unconstitutional and void and an order permanently enjoining the federal government from administering and enforcing DOMA's definition of "marriage" and "spouse" to exclude homosexual couples legally married under state law from receiving recognition and benefits under the

plethora of federal laws which rely on DOMA's definitions.  Currently pending before the Court is a Motion for Summary Judgment [Dkt. #60] filed by the Plaintiffs asserting that they are entitled to judgment as a matter of law, along with a Motion to Dismiss [Dkt. #80] filed by the Intervenor-Defendants, the Bipartisan Legal Advisor Group of the United States House of Representatives, ("BLAG") pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim.  As both motions seek ultimate resolution of this matter, the Court will consider and review the motions simultaneously, addressing the fundamental question of whether or not Section 3 of DOMA can withstand the applicable level of constitutional scrutiny.

  I.    Factual Background

      A.  History of DOMA

      DOMA was enacted on September 21, 1996 and signed into law by President Clinton after passing both houses of Congress with large majorities. Section 3 of DOMA, the provision which is the subject of the Plaintiffs' constitutional challenge, codifies the following definition of the terms "marriage" and "spouse" as a matter of federal law:

> In determining the meaning of any Act of Congress, or of any ruling, regulation, or interpretation of the various administrative bureaus and agencies of the United States, the word 'marriage' means only a legal union between one man and one woman as husband and wife, and the word "spouse" refers only to a person of the opposite sex who is a husband or a wife.

1 U.S.C. §7. As expressly stated in the House Judiciary Committee Report on DOMA, DOMA was drafted as "a response to a very particular development in the

State of Hawaii," where the "orchestrated legal assault being waged against traditional heterosexual marriage by gay rights groups and their lawyers" was poised to achieve "its greatest breakthrough." H.R. Rep. No. 104-664, at 2-4 (1996), *reprinted in* 1996 U.S.C.C.A.N. 2905-23 (hereinafter the "House Report" or "Report").

The "breakthrough" alluded to in the Report was the Hawaii Supreme Court's ruling in *Baehr v. Lewin*, 74 Haw. 530, 852 P.2d 44 (1993), which allowed for the possibility that a Hawaii Revised Statute, Haw. Rev. Stat. §572-1 (1985), which set forth the "[r]equisites of valid marriage contract" and limited state-sanctioned marriages to relationships "between a man and a woman" would be struck down as unconstitutional in violation of the Equal Protection clause of the Hawaii Constitution. The Hawaii Supreme Court held that "on its face and [ . . . ] as applied, HRS §572-1 denies same-sex couples access to the marital status and its concomitant rights and benefits." *Baehr*, 74 Haw. at 564. The *Baehr* Court further recognized "sex" as a suspect category for purposes of Equal Protection analysis under the Equal Protection Clause of the Hawaii Constitution, mandating satisfaction of strict scrutiny analysis, the most rigorous form of constitutional inquiry, in order to withstand challenge to its constitutionality under the Hawaii Constitution. *Id.* at 580. Concerned by this apparent willingness by judges in Hawaii "to foist the newly-coined institution of homosexual 'marriage' upon an unwilling Hawaiian public," and the "possibility that other States could, through the protracted and complex process of litigation, be forced to follow suit," Congress, through DOMA, endeavored to enact a federal definition of marriage,

3

ensuring that for purposes of federal regulations and laws, marital benefits would be conferred only upon heterosexual married couples.  House Report at 6.

The impact of DOMA's definition of marriage is vast, estimated to affect at least 1,138 federal laws and regulations[1] and to deprive an estimated 100,000 legally married same-sex couples of the benefits afforded to married couples under such federal laws and regulations.[2]  Congress was cognizant of DOMA's expansive scope, noting that the terms "marriage" and "spouse" appear hundreds of times in the spectrum of federal laws and regulations.  *See* House Report at 10.  Nevertheless, "the relevant committees did not engage in a meaningful examination of the scope or effect of the law."  *Gill v. Office of Personnel Management*, 699 F.Supp.2d 374, 379 (D. Mass 2010).  "Despite its ramifying application throughout the U.S. Code, only one day of hearings was held on DOMA."  *Massachusetts v. United States Dep't of Health and Human Services*, 682 F.3d 1, 13 (1st Cir. 2012).  During this brief hearing, "Congress did not hear testimony from agency heads regarding how DOMA would affect federal programs.  Nor was there testimony from historians, economists, or specialists in family or child welfare."  *Gill*, 699 F.Supp.2d at 379.

Though the Plaintiffs in the current case have been denied benefits under only five federal statutes and regulatory schemes, the Court recognizes that this list represents merely a brief sampling of the myriad federal laws and regulations impacted by DOMA and the Court finds the Plaintiffs' circumstances to be

---

[1] David B. Cruz, *Sexual Judgments: Full Faith and Credit and the Relational Character of Legal Sex*, 46 Harv. C.R.-C.L. L. Rev. 51, 74, n. 119 (2011) (citing U.S. Gov't Accountability Office, GAO-04-353R, Defense of Marriage Act: Update to Prior Report 1 (2004), available at http://www.gao.gov/new.items/d04353r.pdf.

[2] *See Mass. v. U.S. Dep't. of Health & Human Servs.*, 682 F.3d 1 (1st Cir. 2012)

illustrative of the broad breadth of DOMA's reach.  Specifically, Plaintiffs' marital statuses were denied recognition under the Family and Medical Leave Act ("FMLA"), the Federal Employees Health Benefits Program ("FEHB"), the Internal Revenue Code, the Social Security Act's "One-Time-Lump-Sum Death Benefit," the Qualified Preretirement Survivor Annuity ("QPSA"), and the New Hampshire Retirement System's contribution to Medicare Insurance.

"The FEHB is a comprehensive program of health insurance for federal civilian employees, annuitants, former spouses of employees and annuitants, and their family members."  *See Gill*, 699 F.Supp.2d at 380 (citing 5 U.S.C. §8901 et seq.).  The FEHB was created by the Federal Employees Health Benefits Act, "which established (1) the eligibility requirements for enrollment, (2) the types of plans and benefits to be provided, and (3) the qualifications that private insurance carriers must meet in order to offer coverage under the program."  *Id.*  The statutory purpose of the FEHB is to "protect federal employees against the high and unpredictable costs of medical care and to assure that federal employee health benefits are equivalent to those available in the private sector so that the federal government can compete in the recruitment and retention of competent personnel."  *Nat'l Foundation of Fed. Employees v. Devine*, 679 F.2d 907, 913 n.9 (D.D.C. 1981) (citing S.Rep.No.468, 86th Cong., 1st Sess. 1-2 (1959); H.R.Rep.No. 957, 86th Cong., 1st Sess. 1-2 (1959)).  The FEHB is administered by the Office of Personnel Management ("OPM"), which prescribes the regulations governing enrollment eligibility and dates of coverage provided to "employees, annuitants, members of their families, and former spouses."  *Id.* (citing 5 U.S.C. §8913).

Under these regulations, those eligible for coverage may elect to enroll for individual coverage, or for both individual and family coverage. *Id.* (citing 5 U.S.C. §§ 8905, 8906).  Coverage for family members under the FEHB is limited to "the spouse of an employee or annuitant [or] an unmarried dependent child under 22 years of age." *Id.* (citing 5 U.S.C. §8901(5).

The FMLA was enacted to further public policy, specifically "to balance the demands of the workplace with the needs of families" by "entitl[ing] employees to take reasonable leave for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition." 29 U.S.C. §2601(b)(1), (2).[3]  To accomplish these goals, the FMLA entitles eligible employees to take up to twelve work-weeks of unpaid leave during any twelve-month period. 29 U.S.C. §2612(a)(1).  The regulations promulgated by the Department of Labor to implement the FMLA define the term "spouse" for purposes of the FMLA as "a husband or wife as defined or recognized under State law for purposes of marriage in the State where the employee resides, including common law marriage in States where it is recognized."  29 U.S.C.

---

[3] The entire statutory purpose of the FMLA is: "(1) to balance the demands of the workplace with the needs of families, to promote the stability and economic security of families, and to promote national interests in preserving family integrity; (2) to entitle employees to take reasonable leave for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition; (3) to accomplish the purposes described in paragraphs (1) and (2) in a manner that accommodates the legitimate interests of employers; (4) to accomplish the purposes described in paragraphs (1) and (2) in a manner that, consistent with the Equal Protection Clause of the Fourteenth Amendment, minimizes the potential for employment discrimination on the basis of sex by ensuring generally that leave is available for eligible medical reasons (including maternity-related disability) and for compelling family reasons, on a gender-neutral basis; and (5) to promote the goal of equal employment opportunity for women and men, pursuant to such clause."  29 U.S.C. §2601 (b).

§2654; 29 C.F.R. 825.122.  The definition of "spouse" in Section 3 of DOMA, however, supplants the Department of Labor's regulation's instruction to look to the applicable State law for purposes of analyzing spousal coverage. Thus, for purposes of FMLA coverage, leave to care for a spouse suffering from a serious health condition is available only to members of opposite-sex marriages.  1 U.S.C. § 7.

The Social Security Act was created "as a broad program of social insurance, on which working people could rely to provide for themselves and their dependents in old age." *Rosenberg v. Richardson*, 538 F.2d 487, 490 (2d Cir. 1976). Further, 42 U.S.C. 301 provides that the purpose of grants for old-age assistance is to enable each state "to furnish financial assistance to aged needy individuals."  The Social Security Act "provides certain benefits to the surviving spouse of a deceased wage earner," including the Lump-Sum Death Benefit.  *Gill*, 699 F.Supp.2d at 382.  The Lump-Sum Death Benefit provides that the surviving spouse of "an individual who had adequate lifetime earnings from employment or self-employment" is eligible for "the lesser of $255 or an amount determined based on a formula involving the individual's lifetime earnings."  *Id.* (citing 42 U.S.C. §§402(I), 413(a), 414(a), (b)).

Defined-benefit pension plans are subject to both the Employment Retirement Income Security Act ("ERISA") and the Internal Revenue Code which impose a variety of obligations and requirements with which such pension plans must comply.  *See e.g. McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 203 (2d Cir. 2007) (acknowledging that defined-benefit pension plans are subject to both

ERISA and the Internal Revenue Code). One such requirement imposed by both ERISA and the Internal Revenue Code mandates that defined-benefit pension plans provide a Qualified Preretirement Survivor Annuity ("QPSA"). 29 U.S.C. §1055(a)(2). This requirement was imposed "in order to ensure a stream of income to surviving spouses." *Boggs v. Boggs*, 520 U.S. 833, 843 (1997). Another such requirement provides that pension plans which elect to provide a medical cost subsidy as a benefit to its retirees may only extend this benefit to the retired employees, their spouses, and their dependents. 26 U.S.C. §420(a), (b)(3), (c)(1), (e)(1)(A), and (e)(1)(C).

### B. History of the Legalization of Gay Marriage in Connecticut, Vermont, and New Hampshire

#### 1. <u>Same-Sex Marriage in Connecticut</u>

In 2005, the Connecticut legislature passed Public Acts 2005, No.05-10, codified at Conn. Gen. Stat. §§46b-38aa et seq., establishing the "right of same sex partners to enter into civil unions and conferred on such unions all the rights and privileges that are granted to spouses in marriage." *Kerrigan v. Commissioner of Public Health*, 289 Conn. 135, 143-44 (2008) (citing Conn. Gen. Stat. §46b-38nn). "Under the civil union law, however, 'marriage' [wa]s defined as 'the union of one man and one woman.'" *Id.* (quoting Conn. Gen. Stat. § 46b-38nn).

On January 31, 2007, the Co-Chairmen of the Joint House and Senate Judiciary Committee of the Connecticut General Assembly, State Senator Andrew McDonald and Representative Michael Lawlor introduced a bill affording same-

sex couples full marriage rights.  *See* Raised H.B. No.7395.  The proposed bill indicated that the Connecticut General Assembly had found that "(1) [t]he best interests of a child are promoted by having persons in the child's life who manifest a deep concern for the child's growth and development; (2) [t]he best interests of a child are promoted when a child has as many persons loving and caring for the child as possible; and (3) [t]he best interests of a child are promoted when the child is part of a loving, supportive and stable family, whether that family is a nuclear, extended, split, blended, single parent, adoptive or foster family."  *Id.*  The bill successfully passed the judiciary committee by a vote of 27-15 on April 12, 2007 but was never submitted to the full House or Senate.  *Id.*

In the meantime on October 28, 2008, the Connecticut Supreme Court held that laws restricting civil marriage to heterosexual couples violated same-sex couples' state constitution equal protection rights and that sexual orientation should be considered a quasi-suspect class.  *See Kerrigan,* 289 Conn. at 260.

After the *Kerrigan* decision, the Connecticut legislature proposed a second bill affording same-sex couples full marriage rights and repealing the civil union law.  *See* Raised H.B. No. 899.  On April 22, 2009, both the Senate and the House voted in favor of Raised H.B. No. 899, "An Act Implementing the Guarantee of Equal Protection Under the Constitution of the State for Same Sex Couples," and Republican Governor Rell signed the law the next day.  *Id.*  The 2009 bill contained the same Connecticut General Assembly findings as provided in the 2007 Raised Bill with respect to the best interests of the children.  *See* Public Act No.09-13.

9

###### 2.  Same-Sex Marriage in Vermont

On December 20, 1999, the Vermont Supreme Court held that same-sex couples are entitled under the Vermont constitution to the "same benefits and protections afforded by Vermont law to married opposite-sex couples."  *See Baker v. State*, 170 Vt. 194, 224 (1999).  In response, the Vermont legislature passed H.B. 847 et seq. which established the right of same-sex partners to enter into civil unions.  On February 9, 2007, the Vermont legislature introduced bill H272 which established civil marriage for same-sex couples.  On April 1, 2009, the Vermont Judiciary Committee passed the bill.  On April 3, 2009, the Vermont House passed the bill and then on April 6, 2009, the Vermont Senate approved the amendments the House had made to the proposed bill.  The amended bill was then vetoed by Vermont's governor the following day.  On April 7, 2009, the veto was overridden by an overwhelming vote of the Senate and the law went into effect September 1, 2009.  *See Human Rights Commission,* http://hrc.vermont.gov/Same-sex%20Marriage (last visited July 27, 2012).  The stated purpose of the act was to "recognize legal equality in the civil marriage laws and to protect the religious freedom of clergy and religious societies authorized to solemnize civil marriages."  Vt. Stat. Ann. tit. 15, § 8 (LexisNexis through 2011 session).

###### 3.  Same-Sex Marriage in New Hampshire

On April 4 and 26, 2007, the New Hampshire House and Senate respectively passed bill H.B. 437, establishing same-sex civil unions which was signed into

law on May 31, 2007.  2007–2 N.H.Rev.Stat. Ann. Adv. Legis. Serv. 54 (LexisNexis).

On March 18, 2009, the New Hampshire legislature voted on a bill H.B. 436

establishing civil marriage for same-sex couples.  An amended version of the bill

was passed in both the Vermont Senate and the House in May 2009 and signed

into law on June 3, 2009.  *See* N.H.Rev.Stat. Ann. § 457:1 (LexisNexis through

chapter 9 of 2012 session); Abby Goodnough, *New Hampshire Legalizes Same-*

*Sex Marriage*, N.Y. TIMES, June 3, 2009, *available at*

http://www.nytimes.com/2009/06/04/us/04marriage.html.

    c. Plaintiffs' Factual Backgrounds

      The pertinent facts are undisputed.  Plaintiffs are gay men or lesbians who

legally married a person of the same sex under the laws of the States of

Connecticut, Vermont and New Hampshire and have applied and been denied

federal marital benefits or sought to file federal income tax returns based on their

married status.[4]  [Dkt. #61, Pl. Local Rule 56(a)1 Statement, ¶¶1-3].

      Plaintiffs Joanne Pedersen ("Pedersen") and Ann Meitzen ("Meitzen") have

been validly married under Connecticut law since December 22, 2008 and have

been a committed couple for over twelve years.  *Id.* at ¶4.  Pedersen is a retired

civilian employee of the Department of the Navy, Office of Naval Intelligence, and

is enrolled in the Federal Employees Health Benefits Program ("FEHB").  *Id.* at ¶5.

Pedersen contacted FEHB and was told that her wife could not be added to her

---

[4] **BLAG has contested the standing of those Plaintiffs who sought to file federal income tax returns based on their married status arguing that the IRS code bars joint tax filing by same-sex couples even absent DOMA.  The facts related to those "Tax Plaintiffs" are not in dispute. Instead, the parties solely dispute whether these Plaintiffs have standing as a matter of law.**

insurance plan.  On November 8, 2010, during FEHB's open enrollment period, Pedersen used the online option to change her health insurance from "Self-Only" to "Self and Family" and was informed that the system could not process the request and was instructed to call FEHB.  *Id.* at ¶¶6-7.  Pedersen called the number provided on the website and was informed that her wife was not eligible as her spouse because she is of the same sex.  *Id.* at ¶8.  Pedersen's wife, Meitzen, struggles with a chronic lung condition affecting her ability to work and would prefer to retire from full-time employment but is unable to due to the health insurance costs she must pay in light of the fact that she has been denied access to Pedersen's FEHB health insurance benefits.  *Id.* at ¶¶10-11.

Plaintiffs Gerald V. Passaro II ("Passaro") and Thomas Buckholz ("Buckholz") were validly married under Connecticut law from November 26, 2008 until Buckholz's death on January 7, 2009.  They had been a committed couple for over 13 years.  *Id.* at ¶¶13-14.  Buckholz was a chemist at the Bayer Corporation ("Bayer") for more than 20 years and was fully vested in Bayer's defined benefit pension plan under which Passaro was his named beneficiary.  Bayer denied Passaro's request to provide him with benefits under the pension plan.  *Id.* at ¶16. Passaro also applied for the Social Security lump-sum benefit available to surviving spouses.  *Id.* at ¶18.  The Social Security Administration ("SSA") denied his claim and he was informed by SSA that his "marriage d[id] not meet the requirements under Federal law for payment of Social Security Lump Sum Death benefits."  *Id.* at ¶19.

Plaintiffs Raquel Ardin ("Ardin") and Lynda DeForge ("DeForge") have been validly married under Vermont law since September 7, 2009 and have been a committed couple for over thirty years. *Id.* at ¶20. DeForge has been a United States Postal Service employee for 26 years and is an eligible employee under the terms of Title I of the Family Medical Leave Act ("FMLA"). *Id.* at ¶21. Ardin also worked for the United States Postal Service for 25 years before taking disability retirement in 2005 for a neck injury sustained during her service abroad for the United States Navy. *Id.* at ¶¶22-23. DeForge is required to be with Ardin one day every three months to care for her during her regular treatments for her neck injury. DeForge applied for FMLA leave for one day every three months to care for her wife during these treatments. *Id.* at ¶¶25-26. The United States Postal Service denied DeForge's request for FMLA leave and instead DeForge has taken vacation time to provide such care for her wife. *Id.* at ¶¶27-28. DeForge has also taken an additional 64 hours of vacation time to care for her wife following two surgeries in which she would have preferred to have taken this time as unpaid leave under the FMLA. *Id.* at ¶¶29. Both DeForge and Ardin are enrolled in the FEHB Program under a "Self-Only" plan. During open enrollment, DeForge applied to have Ardin added to her "Self and Family" plan under the FEHB program and was informed that "[s]ame sex spouses are not considered eligible family members under FEHB." *Id.* at ¶¶32-35. DeForge and Ardin would prefer to have one "Self and Family" plan in order to take advantage of the cost savings of a single plan. *Id.* at ¶36.

13

Plaintiffs Janet Geller ("Geller") and Joanna Marquis ("Marquis") have been validly married under New Hampshire law since May 3, 2010 and have been a committed couple for over thirty years. *Id.* at ¶38. Marquis is a retired school teacher having taught in New Hampshire public schools for over 30 years. Geller is also a retired school teacher having taught in New Hampshire public schools for over 25 years. *Id.* at ¶¶39-40. Both receive a pension through the New Hampshire Retirement System ("NHRS"). *Id.* at ¶41. Because Marquis has over 30 years of service her NHRS benefits include a medical cost supplement that helps pay for her Medicare Part B supplemental insurance and which also provides a supplement for her spouse. Marquis applied for the cost supplement for her wife Geller and was denied the benefit which would have resulted in $375.56 in savings per month. *Id.* at ¶¶42-45.

Plaintiffs Suzanne Artis and Geraldine Artis have been validly married under Connecticut law since July 11, 2009, have been a committed couple for over seventeen years, and are raising three children together. *Id.* at ¶¶47-48. For the year 2009, Suzanne Artis filed a federal income tax return as Head of Household and Geraldine Artis filed a federal income tax return as Single. *Id.* at ¶49. Both Suzanne and Geraldine Artis submitted a first amended federal income tax return for the year 2009 on IRS Form 1040X requesting a refund of $1,465, which is the difference between what they each paid as a Head of Household filer and as a Single filer, respectively, and what they would have paid if they had been permitted to file with the status of Married Filing Jointly. The IRS denied the Artis's 2009 refund request because "for federal tax purposes, a marriage means

only a legal union between a man and a woman as husband and wife."  *Id.* at ¶¶50-52.

Plaintiffs Bradley Kleinerman ("Kleinerman") and James Gehre ("Gehre") have been validly married under Connecticut law since March 6, 2009 and have three children whom they adopted jointly.  *Id.* at ¶¶55-56.  For the year 2009, Kleinerman filed a federal income tax return as Head of Household.  Gehre, a stay at home parent did not have sufficient income to file a federal income tax return. *Id.* at ¶57.  Kleinerman submitted a first and then second amended federal income tax return for the year 2009 on IRS Form 1040X requesting a refund of $2,085 which is the difference between what he paid as a Head of Household filer and what he would have paid if he had been permitted to file with the status of Married Filing Jointly.  *Id.* at ¶¶58-59.  The IRS failed to act on the second amended return within 6 months and therefore his request has been deemed denied by the IRS. *Id.* at ¶60.  Kleinerman and Gehre were also informed that they would have to fill out two United States customs forms upon returning to the United States from an international trip.  *Id.* at ¶62.

Plaintiffs Damon Savoy ("Savoy") and John Weiss ("Weiss") have been validly married under Connecticut law since October 9, 2010, have been a committed couple for twelve years, and are raising three adopted children together.  *Id.* at ¶¶64,66.  Savoy has been a government attorney for the Office of the Comptroller of the Currency ("OCC") since 1992 and is enrolled in the FEHB program.  *Id.* at ¶65.  Weiss gave up his career to focus on raising their children full time.  After Weiss's COBRA health coverage terminated, he had to apply for

and purchase health care coverage on the private insurance market.  *Id.* at ¶¶66-67.  Savoy applied to have his husband added to his existing health plan under the FHEB Program and his application was denied.  *Id.* at ¶¶69-70.

II.      **Standards of Review**

        A.  **Motion to Dismiss**

    "'To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Sarmiento v. U.S.*, 678 F.3d 147 (2d Cir. 2012)(quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  While Rule 8 does not require detailed factual allegations, "[a] pleading that offers 'labels and conclusions' or 'formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (citations and internal quotations omitted).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Id.* (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 557 (2007)).  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (internal citations omitted).

        In considering a motion to dismiss for failure to state a claim, the Court should follow a "two-pronged approach" to evaluate the sufficiency of the complaint. *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010).  "A court 'can choose to begin by identifying pleadings that, because they are no more than

conclusions, are not entitled to the assumption of truth.'" *Id.* (quoting *Iqbal*, 129 S.Ct. at 1949-50). "At the second step, a court should determine whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal*, 556 U.S. 679). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (internal quotations omitted).

### B.  Motion for Summary Judgment

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Fed.R.Civ.P. 56(a). The moving party bears the burden of proving that no factual issues exist. *Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir.2010). "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id.,* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH,* 446 F.3d 313, 315–16 (2d Cir.2006) (internal quotation marks and citation omitted).

"A party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible. At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient." *Welch–Rubin v. Sandals Corp.,* No.3:03cv481, 2004 WL 2472280, at *1 (D.Conn. Oct. 20, 2004) (internal quotation marks and citations omitted); *Martinez v. State of Connecticut*, No. 3:09cv1341 (VLB), 2011 WL 4396704 at *6 (D. Conn. Sept. 21, 2011).   Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie. *Fincher v. Depository Trust and Clearance Co.*, 604 F.3d 712 (2d Cir. 2010).

III.     Discussion

   A. Standing of those Plaintiffs Who Were Prevented from Filing Joint Tax
       Returns

BLAG argues that those Plaintiffs who claim that DOMA prohibited them from jointly filing their taxes lack standing in this case.  *See* [Dkt. #82, BLAG Obj. to Summary Judgment, p. 34-37].  BLAG argues that the "statute governing the joint filing of married persons, 26 U.S.C. §6013, does not on its own extend to same-sex couples."  *Id.* at 34.  26 U.S.C. §6013 provides in relevant part that a "husband and wife may make a single return jointly of income taxes…"  26 U.S.C. §6013(a).  BLAG argues that these Plaintiffs lack standing "because the joint

filing statute itself offers an independent ground to deny them joint, married filing status." [Dkt. #82, p. 35].  BLAG argues that even if DOMA were struck down, these Plaintiffs would not qualify as "spouses" nor would their relationships qualify as "marriages" within the meaning of the IRS code.  *Id.* at 37.

"Article III, § 2 of the United States Constitution restricts federal courts to deciding 'Cases' and 'Controversies' and thus imposes what the Supreme Court has described as the 'irreducible constitutional minimum of standing,'—injury-in-fact, causation, and redressability." *Baur v. Veneman,* 352 F.3d 625, 631–32 (2d Cir.2003) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992)).  *Lujan* holds that a "litigant must demonstrate that it has suffered a concrete and particularized injury that is either actual or imminent, that the injury is fairly traceable to the defendant, and that it is likely that a favorable decision will redress that injury." *Massachusetts v. EPA,* 549 U.S. 497, 517, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007).  "In the absence of standing, a court lacks the requisite subject matter jurisdiction over the case."  *HealthNow New York Inc. v. New York*, 448 Fed. Appx. 79, 81 (2d Cir. 2011).

Plaintiffs argue that BLAG's interpretation of the IRS code is unavailing because gendered terms in federal statutes are presumptively gender-neutral. U.S.C. Title 1, Section 1 states in relevant part that "when determining the meaning of any Act of Congress, unless the context indicates otherwise … [the] words importing the masculine gender include the feminine as well."  1 U.S.C. §1. Moreover, the Internal Revenue Code itself states that it cross references 1 U.S.C. §1 for the other definitions including "masculine as including feminine."  *See* 26

U.S.C. §7701 (p) (1) (3).  The gender neutral equivalent of the terms husband and wife is spouse. Therefore it is clear that even absent DOMA the use of the gendered terms of "husband" and "wife" in Section 6013 would not bar Plaintiffs from joint filing on the basis of the IRS code's adoption of Section 1's gender-neutral directive.

In addition, Plaintiffs argue that the IRS has "never adopted the narrow statutory construction the House now urges.  To the contrary, the IRS has repeatedly stated that DOMA – and not Code Section 6013 – is the reason that same-sex couples may not file joint tax returns."  [Dkt. #95, Pl. Obj. to Motion to Dismiss, p. 36].  Moreover, Plaintiffs have provided evidence that prior to the enactment of DOMA in 1996 the IRS's practice was to defer to state law to determine marital status.  *See Boyter v. Comm'r*, 668 F.2d 1382. 1385 (4th Cir. 1981) ("[U]nder the Internal Revenue Code a federal court is bound by state law rather than federal law when attempting to construe marital status.").  The 1995 version of IRS Publication 17, Cat. No. 10311G, "Your Federal Income Tax – For Individuals" for use in preparing 1995 returns stated that "[y]our filing status is a category that identifies you based on your marital and family situation.  State law governs whether you are married, divorced, or legally separated under a decree of divorce or separate maintenance."  [Dkt. #100, attach 10, Exhibit J].

Plaintiffs offer unequivocal evidence that DOMA was the reason the IRS no longer deferred to state law and instead denied same-sex couples who were validly married under state law the ability to file joint tax returns.  Indeed, Plaintiffs have submitted a letter from the IRS itself indicating that DOMA was the

reason why they were denied joint married filing status.  The IRS sent a
Determination Letter to Plaintiff Suzanne Artis dated December 31, 2009 stating
that "[a]ccording to Public Law 104-199, Defense of Marriage Act (DOMA) states
that a legal union between one man and one woman is considered marriage.  And
because same sex couples cannot, under DOMA, constitute a marriage, they
cannot file a Married Filing Joint tax return." [Dkt. #100, attach 8, Exhibit H].
Further, Plaintiffs have submitted an IRS information letter dated December 31,
2001, stating that "[b]ecause parties to a Vermont civil union must be of the same
sex, a Vermont civil union cannot, under DOMA, be a marriage for purposes of
the Internal Revenue Code.  Therefore, parties to a Vermont civil union cannot be
considered married for purposes of §1 or as husband and wife for purposes of
§6013."  [Dkt. #100, attach 11, Exhibit K].  Lastly, in addition, the 2009 version of
IRS publication 17, "Your Federal Income Tax – For Individuals" for use in
preparing 2009 returns stated that "[i]n general, your filing status depends on
whether you are considered unmarried or married.  For federal tax purposes, a
marriage means only a legal union between a man and a woman as husband and
wife." [Dkt. #100, attach 9, Exhibit I].

　　　　The record clearly establishes that those Plaintiffs referred to as the "Tax
Plaintiffs" have satisfied their burden of proving that DOMA was, and but for
adjudication of this issue will continue to be, the cause of their alleged injury.
BLAG's arguments that Section 6013 and not DOMA deprives the "Tax Plaintiffs"
of the tax treatment to which they assert entitlement is unpersuasive in light of
the IRS's clear  and unequivocal statement that DOMA was the basis for its denial

of joint married filing status.  The Court therefore finds that the "Tax Plaintiffs" have standing to pursue their claims in this Court.

      **B.  *Baker v. Nelson* Does Not Mandate Dismissal of Plaintiffs' Case**

      BLAG argues that the Supreme Court's summary dismissal in *Baker v. Nelson*, 409 U.S. 810 (1972), forty (40) years ago is binding precedent supporting the constitutionality of DOMA and that *Baker* mandates dismissal of Plaintiffs' case.  [Dkt. #81, BLAG Motion to Dismiss, p.14.].  The Court rejects BLAG's argument for two reasons. First, Baker has limited precedential value.  In *Baker*, the Appellants challenged a Minnesota statute which denied marriage licenses to same-sex couples on due process and equal protection grounds arguing that "the right to marry without regard to the sex of the parties is a fundamental right," and that "restricting marriage to only couples of the opposite sex is irrational and invidiously discriminatory."  *Baker v. Nelson*, 291 Minn. 310, 312 (1971).  The Minnesota Supreme Court affirmed that the statute "does not authorize marriage between persons of the same sex and that such marriages are accordingly prohibited" and held that the "equal protection clause of the Fourteenth Amendment, like the due process clause, is not offended by the state's classification of persons authorized to marry."  *Id.* at 312-313.  The Appellants then exercised their right of appeal to the United States Supreme Court pursuant to 28 U.S.C. § 1257 (2) (repealed 1988) arguing that the Minnesota marriage statute violated due process and equal protection rights guaranteed by the Fourteenth Amendment.  The Supreme Court summarily dismissed the appeal "for want of substantial federal question." *Baker v. Nelson*, 409 U.S. at 810.

The Second Circuit has eschewed the application of *Baker* advocated by BLAG. "The Supreme Court has long recognized that the precedential value of a summary dismissal is limited to the 'precise issues presented and necessarily decided by' the dismissal." *Alexander v. Cahill*, 598 F.3d 79, 89 n.7 (2d Cir. 2010). The Supreme Court has repeatedly cautioned that the precedential import of a summary dismissal is extremely narrow.  In other words, a "summary affirmance [or dismissal] is a 'rather slender reed' on which to rest future decisions." *Morse v. Republican Party*, 517 U.S. 186, 203 n.21 (1996) (internal citation omitted). Consequently, any "[q]uestions which 'merely lurk in the record,'… are not resolved, and no resolution of them may be inferred." *Ill. State Bd. of Elec. v. Socialist Workers*, 440 U.S. 173, 182 (1979).

Second, the instant case does not present the same questions presented in *Baker*.  *Baker* presented a state constitutional question while this case presents a United States constitutional question.  Plaintiffs have challenged a federal law which defines marriage for federal purposes, impacting entitlement to federal benefits and obligations under federal law.  DOMA abridges the states' right to confer marital status on residents, but it does not wholly deprive states of the right to do so.  DOMA impacts federal benefits and obligations, but does not prohibit a state from authorizing or forbidding same-sex marriage, as was the case in *Baker*.

In addition, although the Plaintiffs argue that DOMA impacts a fundamental right, the issue of whether there is a constitutional right to same-sex marriage is not present in the instant matter as all Plaintiffs are validly married under state

23

law.  Consequently, *Baker*, which addressed whether there was a constitutional right to same-sex marriage, is clearly unrelated to the question presented in the current case and is therefore not binding on this Court.  *Accord*, *e.g.*, *Windsor v. United States*, 833 F.Supp. 2d 394, 399-400 (S.D.N.Y. 2012) ("[A]fter comparing the issues in *Baker* and those in the instant case, the Court does not believe that *Baker* 'necessarily decided' the question of whether DOMA violates the Fifth Amendment's Equal Protection Clause."); *Golinski v. U.S. Office of Personnel Management*, 824 F.Supp.2d 968, 983 n.5 (N.D. Cal. 2012) (finding *Baker* to be irrelevant to Plaintiffs' equal protection challenge to DOMA);  *Massachusetts*, 682 F.3d at 2 (holding on challenge to DOMA that "*Baker* does not resolve our own case but it does limit the arguments to ones that do not presume or rest on a constitutional right to same-sex marriage."); *Smelt v. County of Orange*, 374 F.Supp. 2d 861, 873 (C.D. Cal. 2005) (finding that DOMA reflects "interests and its own legislative history" that "were not before the Minnesota Supreme Court or the U.S. Supreme Court at the time of *Baker*"); *In re Kandu,* 315 B.R. 123, 137 (Bankr. W.D. Wash. 2004) (finding that *Baker* does not apply because DOMA deals with "subsequently-enacted federal legislation with its own Congressional history that concerns exclusively federal benefits").   Having concluded that *Baker* is not dispositive of the issues presented in this case, the Court will consider the parties' arguments as to whether DOMA violates the promise of equal protection.

### C.  Equal Protection

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection

of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)).  Though the Fifth Amendment makes no explicit mention of equal protection under the laws, the Supreme Court has recognized that since 1975, "[t]his Court's approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 217 (1995) (internal quotations omitted) (quoting *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975)); *see also Buckley v. Valeo*, 424 U.S. 1, 93 (1976) ("Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment.").

The guarantee of equal protection of the laws, well-established to be incorporated into the Fifth Amendment, "is a pledge of the protection of equal laws." *See Romer v. Evans*, 517 U.S. 620, 633-34 (1996) (internal quotations omitted) (quoting *Skinner v. Oklahoma ex. Rel. Williamson*, 316 U.S. 535, 541 (1942)).  When considering a state constitutional amendment prohibiting any administrative, legislative or judicial action designed to protect homosexuals from discrimination, the United States Supreme Court reminded us that our "Constitution 'neither knows nor tolerates classes among citizens.'" *Romer*, 517 U.S. at 623 (quoting *Plessy v. Ferguson*, 163 U.S. 537, 559 (1896)).

The need to adhere to these directives of equal protection, however, must be balanced against "the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or

persons." *Romer*, 517 U.S. at 631 (citing *Pers. Admin. of Mass. v. Feeney*, 442 U.S. 256, 271-72 (1979). "A legislature must have substantial latitude to establish classifications that roughly approximate the nature of the problem perceived, that accommodate competing concerns both public and private, and that account for limitations on the practical ability of the State to remedy every ill. In applying the Equal Protection Clause to most forms of state action, we thus seek only the assurance that the classification at issue bears some fair relationship to a legitimate public purpose." *Plyler*, 457 U.S. at 216.

"[C]ourts apply the most searching constitutional scrutiny to those laws that burden a fundamental right or target a suspect class, such as those based on race, national origin, sex or religion. *Golinski*, 824 F.Supp.2d at 981 (citing *Romer*, 517 U.S. at 631). Conversely, "if a law neither burdens a fundamental right nor targets a suspect class," the legislative classification will withstand constitutional scrutiny "so long as it bears a rational relation to some legitimate end." *Romer*, 517 U.S. at 631 (citing *Heller v. Doe*, 509 U.S. 312, 319-20 (1993)). However, even under rational basis review the constitutional scrutiny is not "minimalist," rather the Court must consider the "case-specific nature of the discrepant treatment, the burden imposed, and the infirmities of the justifications offered." *Massachusetts*, 682 F.3d at 6.

At the outset, the Court must determine the appropriate level of scrutiny to apply. Plaintiffs argue that DOMA should be subject to heightened judicial review because DOMA treats individuals differently on the basis of their sexual

orientation by denying certain benefits to legally married same-sex couples that are available to legally married opposite-sex couples.

### D.  Suspect Class

The Supreme Court has acknowledged that it "would not be faithful" to its obligations under the Constitution to apply "so deferential a standard to every classification" as the equal protection clause was intended as a restriction on legislative action "inconsistent with elemental constitutional premises."  *Plyler*, 457 U.S. at 216.  Consequently, a greater scrutiny is applied to classifications that disadvantage a suspect class or that impinge upon the exercise of a fundamental right. *Id.*  Such classifications are therefore "treated as presumptively invidious" and must be "precisely tailored to serve a compelling government interest" to pass constitutional muster.  *Id.*  In addition, classifications that disadvantage a quasi-suspect class are also subject to a form of heightened scrutiny and must be "substantially related to a legitimate state interest" to withstand so-called intermediate scrutiny.  *See Mills v. Habluetzel*, 456 U.S. 91, 99 (1982).

Plaintiffs argue that heightened scrutiny is appropriate in the instant case on two bases:  first Plaintiffs argue that sexual orientation should be considered a suspect or quasi-suspect class and second that DOMA "disparately burdens the fundamental interest in maintaining existing family relationships".  *See* [Dkt. #63, Pl. Motion for Summary Judgment, p.15-30].  Since Plaintiffs' first argument is the narrower ground for assessing the appropriateness of heightened scrutiny the Court will consider this argument first as "courts generally decide constitutional questions on the narrowest ground available."  *Perry v. Brown*, 671

F.3d 1052, 1076 (9th Cir. 2012) (citing *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 217 (1995)).

The Supreme Court has considered the following factors in assessing whether a particular classification should be considered either a suspect or quasi-suspect class:  "(1) the history of invidious discrimination against the class burdened by the legislation; (2) whether the characteristics that distinguish the class indicate a typical class member's ability to contribute to society; (3) whether the distinguishing characteristics are 'immutable' or beyond the class members' control; and (4) the political power of the subject class."  *Golinski*, 824 F.Supp.2d at 983 (citation omitted).

"No single factor for determining elevated scrutiny is dispositive."  *Id.  See Massachusetts Bd. of Ret. v. Murgia*, 427 U.S. 307, 321 (1976) (Marshall, J. dissenting) (acknowledging the problems of "deciding cases based on factors not encompassed by the applicable standards" as "rudderless" and "unpredictable" and the related danger that "relevant factors will be misapplied or ignored."  "All interests are not 'fundamental' and all classes not 'suspect' are not the same; and it is time for the Court to drop the pretense that, for purposes of the Equal Protection Clause, they are.").  The presence of any one of these factors marks such classification as "more likely than others to reflect deep-seated prejudice rather than legislative rationality in pursuit of some legitimate objective."  *Plyler*, 457 U.S. at 216 n.14.  "Legislation predicated on such prejudice is easily recognized as incompatible with the constitutional understanding that each person is to be judged individually and is entitled to

equal justice under the law. Classifications treated as suspect tend to be irrelevant to any proper legislative goal." *Id.* Although no one factor is dispositive, Supreme Court precedent has placed greater emphasis on the first two factors. *See Golinski*, 824 F.Supp.2d at 983 (citing *Kerrigan*, 289 Conn. at 167-68).

### 1. Federal Precedent Regarding Suspect Classification

BLAG contends that sexual orientation has never been viewed as a suspect or quasi-suspect class by federal courts and argues that it would be a "radical step" to disregard "consistent, substantial and persuasive authority." *See* [Dkt. #82, p.8]. In support of this contention, BLAG points to the Supreme Court's past application of rational basis review to classifications based on sexual orientation in *Romer* and *Lawrence* and emphasizes that eleven federal circuits have previously held that homosexuals are not a suspect class. *Id.* at 7 (citing *Cook v. Gates*, 528 F.3d 42, 61 (1st Cir. 2008); *Lofton v. Sec. of Dep't of Children & Fam. Servs.*, 358 F.3d 804, 818 & n.1 (11th Cir. 2004); *High Tech Gays v. Def. Indus. Sec. Clearance Office*, 895 F.2d 563, 574 (9th Cir. 1990); *Ben-Shalom v. Marsh*, 881 F.2d 454, 464 (7th Cir. 1989)).

The jurisprudence of the appropriate classification is inchoate. While BLAG's asserts that there is "consistent, substantial and persuasive authority" supporting the conclusion that sexual orientation is not a suspect or quasi-suspect class, many circuits, including ours, have not had occasion to squarely address it. First, the question of whether sexual orientation is a suspect class is an open question in the Second Circuit and therefore a matter of first impression

before this Court. *See Able v. United States*, 155 F.3d 628, 632 (2d Cir. 1998) (noting that the court need not decided whether homosexuals were a suspect class in the Second Circuit since the "plaintiffs asserted that they were not seeking any more onerous standard than the rational basis test" on appeal); *see also Windsor*, 833 F.Supp.2d at 402 (finding DOMA violated equal protection under rational basis review and noting that the court "need not decided today whether homosexuals are a suspect class.").

Second, the Supreme Court has not yet ruled on the appropriate level of scrutiny for classifications based on sexual orientation. In both *Romer* and *Lawrence*, the Supreme Court only assessed whether the subject legislation failed rational basis review and neither opinion addressed the issue of suspect class. *See Kerrigan*, 289 Conn. at 238-39 (rejecting the contention that the United States Supreme Court in *Romer* "implicitly concluded that gay persons do not comprise a suspect or quasi-suspect class … Because the court indicated that the Colorado constitutional amendment could not withstand even rational basis review, the lowest level of judicial scrutiny, the court had no reason to decide whether heightened review was appropriate."). Indeed, the word "suspect" does not appear once in the Supreme Court's decision in *Lawrence* and only the dissent in *Romer* mentions suspect class in a footnote noting that respondents elected to not appeal to the Supreme Court of Colorado the trial court's rejection of their argument that homosexuals constitute a suspect or quasi-suspect class. *Romer*, 517 U.S. 640 n.1; *Lawrence v. Texas*, 529 U.S. 558, 529 n.1 (2003). In view

30

of this, *Romer* and *Lawrence* are not dispositive as to the level of scrutiny that should be afforded to classifications based on sexual orientation.

Lastly,  many of the cases relied on by BLAG in turn rely on the reasoning of *Bowers v. Hardwick*, 478 U.S. 186 (1986) which was subsequently overruled in *Lawrence* or gave cursory consideration to the suspect class analysis.  Thus these cases lack both contemporary and explicative analysis of the issue.  As the *Golinski* court in the Northern District of California noted "[w]hen the premise for a case's holding has been weakened, the precedential import of the case is subject to question. District courts are not governed by earlier appellate precedent that has been undercut by higher authority to such an extent that it has been effectively overruled by such higher authority."  *Golinski,* 824 F.Supp.2d at 983 (internal quotation marks and citation omitted).  As the *Golinski* court explained, the Ninth Circuit's holding in *High Tech Gays* that homosexuals could not constitute a suspect or quasi-suspect class was entirely predicated on the Supreme Court's reasoning in *Bowers* upholding the criminalization of private consensual homosexual conduct.  *Id.* at 983-984; *High Tech Gays*, 895 F.2d at 571 ("because homosexual conduct can … be criminalized, homosexuals cannot constitute a suspect or quasi-suspect class entitled to greater than rational basis review for equal protection purposes.").  However, this very reasoning was squarely rejected in *Lawrence* in which the Supreme Court held that private consensual homosexual conduct could not be criminalized because such practices were safeguarded by the liberty protections afforded by the Due Process Clause of the Fourteenth Amendment.  Like the Ninth Circuit, the vast

31

majority of the federal circuit cases addressing this issue "either relied on *Bowers* explicitly or relied on cases that were predicated on *Bowers*." *Kerrigan*, 289 Conn. at 231 n.64 (collecting cases).  Consequently, the Supreme Court's holding in *Lawrence* "remov[ed] the precedential underpinnings of the federal case law supporting the defendants' claim that gay persons are not a [suspect or] quasi-suspect class." *Id.* at 233.

Furthermore as the Department of Justice ("DOJ") in their response to the Plaintiffs' motion for summary judgment and BLAG's motion to dismiss note, a number of the circuit cases relied on by BLAG involve challenges to military policy on homosexual conduct and are therefore distinguishable from challenges within the civilian context.  *See* [Dkt. #98, DOJ Obj. to Motion to Dismiss and Summary Judgment, p. 10 n.2]; *Cook*, 528 F.3d at 45 (challenge to the military's "Don't Ask Don't Tell" policy); *Ben-Shalom*, 881 F.2d at  456 (challenge to Army Regulation 135-178); *High Tech Gays*, 895 F.2d at 565 (challenge to the Department of Defense policy of conducting expanded investigations into backgrounds of all gay and lesbian applicants for secret and top secret security clearances).  Indeed, the Second Circuit has observed that "[i]n full recognition that within the military individual rights must of necessity be curtailed lest the military's mission be impaired, courts have applied less stringent standards to constitutional challenges to military rules, regulations and procedures than they have in the civilian context" and consequently a court's "'review of military regulations ... is far more deferential than constitutional review of similar laws or regulations designed for civilian society.'"  *Able*, 155 F.3d at 633 (quoting

*Goldman v. Weinberger*, 475 U.S. 503, 507 (1986)); *see also Rostker v. Goldberg*, 453 U.S. 57, 70 (1981) (acknowledging that "judicial deference to such congressional exercise of authority is at its apogee when legislative action under the congressional authority to raise and support armies and make rules and regulations for their governance is challenged").  Considering the inimitable circumstances attending military regulations and the uniquely deferential approach afforded to such regulations, whatever precedential value these cases have to the civilian context is considerably diminished.[5]

In view of the fact that the authority relied on by BLAG in turn relied on *Bowers*, which was rejected in *Lawrence*, and relied on analyses in the deferential military context rather than the more discretionary civilian context, the precedential import of such authority is unpersuasive, particularly given the fact that the Second Circuit has not had an opportunity to consider the matter.

The Court is mindful of the Supreme Court's admonition that "'respect for the separation of powers' should make courts reluctant to establish new suspect classes."  *Thomasson v. Perry*, 80 F.3d 915, 928 (4th Cir. 1996) (quoting *Cleburne*, 473 U.S. at 441).  The Supreme Court has to date only recognized a handful of

---

[5] The Court notes that the First Circuit in its recent opinion, *Massachusetts*, 682 F.3d at 4, concluded that its prior decision in *Cook v. Gates* declining to create a new category of suspect classification for sexual orientation bound the panel.  As discussed above, this Court questions the precedential value of *Cook* in light of its military context.  The First Circuit in *Cook* deliberately "recognize[d] the unique context in which the liberty interest at stake" arose and expressly acknowledged that it was applying a uniquely deferential approach in "reviewing an exercise of Congressional judgment in the area of military affairs."  *Cook*, 528 F.3d at 57.  Consequently, the First Circuit's recent affirmation in *Massachusetts* of the appropriateness of rational basis review with respect to sexual orientation is not persuasive in light of its reliance on *Cook*.

suspect and quasi-suspect classes.  *See e.g., Loving v. Virginia*, 388 U.S. 1, 11
(1967) (race subject to strict scrutiny); *Korematsu v. United States*, 323 U.S. 214,
216 (1944) (national ancestry and ethnic origin subject to strict scrutiny);
*Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality opinion) (gender
subject to intermediate scrutiny); *Mathews v. Lucas*, 427 U.S. 495, 505-506 (1976)
(illegitimacy subject to intermediate scrutiny); *cf.,e.g., Cleburne*, 473 U.S. at 443
(declining to recognize mentally disadvantaged as a suspect class); *Murgia*, 427
U.S. at  313 (per curiam) (declining to extend strict scrutiny to the elderly); *Lyng v.
Castillo*, 477 U.S. 635, 638 (1986) (declining to extend strict scrutiny to close
relatives).

      Although heedful of the command for judicial restraint, the Court
recognizes that a mechanical adherence to this command would likely undermine
the Court's obligation to ensure that the equal protection clause does serve as a
restriction on legislative action "inconsistent with [the] elemental constitutional
premise[]" that "all persons similarly circumstanced shall be treated alike."
*Plyler*, 457 U.S. at 216-17 (internal quotation marks and citation omitted).
Pursuant to this obligation, the Court must not be tempted to tie conceptions of
judicial restraint to historic notions of equality.  The Supreme Court has indeed
remarked that "the Equal Protection Clause is not shackled to the political theory
of a particular era.   In determining what lines are unconstitutionally
discriminatory, we have never been confined to historic notions of equality, any
more than we have restricted due process to a fixed catalogue of what was at a
given time deemed to be the limits of fundamental rights.  Notions of what

constitutes equal treatment for purposes of the Equal Protection Clause do change." *Harper v. Virginia State Bd. Of Elections*, 383 U.S. 663, 669 (1966). In this Court's view, this elasticity does not mean a rewriting of the Constitution, but rather a rigorous examination of the fundamental meaning of the noble ideals established by our founding fathers as our guiding and enduring principles. Considering the import of the elemental premise of equal protection and in light of the lack of persuasive authority as to appropriate the level of scrutiny, it is this Court's duty to meaningfully assess in the first instance whether sexual orientation constitutes a suspect or quasi-suspect class.

   2.  **Suspect or Quasi-suspect Class Factors**

        At the outset, this Court is guided by Justice Thurgood Marshall's approach in his concurring and dissenting opinion in *Cleburne*, joined by Justices Brennan and Blackmun, that "[n]o single talisman can define those groups likely to be the target of classifications offensive to the [f]ourteenth [a]mendment and therefore warranting heightened or strict scrutiny; experience, not abstract logic, must be the primary guide." 473 U.S. at 472-73 n. 24. Moreover, "[t]he discreteness and insularity warranting a 'more searching judicial inquiry' . . . must therefore be viewed from a social and cultural perspective as well as a political one. To this task judges are well suited, for the lessons of history and experience are surely the best guide as to when, and with respect to what interests, society is likely to stigmatize individuals as members of an inferior caste or view them as not belonging to the community. Because prejudice spawns prejudice, and stereotypes produce limitations that confirm the

stereotype on which they are based, a history of unequal treatment requires sensitivity to the prospect that its vestiges endure.   In separating those groups that are discrete and insular from those that are not, as in many important legal distinctions, 'a page of history is worth a volume of logic.'"   *Id.* (citations omitted).  Thus the Court's analysis will be cognizant of social, cultural and political perspectives grounded in experience as opposed to abstract logic and an awareness that there is likely no single talisman that signals which groups are the subject of classifications offensive to the principle of equal protection.

> i.        History of Discrimination

The first factor courts consider is whether the class has suffered a history of discrimination.  Plaintiffs argue that "[i]t is beyond dispute that 'for centuries there have been powerful voices to condemn homosexual conduct as immoral'" and that "lesbians and gay men have suffered a long history of discrimination and condemnation." [Dkt. #63, p.30] (citing *Lawrence*, 539 U.S. at 571).  BLAG responds that it "does not dispute that homosexuals have been subject to discrimination" however BLAG questions the length of this history.  This acknowledgement is emblematic of the incidents of discrimination, including annulation, negation, ostracism and isolation of the group which is the object of discrimination resulting in the broader society's lack of knowledge and understanding of that group.

BLAG argues that the history of discrimination against homosexuals is relatively short-lived and ostensibly the product of the twentieth century which counsels against recognizing sexual orientation as a suspect or quasi-suspect

class.  [Dkt. #82, p.9-10].  In support of this sweeping argument, BLAG cites to a short excerpt taken from an article published by one of Plaintiff's experts, George Chauncey, Ph.D., ("Chauncey") and a quote from an internet interview given by Chauncey in which Chauncey notes that affirmative legislative proscriptions against homosexuals as an identity group were implemented in the twentieth century consequent to the emergence of the concept of homosexual as a distinct category of people in the nineteenth century.  *Id., see also* [Dkt. #74, Chauncey Aff., ¶ 10].

Chauncey elaborates in his expert affidavit[6] that the formal institutionalization of discrimination against homosexual identity or status in the twentieth century was really the outgrowth of "ancient Judeo-Christian prohibitions against sodomy and 'unnatural acts,'" which "penalized a wide range of non-procreative behavior, including many forms of what would now be called homosexual conduct."  [Dkt. #74, ¶ 10]; see *also Owen Keehnen, The Case for Gay Marriage: Talking with Why Marriage?* Author George Chauncey (2004), QLBTQ.com, http://www.glbtg.com/sfeatures/interviewgchauncey.html ("It's important to note that there's been a long history in the regulation of sexual acts

---

[6] **BLAG broadly argues that portions of the Plaintiffs' expert affidavits should be disregarded to the extent they contain conclusory assertions not supported by any identification of the facts upon which they are based.  [Dkt. #82, p. 37-42].  To the extent that any material included in an expert affidavit does not demonstrate the inferential process and factual basis underlying the affiant's conclusions thereby making the opinion unreliable or unhelpful, the Court has disregarded such material in line with the Second Circuit's guidance in *Iacobelli Const., Inc. v. County of Monroe*, 32 F.3d 19, 25 (2d Cir. 1994) ("An affidavit stating the facts upon which the expert's opinion is based satisfies rule 56(e) even if the data supporting the facts is not attached.") (citation omitted).**

of various kinds, not just homosexual acts").  In his expert affidavit, Chauncey details the long-standing roots of anti-gay discrimination describing that the "first American laws against homosexual conduct were rooted in the earliest English settlers' understanding of the religious and secular traditions that prohibited sodomy." [Dkt. #74, ¶¶ 17-19].  Chauncey accounts that the English Reformation Parliament of 1533 turned the religious injunction against sodomy into the secular crime of buggery which English courts interpreted to apply to anal intercourse between a man and woman as well as between two men.  *Id.* at ¶18. Chauncey further explains that Colonial American statutes likewise criminalized homosexual conduct through prohibitions on sodomy or buggery noting that for example the Massachusetts Bay Colony prohibited sodomy by statute in 1641.  *Id.* at ¶19.  Consequently, the affirmative legislation of anti-gay policing that arose in the twentieth century was not reflective of an absence of prior discrimination or the emergence of a new form of discrimination as BLAG contends.  Instead, the legislative framework which was constructed in the twentieth century can been seen as consistent with and reflective of the long standing moral condemnation of homosexual conduct that dates back to ancient Judeo-Christian prohibitions against sodomy.

In view of this, BLAG's invocation of Chauncey's conclusion that antigay discrimination is "unique and relatively short-lived" is clearly taken out of context.  Chauncey explains that it was only until the twentieth century "[b]etween the 1920s and 1950s, the government, drawing on long traditions of hostility to same-sex conduct and responding to new conceptions of the

homosexual as an individual and to the growing visibility of those individuals, began to classify and discriminate against certain of their citizens on the basis of their *status or identity* as homosexuals" as opposed to discrimination on the basis of homosexual conduct.  *Id.* at ¶21 (emphasis added).   In other words, what was "unique and relatively short-lived" was the fact that it was not until the twentieth century that laws that discriminated against homosexuality were for the first time conceptualized in terms of status or identity as opposed to conduct.  As discussed above, laws that proscribed homosexual conduct more generally, such as anti-sodomy or buggery statutes, have undeniably long-standing roots.   When viewed in this fuller context, Chauncey's conclusion that laws discriminating against homosexual identity or status in the twentieth century were unique and short-lived is not inconsistent with a finding that homosexuals have suffered a long history of discrimination.

Further contradicting this notion is the fact that not just the conduct was labeled, but the individuals who engaged in or who appeared to have the proclivity to engage in such conduct were labeled.

Likewise the fact that the concept of homosexuality as a distinct category or class wasn't fully recognized until the late nineteenth century is not indicative of an absence of a long history of discrimination in light of the long standing proscriptions on homosexual conduct – conduct that is central if not tantamount in some sense to identity.  Moreover, the pervasiveness of the "closet" in which homosexuals purposefully hid their sexualities could very well explain why it was only in the late nineteenth century that conceptions of homosexual identity

emerged as gay Americans moved into cities and began tentatively stepping out of the closet.  *See, e.g.,* Kenji Yoshino, *Covering*, 111 Yale L. J. 769, 784 (2002) (describing the "progress of the gay rights movement as a shift in emphasis from the demand that gays convert, to the demand that gays pass, to the demand that gays cover"); Kenji Yoshino, *Suspect Symbols: The Literary Argument for Heightened Scrutiny for Gays*, 96 Colum. L. Rev. 1753 (1996) (discussing the ability of the closet as a means of oppression, isolation and invisibility) (citing Eve K. Sedgwick, The Epistemology of the Closet 129 (1990));  [Dkt. #72, Segura Aff., ¶¶ 56-64] (discussing the political and personal costs of gay and lesbians' relative "invisibility" and decision to "pass"]; [Dkt. #74, ¶¶ 22-25] (noting that the "dramatic growth of American cities in the late nineteenth century permitted lesbian and gay men to develop a more complex and extensive collective life than was possible in small towns and rural areas.").

In addition, the DOJ in their memorandum of law in response to Plaintiffs' motion for summary judgment and BLAG's motion to dismiss cogently argues that the "federal government has played a significant and regrettable role in the history of discrimination against gay and lesbian individuals."  [Dkt. #98, p. 12]. The DOJ points to evidence of the federal government's long-standing practice of deeming homosexuals unfit for government employment.  *See Employment of Homosexuals and Other Sex Perverts in Government, Interim Report submitted to the Committee by its Subcommittee on Investigations* pursuant to S. Res. 280 81st Congress (December 15, 1960) at 9 (finding that between 1947 to 1950, approximately 1,700 applicants for federal positions were denied employment

because of a record of homosexuality or other sex perversion).  In 1953, President Eisenhower issued Executive Order 10,450 which officially added "sexual perversion" as a ground for investigation and dismissal from federal government employment.  Exec. Order No. 10450, 3 C.F.R. 936, 938 (1953).

In addition to discrimination against homosexuals in employment, the federal government categorically discriminated against homosexuals in immigration until 1990, barring all gay and lesbian noncitizens from entering the United States.  *See Boutilier v. INS*, 387 U.S. 118, 120 (1967) (concluding that the legislative history of the Immigration and Nationality Act of 1952 "indicated beyond a shadow of a doubt that Congress ended the phrase 'psychopathic personality' to include homosexuals.").  In addition, the federal government has also labeled homosexuals mentally ill. *Id.*

Broad-based repressive discrimination has existed at all levels of government. The DOJ also points to the long history of discrimination by state and local governments against gays and lesbians in (i) public employment; (ii) the denial of child custody and visitation rights; (iii) ability to associate freely; and (iv) legislative efforts including local initiatives to repeal laws that protect homosexuals from discrimination.  *See* [Dkt. #98, p.15-19].

Discrimination also permeates society as a whole and is perpetrated on a private level as well. Lastly, the DOJ emphasizes that gays and lesbians suffer from discrimination by private parties highlighting statistics which demonstrate that homosexuals continue to be among the most frequent victims of all reported hate crimes.  *Id.* at 20 (citing H.R. Rep. 11-86, at 10 (2009)).

41

The long history of discrimination against homosexuals is widely acknowledged in American jurisprudence, including United States Supreme Court jurisprudence.  Many courts have concluded that homosexuals have suffered a long and significant history of purposeful discrimination. *See, e.g., High Tech Gays*, 895 F.2d at 573 ("[W]e do agree that homosexuals have suffered a history of discrimination…"); *Ben-Shalom*, 881 F.3d at 465-66 ("Homosexuals have suffered a history of discrimination and still do, though possibly now in less degree."); *Golinksi*, 824 F.Supp. 2d at 985 ("There is no dispute in the record that lesbians and gay men have experienced a long history of discrimination."); *Perry v. Schwarzenegger*, 704 F.Supp.2d 921, 981-82 (N.D.Cal. 2010) (acknowledging evidence of public and private discrimination against gay men and lesbians).  *See also, e.g., Mad River Local School District, Montgomery County, Ohio*, 470 U.S. 1009, 1014 (1985) (J. Brennan, dissenting) ("Moreover, homosexuals have historically been the object of pernicious and sustained hostility, and it is fair to say that discrimination against homosexuals is likely "to reflect deep-seated prejudice rather than ... rationality"); *Lawrence*, 539 U.S. at 568-69 (acknowledging that the long history of laws proscribing sodomy and buggery while not directly aimed at homosexuals did "not suggest approval of homosexual conduct."); *Kerrigan*, 289 Conn. at 179 (concluding that "[t]here is no question, therefore, that gay persons historically have been, and continue to be, the target of purposeful and pernicious discrimination due solely to their sexual orientation.").

Discrimination against homosexuals has been recognized by at least one court in this district, holding that "[w]hile social and political tolerance of

homosexuality is increasing, gay men and lesbians have endured a long history of discrimination, both official and private." *Able v. United States*, 968 F.Supp. 850, 854 (E.D.N.Y. 1997), *rev'd on other grounds*, 155 F.3d 628 (2d Cir. 1998).  The *Able* court noted that discrimination against homosexuality began in the second half of the twelfth century and that the "'earliest and most drastic legislation against gay people enacted by any government of the High Middle Ages' were laws passed by the European conquerors of Jerusalem imposing death by burning on homosexual men." *Id.* (quoting John Boswell*, Christianity, Social Tolerance and Homosexuality*, 281 (1980)).  The *Able* court also emphasized that during the Holocaust, "Nazis persecuted homosexuals along with Jews, gypsies, and other groups, using the pink triangle as the symbol to designate homosexuality."  *Id.* at 852.

In sum, the evidence in the record detailing the long history of anti-gay discrimination which evolved from conduct-based proscriptions to status or identity-based proscriptions perpetrated by federal, state and local governments as well as private parties amply demonstrates that homosexuals have suffered a long history of invidious discrimination.  Moreover this conclusion is consistent with the majority of cases which have meaningfully considered the question and likewise held that homosexuals as a class have experienced a long history of discrimination.

   ii.        **Ability to Contribute to Society**

Plaintiffs argue "there can be no credible dispute about whether sexual orientation bears a relation to one's 'ability to perform or contribute to society.'"

[Dkt. #63, p. 20].  BLAG does not outright dispute whether homosexuals have the ability to contribute to society.  Instead BLAG curiously argues that since DOMA survives rational basis review this factor cannot justify application of heightened scrutiny.  *See* [Dkt. #82, p. 11].  BLAG argues that the "Congress that enacted DOMA and the President who signed it obviously thought that the classifications drawn by DOMA were relevant and rationally related to several legitimate legislative goals.  If that is the case, then DOMA survives rational basis review.  If that were not the case, the DOMA would fail rational basis review, and the application of heightened scrutiny would be superfluous." *Id.*  This Court is at a loss to see how the merits of rational basis review has any relation or nexus to the question of whether homosexuals have the ability to contribute to society.  BLAG's argument fails to address and therefore apparently concedes that this factor is met.

Certainly the recent repeal of "Don't Ask Don't Tell" and the military's contemporaneous recognition of the long history of valiant honorable service of homosexual servicemen and women attests to the fact that homosexuals have made the ultimate contribution to society.  Defense Secretary Leon Panetta recently highlighted these contributions and "thank[ed] gay and lesbian service members, LCGT civilians, and their families for their dedicated service to our country."  Leon Panetta, *Secretary Penetta Video Message for Lesbian, Gay, Bisexual, Transgender Pride Month from the Pentagon*, U.S. Dep't. of Def. (June 15, 2012), http://www.defense.gov/transcripts/transcript.aspx?transcriptid=5062. Secretary Panetta stated that "[b]efore the repeal of 'Don't Ask, Don't Tell,' you

faithfully served your country with professionalism and courage.  And just like your fellow service members, you put your country before yourself…The pursuit of equality is fundamental to the American story.  The successful repeal of 'Don't Ask, Don't Tell' proved to the Nation that just like the country we defend, we share different backgrounds, different values, and different beliefs -- but together, we are the greatest military force in the world."  *Id.*

In addition, the long-held consensus of the psychological and medical community is that "'homosexuality per se implies no impairment in judgment, stability, reliability or general or social or vocational capabilities.'"  [Dkt. #73, Peplau Aff., ¶30] (quoting 1973 Resolution of the American Psychological Association).  Furthermore, Plaintiffs have highlighted that homosexuals have long and honorably served in Congress, the judiciary, and the military as well as played important roles in local communities.  *See* [Dkt. #63, p. 20].

Again this conclusion is consistent with the majority of cases that have meaningfully considered the question.  *See e.g., Golinksi*, 824 F.Supp.2d at 986; *Perry v. Schwarzenegger*, 704 F.Supp.2d at 1002 (finding that "by every available metric, opposite-sex couples are not better than their same-sex counterparts, instead, as partners, parents and citizens, opposite-sex couples and same-sex couples are equal."); *Watkins v. United States Army*, 875 F.2d 688, 725 (9th Cir. 1989) ("Sexual orientation plainly has no relevance to a person's 'ability to perform or contribute to society.'"); *Equality Foundation of Greater Cincinnati, Inc. v. Cincinnati*, 860 F.Supp. 417, 437 (S.D. Ohio 1994) ("[s]exual orientation … bears no relation whatsoever to an individual's ability to perform, or to participate

in, or contribute to, society … If homosexuals were afflicted with some sort of impediment to their ability to perform and contribute to society the entire phenomenon of 'staying in the [c]loset' and of 'coming out' would not exist, their impediment would betray their status"), *rev'd on other grounds*, 54 F.3d 261 (6th Cir. 1995), *vacated and remanded*, 518 U.S. 1001, (1996); *Kerrigan*, 289 Conn. at 180-81 (concluding that the United States Supreme Court's observation that race, alienage and national origin "are so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy is no less applicable to gay persons" in light of fact that sexual orientation plainly bears no relation to an individual's ability to contribute to society) (internal quotation marks and citation omitted).

The ability to contribute to society has played a critical and decisive role in Supreme Court precedent both denying and extending recognition of suspect class to other groups.  In *Cleburne*, the Supreme Court's holding that mental retardation was not a suspect class rested almost entirely on its conclusion that it was "undeniable … that those who are mentally retarded have a reduced ability to cope with and function in the everyday world." *Cleburne*, 473 U.S. at 442. Likewise, the Supreme Court twice declined to recognize the elderly as a suspect class on the basis of its conclusions that "physical ability generally declines with age," *Murgia*, 427 U.S. at 315-16, and the "unfortunate fact of life that physical [capacity] and mental capacity sometimes diminish with age."  *Gregory v. Ashcroft*, 501 U.S. 452, 472 (1991).  Unsurprisingly, where the classification has no bearing on one's ability or capacity to contribute to society the Supreme Court

has recognized such groups as suspect or quasi-suspect classes.  In *Frontiero*, the Supreme Court's recognition that gender constituted a quasi-suspect class in part rested on its reasoning that what "differentiates sex from nonsuspect statuses such as intelligence or physical disability … is that the sex characteristic frequently bears no relation to ability to perform or contribute to society." 411 U.S. at 686 (plurality opinion).  Likewise, the Supreme Court in *Mathews* recognized illegitimacy as a quasi-suspect class on the basis that illegitimacy "bears no relation to an individual's ability to participate in and contribute to society."  *Mathews*, 427 U.S. at 505-506.

The animating principle throughout these cases demonstrate that "where individuals in the group affected by a law have distinguishing characteristics relevant to interests the State has the authority to implement, the courts have been very reluctant, as they should be in our federal system and with our respect for the separation of powers, to closely scrutinize legislative choices as to whether, how, and to what extent those interests should be pursued."  *Cleburne*, 473 U.S. at 441.  However, where individuals in a group have "been subjected to unique disabilities on the basis of stereotyped characteristics not truly indicative of their abilities" will likely offend the principle of Equal Protection.  *Id.* (quoting *Murgia*, 427 U.S. at 313).  Sexual orientation is not a distinguishing characteristic like mental retardation or age which undeniably impacts an individual's capacity and ability to contribute to society.  Instead like sex, race, or illegitimacy, homosexuals have been subjected to unique disabilities on the basis of stereotyped characteristics not truly indicative of their abilities.  Accordingly, this

47

factor weighs strongly in favor of recognizing sexual orientation as a quasi-suspect or suspect class.

    iii.        Defining or Immutable Characteristics

       Another relevant consideration is whether the characteristic that defines the class as a discrete group is immutable or otherwise not within the member's control. *Golinski*, 824 F.Supp.3d at 986 (citing *Lyng v. Castillo*, 477 U.S. 635, 638 (1986)). It does not appear that this factor is necessary to trigger heightened scrutiny in view of the Supreme Court's recognition of suspect class to groups with ostensibly mutable characteristics. The Supreme Court has held that resident aliens constitute a suspect class despite the ability to opt out of the class voluntarily. *See Nyquist v. Mauclet*, 432 U.S. 1, 9 n.11 (1977). Additionally, one's status as illegitimate may be subject to change and is therefore not a strictly immutable characteristic. *See Miller v. Albright*, 523 U.S. 420, 431 (1998) (acknowledging that illegitimate child may be legitimated by father). Further as the *Kerrigan* court astutely observed "not infrequently, the United States Supreme Court has omitted any reference to immutability in discussing the identifying or distinguishing characteristic of a particular class." *Kerrigan*, 289 Conn. at 171 n. 20 (citing *Murgia*, 427 U.S at 313-14; *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 20, 25 (1973); *Graham v. Richardson*, 403 U.S. 365, 371-72 (1971)). Consequently, immutability is not an essential requirement but merely one indication that the classification reflects "deep-seated prejudice rather than legislative rationality in pursuit of some legitimate objective." *Pylyer*, 457 U.S. at 216 n.14; *see also, Kerrigan*, 289 Conn. at 170 n.20;

*Olaques v. Russoniello*, 797 F.2d 1511, 1520 (9th Cir. 1986) ("Whether the classification is based on an immutable characteristic is sometimes an indication of a suspect class.... But immutability is not the sole determining factor."), *rev'd on other grounds*, 484 U.S. 806 (1987); *Able,* 968 F.Supp. at 863 ("[i]mmutability is merely one of several possible indications that a classification is likely to reflect prejudice").

Plaintiffs argue that sexual orientation should be considered an immutable or defining characteristic in view of the fact that such a characteristic is an integral part of one's identity and have presented evidence that sexual orientation is an enduring characteristic and highly resistant to change.  [Dkt. #63, p. 24-27].  As the *Golinski* court stated, it appears that "the consensus in the scientific community is that sexual orientation is an immutable characteristic."  *Golinski*, 824 F.Supp.2d  at 986.  This conclusion, while not universal, is supported by studies which document the prevalence of long-lasting and committed relationships between same-sex couples as an indication of the enduring nature of the characteristic.  [Dkt. # 73, Peplau Aff., ¶22].  While this is not a universally held view, the American Psychological Association task force concluded based on a systematic review of peer-reviewed journal literature on sexual orientation change efforts that those efforts "are unlikely to be successful and involve some risk of harm."  *Id.* at ¶26 (citing APA Task Force on Appropriate Therapeutic Responses to Sexual Orientation, 2009, Report of the Task Force, available at http://www.apa.org/pi/lgbt/publications/therapeutic-response.pdf).  The American Psychiatric Association, American Psychological Association, American

49

Counseling Association, National Association of Social Workers and the American Academy of Pediatrics all "have adopted policy statements cautioning professionals and the public about these treatments." *Id.* at ¶27. *See also Perry v. Schwarzenegger,* 704 F.Supp.2d at 966 ("No credible evidence supports a finding that an individual may, through conscious decision, therapeutic intervention or any other method, change his or her sexual orientation."). Lastly, studies have also indicated that the majority of gay men and lesbians report that they experienced no choice or little choice about their sexual orientation. [Dkt. # 73, Peplau Aff., ¶25] (citing 2010 national survey conducted with representative sample of more than 650 self-identified lesbian, gay and bisexual adults, 88% of gay men reported that they had "no choice," and 7% reported "very little choice" while 68% of lesbians responded they had "no choice at all" and 15% reported having "very little choice.").

Contrastingly, BLAG argues that homosexuality cannot be immutable considering the multiplicity of terms used to describe homosexual experiences. BLAG contends that "Plaintiffs' claims run headlong into the differing definitions of the terms 'sexual orientation,' 'homosexual,' 'gay' and 'lesbian' supplied by Plaintiffs' own experts…These differing definitions show that these terms are amorphous and do not adequately describe a particular class." [Dkt. #82, p. 22-23]. Although there might be subtle semantic distinctions between each of these terms from an academic perspective, each term is principally defined as pertaining to same-sex attraction or sexual behavior and could not be understood without reference to this elemental concept. In fact, the colloquial definitions of

"gay," "lesbian" and even "sexual orientation" are each defined by reference to "homosexual" which is defined as sexual desire or intercourse between individuals of the same sex.  Merriam Webster defines "Homosexual" as "of, relating to, or characterized by a tendency to direct sexual desire toward individuals of one's own sex" or "of, relating to, or involving sexual intercourse between individuals of the same-sex."  *Homosexual Definition*, MERRIAM-WEBSTER.COM, http://www.merriam-webster.com/dictionary/homosexual (last visited July 27, 2012).  "Gay" is defined as "homosexual; especially: a homosexual male."  *Gay Definition*, MERRIAM-WEBSTER.COM, http://www.merriam-webster.com/dictionary/gay (last visited July 27, 2012).  "Lesbian" is defined as "a woman who is homosexual."  *Lesbian Definition*, MERRIAM-WEBSTER.COM, http://www.merriam-webster.com/dictionary/lesbian (last visited July 27, 2012).  Lastly, "sexual orientation" is defined as "the inclination with respect to heterosexual, homosexual and bisexual behavior."  *Sexual orientation definition*, MERRIAM-WEBSTER.COM, http://www.merriam-webster.com/medical/sexual%20orientation (last visited July 27, 2012).  Although scholars may quibble over subtle differences in terminology, it is clear that none of these terms are neither amorphous nor incapable of describing a particular class.  Indeed, the colloquial understanding of each of these terms readily describe a class that is defined by same-sex attraction and sexual behavior.  BLAG's contention that "Plaintiffs' claims run headlong into the differing definitions of the terms" risks elevating abstract logic over experience.  Here

experience palpably demonstrates that each of these terms is capable of describing a particular class with precision and clarity.

BLAG also contends that homosexuality cannot be immutable since Plaintiff's own expert admits that homosexuality cannot be determined at birth. BLAG points to Plaintiffs' expert Letitia Anne Peplua's, Ph.D., ("Peplua") deposition testimony that "looking at a newborn, I would not be able to tell you what the child's sexual orientation is going to be." [Dkt. #82, p. 23] (citing Peplau Dep. at 25:20-23).   However, Peplua's testimony merely acknowledges that unlike race or gender, sexual orientation, either homosexual or heterosexual, has no physical external manifestation and typically develops or emerges not at birth but during adolescence.  Indeed, Peplau actually testified in her deposition that since research demonstrates that "people come to understand their sexual orientation most typically during adolescence," she "would not be able to tell you what the child's sexual orientation is going to be" at birth.  [Dkt. #83, attach 2, Exhibit B, Peplau Dep., 25:18-23].  When viewed in context, Peplau's testimony acknowledges that sexuality develops only after an individual begins puberty and such testimony suggests that it would be premature to study sexual orientation prior to adolescence.  Considering the nature of the development of sexual orientation generally, the key inquiry is whether sexual orientation is enduring or resistant to change after its development or emergence in adolescence. Therefore Peplau's statement that sexual orientation cannot be determined at birth is not inconsistent with a conclusion that sexual orientation is also immutable.  As discussed above, Plaintiffs have submitted substantial evidence

that the consensus in the scientific community is that sexual orientation after its development is immutable.

To the extent that BLAG is suggesting that Peplau's conclusion that homosexuality cannot be determined at birth reflects the fact that homosexuality is a characteristic that may not be readily visible and therefore not immutable like race or gender, such an argument would be unpersuasive in light of Supreme Court precedent recognizing suspect class status to characteristics that are not readily visible such as illegitimacy or resident alienage.  *See Mathews*, 427 U.S. at 506 (acknowledging that while "illegitimacy does not carry an obvious badge, as race or sex do," such classification should still be considered a suspect class). Although sexual orientation, like national origin, may not be as obvious a badge as race or sex, that does not indicate that it cannot also be immutable or that such a classification does not also offend the principles of equal protection.

Lastly, BLAG argues that there can be no immutability where a "significant percentage of gays and lesbians believe they exercised some or a great deal of choice in determining their sexuality." [Dkt. #82, p. 23].   BLAG presents some evidence which demonstrates there is some fluidity on the continuum or spectrum of sexuality for some individuals who identify as homosexual.  BLAG emphasizes that "Plaintiffs' own evidence indicates that more than 12% of self-identified gay men and nearly one out of three lesbians reported that they experienced some or much choice about their sexual orientation."  *Id.*  However, the Court disagrees with BLAG's contention that these statistics demonstrate a "significant percentage."  On the contrary, the overwhelming majority of gay men

and the vast majority of lesbians indicated they felt they had no or little choice in determining their sexuality.

BLAG also suggests that if sexuality is fluid it cannot also be immutable and highlights that even Plaintiff's own expert, Peplau, recognizes that sexuality is plastic or fluid and admits that "individuals have reported changes in their sexual orientation in midlife.  [Dkt. #82, p. 23] (citing Peplau Aff. at ¶23).  However, Peplau explains in her expert affidavit that "the significant majority of adults exhibit a consistent and enduring sexual orientation" but that "[n]onetheless, a small minority of individuals are exceptions to this majority pattern." [Dkt. #73, ¶23].  Peplau elaborates that "'claims about potential erotic plasticity of women do not mean that most women will actually exhibit change over time.  At a young age, many women adopt patterns of heterosexuality that are stable across their lifetime.  Some women adopt enduring patterns of same-sex attractions and relationships.'   Nor does the fact that a small minority of people may experience some change in their sexual orientation over their lifetime suggest that such change is within their power to effect." *Id.*  Although it appears that a tiny percentage of gay men or lesbians may experience some flexibility in the continuum of their sexuality, there is substantial evidence that the vast majority of gay men and lesbians do not experience any such fluidity in their sexualities and that efforts to change sexual orientation are unlikely to be successful and involve some risk of harm.

BLAG also points to two studies to demonstrate that "a high number of persons who experience sexual attraction to members of the same sex early in

their adult lives later cease to experience such attraction." [Dkt. #82, p. 23].
BLAG points to a study by Lisa M. Diamond and Ritch C. Savin-Williams in which
they reported that a study had found that "50% [of respondents] had changed
their identity label more than once since first relinquishing their heterosexual
identity." Lisa M. Diamond & Ritch C. Savin-Williams, *Explaining Diversity in the
Development of Same-Sex Sexuality Among Young Women*, 56 J. of Soc. Issues
301 (2000). The authors of the article speculate that changes in identity labels
more than once could be explained by the fact that "women with nonexclusive
attractions may comfortably adopt a lesbian or bisexual identity, depending on
such factors as the relative intensity of their attractions, perceived prospects for
same-sex and other-sex relationships and their social network." *Id.* at 301.
Consequently, the 50% metric appears to capture individuals who never ceased
to experience same-sex attraction but instead fluctuated between same-sex
attraction and bisexual attraction. For these individuals, a same-sex orientation
was enduring and what fluctuated was whether the individual also felt a capacity
for opposite-sex attraction coexistent with their capacity for same-sex attraction.
Therefore the 50% metric overstates the amount of individuals who displayed a
non-enduring same-sex orientation.

Moreover, it is clear the focus of the study was to examine the subset of
women who experience some flexibility in the continuum of their sexuality. The
study's authors state that a "widespread recruiting strategy was undertaken to
ensure diversity in women's histories of same-sex attractions and behaviors and
to recruit women who decline to identify as lesbian or bisexual but acknowledge

same-sex attractions." *Id.* at 299.  46% of Study A participants and 62% of Study

B participants identified as bisexual or "unlabeled" or "questioning."  *Id.*

Consequently, the study sought to examine at the outset primarily those

individuals who already indicated they experienced flexibility in their sexuality,

and therefore cannot be viewed as conclusive evidence that same-sex orientation

is not an enduring characteristic nor resistant to change for the majority of

individuals who identify as having only a same-sex orientation.  Considering the

aim of the study and the composition of the participant pools, the results of the

study are not inconsistent with Peplau's conclusion that a "small minority of

people may experience some change in their sexual orientation over their

lifetime" and are the exception to the majority pattern.  [Dkt. #73, Peplau Aff.,

¶23].  Here, the study examined those individuals who were the exception to the

majority pattern as evidenced by the study's primary recruitment of women who

identified as bisexual or "unlabeled" or "questioning" as opposed to women who

simply identified as lesbian.

　　　The second study cited by BLAG examined sexual attraction at both the

ages of 21 and 26 and found that between ages 21 and 26, slightly more men

moved away from an exclusive heterosexual attraction (1.9% of all men) than

moved towards it (1.0%) while for woman many moved away (9.5%) than towards

(1.3%) exclusive heterosexual attraction.  The study also noted that a smaller

group with major same-sex attraction actually changed less over time.  Nigel

Dickson et al., *Same Sex Attraction in a Birth Cohort: Prevalence and Persistence

in Early Adulthood*, 56 Soc. Sci. & Med. 1607, 1611-12 (2003).  This study is also

consistent with Peplau's conclusion that a "small minority of people may experience some change in their sexual orientation over their lifetime" and are the exception to the majority pattern.  [Dkt. #73, Peplau Aff., ¶23].   Neither of these two studies discredits Plaintiffs' evidence that for the vast majority of gay men and lesbians sexual orientation is an enduring characteristic that is highly resistant to change.  Following BLAG's logic to its natural conclusion, Blacks or African Americans should not be a protected class because a small percentage of African Americans have features which make them indistinguishable from Caucasians or European Americans.  On this basis alone, the Court finds that the Plaintiffs have satisfied their burden with respect to this factor.

Lastly, BLAG argues that federal precedent supports the conclusion that sexual orientation is not immutable.  As the *Kerrigan* court observed, "[a] number of courts that have considered this factor have rejected the claim that sexual orientation is an immutable characteristic.  Other courts, however, as well as many, if not most, scholarly commentators, have reached a contrary conclusion." *Kerrigan*, 289 Conn. at 184 (collecting cases).  Notably, the cases concluding that homosexuality is not an immutable characteristic relied on *Bowers*'s conceptualization of homosexuality as purely behavioral.  *See High Tech Gays*, 895 F.3d at 573 ("[h]omosexuality is not an immutable characteristic; it is behavioral and hence is fundamentally different from traits such as race, gender or alienage, which define already existing suspect and quasi-suspect classes"); *Woodward v. United States*, 871 F.2d 1068, 1076 (Fed. Cir. 1989) ("[m]embers of recognized suspect or quasi-suspect classes, e.g., blacks or women, exhibit

immutable characteristics, whereas homosexuality is primarily behavioral in nature"); *Equality Foundation of Greater Cincinnati, Inc. v. City of Cincinnati*, 54 F.3d 261, 267 (6th Cir. 1995), *rev'd*, 54 F.3d 261 (6th Cir.1995), *vacated and remanded*, 518 U.S. 1001 (1996) ("[t]hose persons who fall within the orbit of legislation concerning sexual orientation are so affected not because of their orientation but rather by their *conduct* which identifies them as homosexual, bisexual, or heterosexual") (emphasis in the original).  Once again, this conclusion ignores the fact that certain human beings within a certain classification may have characteristics more akin to persons of another classification.  In determining whether to accord protected class status courts base their decisions on the characteristics of the vast majority of the class members and have not withheld it because there exists anomalous outliers within that class.

Moreover, Supreme Court precedent has since rejected the artificial distinction between status and conduct in the context of sexual orientation.  *See Christian Legal Society Chapter of California, Hastings College of Law v. Martinez*, 130 S.Ct. 2971, 2290 (2010) ("Our decisions have declined to distinguish between status and conduct in this context"); *Lawrence*, 539 U.S. at 575 ("When homosexual *conduct* is made criminal by the law of the State, that declaration in and of itself is an invitation to subject homosexual *persons* to discrimination.") (emphasis added); *id.* at 583 (O'Connor, J., concurring in judgment) ("While it is true that the law applies only to conduct, the conduct targeted by this law is conduct that is closely correlated with being homosexual.  Under such

circumstances, [the] law is targeted at more than conduct.  It is instead directed toward gay persons as a class.").  Consequently, the precedential underpinnings of those cases declining to recognize homosexuality as an immutable characteristic have been significantly eroded.  Accordingly, the Court relies instead on more contemporary precedent on the issue of whether homosexuality is an immutable characteristic.

The move away from viewing homosexuality as conduct to status based was driven in part by the increasing recognition that sexual orientation is fundamental and central to one's identity.  Indeed, the Supreme Court's holding in *Lawrence* acknowledged that the "right of homosexual adults to engage in intimate, consensual conduct … [represents] an integral part of human freedom" and recognized that "[w]hen sexuality finds overt expression in intimate conduct with another person, the conduct can be but one element in a personal bond that is more enduring.  The liberty protected by the Constitution allows homosexual persons the right to make this choice."  539 U.S. at 567.

Prior to *Lawrence*, the Supreme Court recognized the centrality of human intimacy to human development.  Nearly 40 years ago, it stated that sexual intimacy is "a sensitive, key relationship of human existence, central to … the development of human personality…"  *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 63 (1973).

In line with this understanding that sexual intimacy is an integral part of human freedom and the development of human personality, the Ninth Circuit has persuasively held that since sexual orientation and sexual identity are "so

fundamental to one's identity that a person should not be required to abandon

them;" and therefore, "[s]exual orientation and sexual identity are  immutable."

*Hernandez-Montiel v. Immigration and Naturalization Service*, 225 F.3d 1084, 1093

(9th Cir. 2000), overruled in part on other grounds by *Thomas v. Gonzales*, 409

F.3d 1177, 1187 (9th Cir. 2005); see also *Karouini v. Gonzales*, 399 F.3d 1163, 1173

(9th Cir. 2005) (agreeing that homosexuality is a fundamental aspect of human

identity and seeing "no appreciable difference between an individual . . . being

persecuted for being a homosexual and being persecuted for engaging in

homosexual acts."); *see also In re Marriage Cases,* 43 Cal. 4th 757, 842 (2008)

("Because a person's sexual orientation is so integral an aspect of one's identity,

it is not appropriate to require a person to repudiate or change his or her sexual

orientation in order to avoid discriminatory treatment."); *Kerrigan*, 289 Conn. at

186-87("In view of the central role that sexual orientation plays in a person's

fundamental right to self-determination, we fully agree with the plaintiffs that their

sexual orientation represents the kind of distinguishing characteristic that

defines them as a discrete group for purposes of determining whether that group

should be afforded heightened protection under the equal protection provisions

of the state constitution."); *Golinksi*, 824 F.Supp.2d at 987 (finding persuasive the

Ninth Circuit's prior holding that "a person's sexual orientation is so fundamental

to one's identity that a person should not be required to abandon it.").

Judge Norris of the Ninth Circuit in a concurring opinion has cogently

explained the rationale behind the majority's conclusion that sexual orientation is

immutable.  Judge Norris explained that

> [i]t is clear that by 'immutability' the [Supreme] Court has never meant strict immutability in the sense that members of the class must be physically unable to change or mask the trait defining their class.  People can have operations to change their sex.  Aliens can ordinarily become naturalized citizens.  The status of illegitimate children can be changed. People can frequently hide their national origin by changing their customs, their names, or their associations.  Lighter skinned blacks can sometimes 'pass' for white, as can Latinos for Anglos, and some people can even change their racial appearance with pigment injections.  At a minimum, then, the Supreme Court is willing to treat a trait as effectively immutable if changing it would involve great difficulty, such as requiring a major physical change or a traumatic change of identity.

*Watkins*, 875 F.2d at 726 (Norris J. Concurring) (citation omitted).  Accordingly, immutability should "describe those traits that are so central to a person's identity that it would be abhorrent for government to penalize a person for refusing to change them."  *Id.*

   This Court finds the reasoning of the Ninth Circuit to be persuasive in view of the fact that the Supreme Court has already demarcated sexual intimacy, both heterosexual and homosexual, as an integral part of human freedom and the development of human personality, thereby suggesting that sexual orientation should be considered a defining characteristic fundamental to one's identity much like race, ethnicity or gender.  Where there is overwhelming evidence that a characteristic is central and fundamental to an individual's identity, the characteristic should be considered immutable and an individual should not be required to abandon it.   To hold otherwise would penalize individuals for being unable or unwilling to change a fundamental aspect of their identity; an aspect

which has been recognized as an integral part of human freedom.  On this basis as well, this factor weighs in favor of the application of heightened scrutiny.

      iv.      **Minority Status and Political Powerlessness**

The final factor courts consider is whether the subject group is "a minority or politically powerlessness." *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987) (internal quotation marks omitted).  "This factor examines relative political power and seeks the answer the question whether the 'discrimination is unlikely to be soon rectified by legislative means.'" *Golinski*, 824 F.Supp.2d at 987 (quoting *Cleburne*, 473 U.S. at 440).

Courts place less weight with respect to this fourth and final factor considering that the Supreme Court has recognized gender as a quasi-suspect class despite the fact that the group was neither a minority nor truly politically powerless.  *See Frontiero*, 411 U.S. at 686 n.17 (plurality opinion) (acknowledging that women "do not constitute a small and powerless minority"); *see also Equality Foundation*, 860 F.Supp. at 437-38 n.17 ("[T]he significance of the [political powerlessness] test pales in comparison to the question[s] of whether ... the characteristic bears any relationship to the individual[']s ability to function in society, whether the group has suffered a history of discrimination based on misconceptions of that factor and whether that factor is the product of the group's own volition."); *In re Marriage cases*, 43 Cal. 4th at 842-43 (concluding that political powerlessness cannot be required for heightened scrutiny to apply because other groups like women and African Americans continue to be accorded heightened protection although they are no longer lacking in political

power).  As the *Kerrigan* court astutely observed, "[w]e do not doubt, moreover, that the [United States Supreme] court has accorded little weight to a group's political power because that factor, in contrast to the other criteria, frequently is not readily discernible by reference to objective standards.  Thus, an attempt to quantify a group's political influence often will involve a myriad of complex and interrelated considerations of a kind not readily susceptible to judicial fact-finding."  289 Conn. at 171.  Despite this inherent difficulty, the Court will endeavor to delve into this myriad of complex and interrelated considerations.

Plaintiffs argue that "[g]ay men and lesbians do not possess a meaningful degree of political power, and are politically vulnerable, relying almost exclusively on allies who are regularly shown to be insufficiently strong or reliable to achieve their goals or protect their interest" and that "obstacles to political power for gay men and lesbians are manifold."  [Dkt. #63, p.21].  There appears to be no dispute in the record that gay men and lesbians are both nationally and locally a minority.  *See* [Dkt. #72, Segura Aff., ¶45] (citing a recent national study estimating that the gay, lesbian and bisexual population of the Unites States to be approximately 3.5%).

Plaintiffs contend that the lack of meaningful political power is further demonstrated by the fact that since 1990 anti-gay marriage statutes or constitutional amendments have been passed by 41 states.  [Dkt. #62, Pl. Separate Statement of Non-Adjudicative Facts, ¶71].[7]  Most recently months after

---

[7] The Court notes that BLAG has moved to strike portions of Plaintiffs' Statement of Non-Adjudicative Facts.  Here, Statement ¶71 concerning the number of states that have passed anti-gay marriage statutes or constitutional amendments is

the parties filed their summary judgment briefing in this matter, North Carolina voters approved a ballot initiated on May 8, 2012 that proposed an amendment to the North Carolina Constitution to define marriage as between one man and one woman.  Rachel Weiner, *North Carolina passes gay marriage ban Amendment One*, Washington Post Blog (May 8, 2012, 9:17am), http://www.washingtonpost.com/blogs/the-fix/post/north-carolina-passes-gay-marriage-ban-amendment-one/2012/05/08/gIQAHYpfBU_blog.html.

Gay men and lesbians are legally discriminated against in a variety of ways.  By way of illustration, gay men and lesbians are prohibited from adopting children in five states.  [Dkt. #72, ¶39].  In addition, there are no federal prohibitions against discrimination based on sexual orientation in employment, housing, public accommodations, or education, nor any such protection in 29 states.  [Dkt. #62, ¶¶68, 70][8]; *see also Kiley v. American Soc. For Prevention of Cruelty to Animals*, 296 Fed. Appx. 107, 108 (2d Cir. 2008) (Plaintiff "may not bring a claim under Title VII for discrimination based on sexual orientation" because "the statute does not recognize homosexuals as a protected class.").

Lastly, openly gay officials are underrepresented in political office in proportion to the gay and lesbian population.  [Dkt. #72, ¶¶45-47].  Plaintiffs reveal that these are just a few examples of their relative lack of political power

---

appropriately the subject of judicial notice and therefore the Court may properly consider this fact in its analysis.

[8] The Court notes that BLAG has moved to strike portions of Plaintiffs' Statement of Non-Adjudicative Facts.  Here, Statements ¶¶68,70 concerning the lack of federal and state prohibitions against discrimination based on sexual orientation is appropriately the subject of judicial notice and therefore the Court may properly consider this fact in its analysis.

and are an indication that discrimination against homosexuals is unlikely to be soon rectified by legislative means.

Plaintiffs also acknowledge that gay men and lesbians as a group are not entirely lacking in political influence but emphasize that the relatively modest gains made to mitigate discrimination against homosexuals were principally won through the courts and not the majoritarian political process.  Plaintiffs argue that a total lack of political power is not a requirement for this factor noting that "women and racial minorities have won political power and protections far exceeding those won by gay men or lesbians, yet discrimination based on gender and race continues to warrant heightened scrutiny."  [Dkt. #94, Pl. Reply to Motion for Summary Judgment, p. 16].  As Plaintiffs note, courts do continue to apply heightened scrutiny to classifications based on race and gender despite the tremendous gains both groups have made politically and continue to make.

As the *Kerrigan* court noted the Supreme Court in most cases "has no more than made passing reference to the political power factor without actually analyzing it," and "[i]n view of this fact, and because the extent to which a group possess or lacks political power is neither readily discernible nor easily measurable, this facet of the suspectness inquiry aptly has been characterized as ill-defined."  289 Conn. at 191-92 (internal quotation marks and citation omitted).  However, despite the ill-defined nature of this factor, Supreme Court precedent does not require a total lack of political power to satisfy this facet of the suspectness inquiry.  Indeed, the Supreme Court in *Fronteiro* expressly

recognized the gains women had made politically when they recognized gender

as a suspect class.  The Supreme Court highlighted that:

> [O]ver the past decade, Congress has itself manifested
> an increasing sensitivity to sex-based classifications.  In
> [Title] VII of the Civil Rights Act of 1964, for example,
> Congress expressly declared that no employer, labor
> union, or other organization subject to the provisions of
> the [a]ct shall discriminate against any individual on the
> basis of race, color, religion, sex, or national origin.
> Similarly, the Equal Pay Act of 1963 provides that no
> employer covered by the [a]ct shall discriminate ...
> between employees on the basis of sex.  And § 1 of the
> [e]qual [r]ights [a]mendment, passed by Congress on
> March 22, 1972, and submitted to the legislatures of the
> [s]tates for ratification, declares that [e]quality of rights
> under the law shall not be denied or abridged by the
> United States or by any [s]tate on account of sex.

*Frontiero*, 411 U.S. at 687 (Internal quotation marks omitted).  The Supreme Court

ultimately declined to view this factor in a rigid fashion instead allowing women

to satisfy this factor despite the fact that women were not entirely politically

powerless.  The Supreme Court concluded that while "[i]t is true, of course, that

the position of women in America has improved markedly in recent decades"

despite such improvement "women still face pervasive, although at times more

subtle, discrimination in our educational institutions, in the job market and,

perhaps most conspicuously, in the political arena." *Id.* at 685-86.   Consequently,

the Supreme Court held that "when viewed in the abstract, women do not

constitute a small and powerless minority" however "in part because of past

discrimination, women are vastly underrepresented in the Nation's

decisionmaking councils."  *Id.* at 686 n.17.

66

The emphasis of the Supreme Court's analysis in *Frontiero* appears to be focused more on whether discrimination against the subject group is unlikely to be soon rectified by legislative means as opposed to a measurement of whether the subject group has any political power.  Therefore there appears to be no requirement that a group demonstrate that it is without any political power in order to be recognized as a suspect class but instead the group must demonstrate that effecting widespread change through the majoritarian process will be onerous.  *See also Golinski*, 824 F.Supp.2d at 987 n.7 (concluding "the standard is not whether a minority group is entirely powerless, but rather whether they suffer from relative political weakness.") (citing *Rodriguez*, 411 U.S. at 28; *Cleburne*, 437 U.S. at 445); *Kerrigan*, 289 Conn. at 196-97 ("We apply this facet of the suspectness inquiry not to ascertain whether a group that has suffered invidious discrimination borne of prejudice or bigotry is devoid of political power but, rather, for the purpose of determining whether the group lacks sufficient political strength to bring a prompt end to the prejudice and discrimination through traditional political means.").

BLAG argues that Plaintiffs have failed to demonstrate that gay men and lesbians lack political power in view of recent political, legal and cultural gains made by homosexuals.  In support of this argument, BLAG offers into evidence a list of achievements and advancements made by gay men and lesbians, which it argues "signals a trend that has been occurring for some time." See [Dkt. #82, p. 12-16].  The evidence offered by BLAG in support of this trend, establishes that homosexuals are not totally devoid of political power, however it does not

67

establish that gay men and lesbians have sufficient political power to bring a prompt end to the prejudice and discrimination perpetrated against them through traditional political means.

First, BLAG argues that gay men and lesbians cannot maintain they lack political power in light of the current Administration's decision to decline to defend the constitutionality of DOMA. *Id.* at 12. BLAG made this same exact argument before the Northern District of California in the *Golinski* matter. This Court also finds that this contention is unsupported by the evidence in the record. BLAG argues that President Obama was persuaded by a letter from the Human Rights Campaign to abandon the defense of DOMA. *Id.* at p. 12-13. However, as the *Golinski* court noted this letter was sent almost two years prior to the announcement of the Administration's current opinion. *Golinski*, 824 F.Supp.2d at 988.

Moreover, the Department of Justice has an independent obligation to assess the constitutionality of any statute that it is tasked with defending. There is no evidence that the Attorney General's decision was the result of anything but his independent assessment. Indeed, Attorney General Eric Holder states in his letter to Congress declining to defend DOMA that although "the Department has a longstanding practice of defending the constitutionality of duly-enacted statutes if reasonable arguments can be made in their defense, a practice that accords the respect appropriately due to a coequal branch of the government . . the Department in the past has declined to defend statutes despite the availability of professionally responsible arguments, in part because the Department does not

68

consider every plausible argument to be a 'reasonable' one" and concludes that "[t]his is a rare case where the proper course is to forgo the defense of this statute."  [Dkt. #39, attach 2, Holder Letter, p. 5].   This Court agrees that BLAG's "contention that a two-year-old letter from a gay rights advocacy group was the pivotal consideration in the Administration's reassessment of the law or that it demonstrates that gay men and lesbians have political power is speculative at best."  *Golinski*, 824 F.Supp.2d at 988.

Next BLAG argues that "[a] spate of recent news stories only confirms the conclusion that homosexuals are far from politically powerless."  [Dkt. #82, p. 13-14].  Although these articles do document certain advancements made by homosexuals, these advances when viewed in context do not indicate that gay men and lesbians have meaningful political power.  Instead, these articles document events which are really episodic in nature.  Moreover, an event's newsworthiness could very well indicate that the event is aberrational or exceptional as opposed to an ordinary or commonplace occurrence.

First, BLAG submits articles on President Obama's nomination of four openly-gay judges and the confirmation by the Senate of the first openly gay male federal judge. *Id.* Even considering that President Obama has nominated four openly-gay federal judges and one judge has since been confirmed, gay men and lesbians are still grossly underrepresented in the federal judiciary.  There are currently 874 authorized Article III judgeships. *Federal Judgeships*, United State Courts, http://www.uscourts.gov/JudgesAndJudgeships/FederalJudgeships.aspx (last visited July 27, 2012).  A recent study has estimated that approximately 3.5%

**69**

of the United States population is gay, lesbian or bisexual.  [Dkt. #72, ¶45].  There would have to be approximately 30 openly-gay federal judges for the federal judiciary to reflect the population.  Moreover, judicial appointments do not truthfully reflect the political power of a subject-group to rectify discrimination by legislative means in light of the bedrock constitutional principle of separation of powers.  It is axiomatic that the federal judicial power "must be exercised by judges who are independent of the Executive and Legislature in order to maintain the checks and balances that are crucial to our constitutional structure." *Commodity Futures Trading Com'n v. Schor*, 478 U.S. 833, 860 (1986).  The federal judicial power is driven by principles of equity and stare decisis that are intentionally divorced and distinct from the political will of both the legislature and the executive.  The representation of openly-gay judges in the federal judiciary therefore cannot be a fitting proxy for political power.

Second, BLAG points to an article regarding the Governor of California's recent signing of legislation which requires California's public school textbooks to include historical contribution of lesbian, gay, bisexual, and transgendered ("LGBT") Americans.  [Dkt. #82, p. 13-14] (citing Wyatt Buchanan, New State Law Requires LGBT History in Textbooks, S.F. Chron, July 15, 2011, http://www.sfgate.com/news/article/New-state-law-requires-LGBT-history-in-textbooks-2354578.php).  The passage of such legislation suggests only an isolated achievement for gay rights generally in one state and is not indicative of gay men and lesbians' political clout in a majority of states.  Indeed months after the signing of California's bill, both Tennessee and Missouri introduced "Don't

say gay" bills which would not only have the effect of prohibiting the teaching of LBGT history in schools but would also prohibit any discussion of homosexuality in public schools more broadly.  In Tennessee, the proposed bill would prohibit public elementary and middle schools from providing any instruction or material that "discusses sexual orientation other than heterosexuality."  *See*, Chas Sisk, Tennessee lawmakers advance '*don't say gay*' bill, USA Today, February 16, 2012, http://www.usatoday.com/news/nation/story/2012-02-16/tennessee-bill-homosexuality/53116470/1; *see also* proposed Senate Bill 0049, available at http://www.capitol.tn.gov/Bills/107/Bill/SB0049.pdf.  In Missouri, the "bill would prohibit public school from being able to talk about sexual orientation except in terms of reproduction." *See*, Allison Blood, Controversial "Don't Say Gay" bill Debated in MO House, CBSlocal, April 23, 2012, http://stlouis.cbslocal.com/2012/04/23/controversial-dont-say-gay-bill-debated-in-mo-house/; *see also* proposed House Bill No.2051, available at http://www.house.mo.gov/billtracking/bills121/biltxt/intro/HB2051I.htm.  Since only one out of fifty states has adopted legislation mandating the teaching of LBGT history, the Court does not find this particular news article to be demonstrative of gay men and lesbians' political clout.  On the contrary, these legislative backlashes illustrate the powerlessness of gays and lesbians in America today.

Lastly, BLAG points to articles documenting Rhode Island's recent passage of a bill instituting civil unions for same-sex couples, New York's legalization of same-sex marriage, the repeal of the "Don't Ask, Don't Tell" policy,

President Obama's announcement of his support for a senate bill to repeal DOMA and Vice President Biden's statement that a national consensus on gay marriage is inevitable. [Dkt. #82, p. 14, 19].  As the *Golinski* court noted, "[o]nly a handful of states have successfully passed legislation legalizing same-sex marriage, and only a few more have been required to afford equal marital rights to gay and lesbian individuals through judicial decisions."  *Golinski*, 824 F.Supp.2d at 988. By contrast, since 1990 anti-gay marriage statutes or constitutional amendments have been passed by 41 states and are continuing to be proposed and passed. [Dkt. #62, ¶71].  As the *Golinski* court pointed out, "[i]n contrast, when the Supreme Court ruled in *Loving*, interracial marriage was legal in thirty-four states." *Golinski*, 824 F.Supp.2d at 988 (citing *Loving*, 388 U.S. at 6).  New York and Rhode Island's recent legislation is in no real sense indicative of meaningful political power in the context of a suspect classification analysis.

Next, BLAG argues that gays and lesbians "have wielded considerable power in corporate America" noting that there is "even a gay chamber of commerce dedicated to certifying business as gay owned." [Dkt. #82, p. 14 -15]. However BLAG cites to no authority or evidence demonstrating that this "corporate power" has effected appreciable socio-economic or political change beneficial to gays and lesbians or that this is equivalent to political power. Without any demonstration of a nexus between homosexuals' alleged "corporate power" and their ability to end discrimination by legislative means this Court finds evidence of corporate power irrelevant to its analysis.

BLAG also argues that "significant sums of money also have been spent by gay and lesbian advocacy groups."  However this argument is flawed for the same reason.  Moreover there appears to be evidence that despite these sums raised, gay men and lesbians are still unable to impact the outcome of legislative processes as the campaign against proposition 8 in California illustrated.  Despite the significant amount of funds raised to defeat proposition 8 and the purported corporate power of gay men and lesbians "the majority of Californians still voted to alter the state constitution to strip gay and lesbian individuals of their rights."  *Golinski*, 824 F.Supp.2d at 988; *See also* Tamara Audi, Justin Scheck, and Christopher Lawton, "*California Votes for Prop 8,*" WALL STREET JOURNAL, November 5, 2008, http://online.wsj.com/article/SB1225860567 59900673.html (noting that $38 million was raised to support gay marriage and more than $32 million to ban it).

BLAG also highlights that the "Gay and Lesbian Victory Fund, a group devoted to electing gays and lesbians to office" and the Human Right Campaign indicated that a record number of candidates deemed "fair-minded" were elected to office in 2008.  [Dkt. #82, p. 17].  However, there is no evidence in the record that the election of these candidates in 2008 resulted in any positive legislative outcomes for gay men and lesbians.  BLAG has failed to demonstrate that the alleged "gay corporate power," the ability of gay men and lesbians to raise money for advocacy, or the election of fair-minded candidates in 2008 has actually translated into an ability to imminently end discrimination, prejudice and

to prevent unfavorable outcomes such as Proposition 8 or "don't say gay" type legislation.

In sum, the record demonstrates that despite some modest successes in mitigating existing discrimination, the record clearly demonstrates that gay men and lesbians continue to suffer discrimination that is "unlikely to be … rectified by legislative means." *Cleburne*, 473 U.S. at 440.  Moreover, these modest successes pale in comparison to the gains women had made at the time of the Supreme Court's decision in *Frontiero*.  *See Kerrigan*, 289 Conn. at 210-211 (concluding "[w]ith respect to the comparative political power of gay persons, they presently have no greater political power-in fact, they undoubtedly have a good deal less such influence-than women did in 1973, when the United States Supreme Court, in *Frontiero*, held that women are entitled to heightened judicial protection… In view of the conclusion of the court in *Frontiero* that women were entitled to heightened judicial protection despite their emergence as a growing political force and despite the widespread, bipartisan support for the equal rights amendment-the imminent ratification of which seemed all but assured-we see no justification for depriving gay persons of such protection.").  As was the case for women at time of the Supreme Court's decision in *Frontiero*, gay men and lesbians likewise still face pervasive discrimination in the political arena despite some modest gains.  The Court therefore agrees with Justices Brennan and Marshall's conclusion in their dissent in *Rowland* that "homosexuals constitute a significant and insular minority of this country's population.  Because of the immediate and severe opprobrium often manifested against homosexuals once

74

so identified publicly, members of this group are particularly powerless to pursue their rights openly in the political arena." *Rowland v. Mad River Local School Dist., Montgomery County, Ohio*, 470 U.S. 1009, 1014 (1985).   Although not necessary to trigger heightened scrutiny, this Court finds that gay men and lesbians lack meaningful political power sufficient to satisfy this factor of the suspectness inquiry.

Having considered all four factors, this Court finds that homosexuals display all the traditional indicia of suspectness and therefore statutory classifications based on sexual orientation are entitled to a heightened form of judicial scrutiny.[9]  However, the Court need not apply a form of heightened

---

[9] Since the Court has found that heightened scrutiny applies based on its conclusion that sexual orientation is a quasi-suspect or suspect class, the Court need not address Plaintiffs' alternative argument that heightened scrutiny is appropriate because DOMA burdens the fundamental interest in maintaining existing family relationships as courts generally decide constitutional questions on the narrowest ground available.  However, the Court notes that the Supreme Court has recognized the existence of a fundamental right to marry.  *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 851 (1992) ("Our law affords constitutional protection to personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education . . . These matters, involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment.") (citations omitted); *Turner v. Safley*, 482 U.S. 78, 95 (1987) ("[T]he decision to marry is a fundamental right."); *Zablocki v. Redhail*, 434 U.S. 374, 384 (1987) ("[T]he right to marry is of fundamental importance for all individuals."); *Loving*, 388 U.S. at 12 (1967) ("The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men"); *Griswold v. Connecticut*, 381 U.S. 479, 486, 495 (1965) ("Marriage is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred. It is an association that promotes a way of life, not causes; a harmony in living, not political faiths; a bilateral loyalty, not commercial or social projects" and therefore the "right 'to marry, establish a home and bring up children was an essential part of the liberty guaranteed by the Fourteenth Amendment'") (quoting *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)).  As the

scrutiny in the instant case to conclude that DOMA violates the promise of the equal protection as it is clear that DOMA fails to pass constitutional muster under even the most deferential level of judicial scrutiny.[10]

### E.  Rational Basis Review

As discussed above, in this Court's opinion, homosexuals warrant judicial recognition as a suspect classification.  However, the Supreme Court has declined to afford them such status, opting instead to apply rational basis review rather than definitively address whether sexual orientation constitutes a suspect or quasi-suspect class.  Accordingly, the Court will apply rational basis review. Even under this, the least intrusive level of review, Section 3 of DOMA fails to withstand constitutional scrutiny.

---

*Golinski* court noted, "the analysis of the fundamental right to marry has not depended upon the characteristics of the spouse."  *Golinksi*, 824 F.Supp.2d at 982 n.5.  Further the Supreme Court's recognition in *Lawrence* that the "right of homosexual adults to engage in intimate, consensual conduct" is also essential part of the liberty protected by the Constitution like the right to marry suggests that the liberty interest in marriage should not be restricted by sexual orientation. 539 U.S. at 560.  Although not the subject of this Court's opinion nor the Parties' briefing, the Court notes that this line of reasoning could serve as an alternative basis for the application of heightened scrutiny to classifications based on sexual orientation.  The Court further notes that such a basis would likely not run afoul of *Baker* as a lower court is not bound by a summary dismissal where "doctrinal developments indicate" that the Supreme Court would no longer consider the federal question decided in the summary dismissal to be unsubstantial.  *Hicks v. Miranda*, 422 U.S. 332, 344 (1975).  Arguably, the Supreme Court's subsequent decisions in *Romer* and *Lawrence* reflect doctrinal developments that suggest the Supreme Court would no longer consider the federal question in *Baker* to be unsubstantial and therefore binding on lower courts.

[10] The Court also notes that the Supreme Court's summary dismissal in *Baker* does not preclude the Court from considering whether sexual orientation is a suspect class as the Minnesota Supreme Court only considered the question of whether there was a constitutional right to same-sex marriage.  Consequently, *Baker* also has no consequence to whether heightened scrutiny is appropriate on the basis of a suspect classification.

As previously discussed, laws incorporating classifications which neither target a suspect class nor burden a fundamental right are subject to rational basis review.  "Rational basis review is the 'paradigm of judicial restraint.'" *Windsor*, 833 F.Supp.2d at 400 (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314 (1993)).  This deferential standard of review accords the classification "a strong presumption of validity," requiring only "a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe by Doe*, 509 U.S. 312, 319-20 (1993).  The proponent of the law "has no obligation to produce evidence to sustain the rationality of a statutory classification. '[A] legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data.'" *Id.* at 320 (quoting *Beach*, 508 U.S. at 315).  The legislature "need not 'actually articulate at any time the purpose or rationale supporting its classification.'" *Id.* (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992)).  Under rational basis review, "[a] statute is presumed constitutional and [t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it." *Id.* (internal quotation marks and citations omitted).  Thus, "a classification 'must be upheld against equal protection challenge if there is any reasonable conceivable state of facts that could provide a rational basis for the classification.'" *Id.* (quoting *Beach*, 508 U.S. at 313).  The standard of rational basis review recognizes that "[t]he problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical , it may be, and unscientific." *Metropolis Theatre Co.*

*v. Chicago*, 228 U.S. 61, 69-70 (1913).  Accordingly, "[a] classification does not fail rational basis review because it is not made with mathematical nicety or because in practice it results in some inequality." *Heller*, 509 U.S. at 321 (internal quotation marks and citations omitted).  Even if the rationale for the law seems tenuous, it is rationally related to the government interest if it bears some relation to that interest.  *Romer,* 517 U.S. at 632-33.  The Court must accept Congress's generalizations "even when there is an imperfect fit between means and ends," *Heller,* 509 U.S. at 321, as long as the generalization is "at least debatable." *Id.* at 326 (internal quotations omitted).

On the other hand, rational basis review is not indiscriminately deferential, "even in the ordinary equal protection case calling for the most deferential of standards, we insist on knowing the relation between the classification adopted and the objective to be attained." *Romer*, 517 U.S. at 632.  "The law must bear a logical relationship to the purpose it purports to advance." *Golinski*, 824 F.Supp.2d at 996.  As the Supreme Court has recognized, "[t]he search for the link between classification and objective gives substance to the Equal Protection Clause." *Romer*, 517 U.S. at 632.  "By requiring that the classification bear a rational relationship to an independent and legitimate legislative end, we ensure that the classifications are not drawn for the purpose of disadvantaging the group burdened by the law." *Id.* at 633 (citation omitted).

Although the legislature need not articulate the purpose or rationale supporting its classification, where, as here, articulated purposes are available, the Court's inquiry will begin by discussing such purposes.  *See Heller*, 509 U.S.

at 320. The House Committee Report identifies "four governmental interests advanced by this legislation [DOMA]," including:

> (1) defending and nurturing the institution of traditional, heterosexual marriage; (2) defending traditional notions of morality; (3) protecting state sovereignty and democratic self-governance; and (4) preserving scarce governmental resources.

House Report at 12.  BLAG, as the Intervenor-Defendant, has raised several additional objectives which could also have motivated Congress to include a classification based on sexual orientation in Section 3 of DOMA.  Specifically, BLAG asserts that "Congress rationally could have been, and in fact was, concerned" with the following objectives:

> 1) To employ caution in the face of a proposed redefinition of the centuries-old definition of marriage;
> 2) To protect the public fisc;
> 3) To maintain consistency and uniformity with regard to eligibility for federal benefits;
> 4) To avoid creating a social understanding of bearing, begetting, and rearing children separate from marriage; and
> 5) To recognize an institution designed to ensure that children have parents of both sexes.

*See* [Dkt. #81, p. 11].

As rational basis review requires the Court to consider not only the articulated legislative objectives, but also any "reasonable conceivable set of facts that could provide a rational basis for the classification," the Court will consider all of the aforementioned objectives to determine whether the Plaintiffs have sustained their burden to negate "every conceivable basis which might support [the statute]." *Heller*, 509 U.S. at 320 (internal citations omitted).

79

1.   Defending and Nurturing the Institution of Traditional  Heterosexual
     Marriage

The House Report argues that it was necessary to exclude same-sex marriages from the federal definition of marriage for two reasons.  First, the Report asserts that Congress, concerned about the children of America, "has a special obligation to ensure that we preserve and protect the institution of marriage." House Report at 14.  The Report notes that "[w]ere it not for the possibility of begetting children inherent in heterosexual unions, society would have no particular interest in encouraging citizens to come together in a committed relationship." *Id.*  This argument is closely related to BLAG's assertion that Congress could have restricted same-sex marriages from receipt of federal marital benefits in order "to avoid creating a social understanding of bearing, begetting, and rearing children separate from marriage."  BLAG posits that "Congress rationally could have been concerned that, by undermining the logic and message that children are a central reason why the state recognizes marriage, recognition of same-sex marriages would lead to an increase in the number of children being raised outside of the marital context." [Dkt. #81, p. 43]. These objectives, though articulated slightly differently, essentially assert that Congress could have rationally have prohibited same-sex married couples from receiving federal marital benefits because providing such benefits to married couples who are not biologically capable of producing children would result in a disassociation of the concepts of producing and rearing children from the institution of marriage, such that heterosexual couples who *are* biologically capable of producing children would increasingly elect to raise children outside

80

of the marital context.  Stated differently, BLAG suggests that DOMA was enacted to encourage marriages between only those persons who could procreate, namely heterosexuals, and to counteract the devaluation of marriage resulting from laws permitting homosexuals to marry.

To support its contention that Congress could rationally have been concerned that providing federal marital benefits to same-sex married couples would increase the number of opposite-sex couples electing to procreate outside of marital relationships, BLAG references a study considered by Congress relating to several Scandinavian countries who reported experiencing an increase in out-of-wedlock births following the emergence of domestic partnerships and same-sex marriages. [Dkt. #81, p. 44-45].  Additionally, BLAG cites the testimony before Congress of members of the African-American and Hispanic communities expressing concern that the erosion of the "traditional" institution of heterosexual marriage has "had a devastating effect" on their respective communities due to the increase in out-of-wedlock births.  *Id.* at 44.

Plaintiffs challenge this objective championed by both BLAG and Congress, asserting that rational speculation does not support the hypothesis that denying federal marital benefits to same-sex married couples would discourage opposite-sex couples from marrying before procreating.  Plaintiffs dispute the credibility of the studies referenced by both BLAG and Congress, positing that the studies are merely "political rhetoric," and in fact the attribution of the rise in out-of-wedlock births to the emergence of domestic partnerships and same-sex marriages has been "thoroughly discredited." [Dkt. #95, p. 23].  In

particular, Plaintiffs argue that the very studies relied upon by BLAG and Congress acknowledge that in fact, the trend in non-marital births in the countries at issue began in the 1970s, long before homosexual couples received societal recognition or were conferred legal status.

Additionally, Plaintiffs dispute the underlying assumption that the social understanding of marriage is inextricably bound with procreation and child-rearing, noting that the ability to procreate has never been a precondition to marriage.  Nor have children adopted by heterosexual couples or single individuals or children conceived through medical procedures been denied federal benefits or recognition.  Couples unable to conceive have not been deprived of any benefits nor has their union been devalued in any way.

Lastly, Plaintiffs argue that denying same-sex couples federal marital benefits and obligations under the guise of seeking to protect America's youth by discouraging extra-marital procreation ignores the reality that Section 3 of DOMA does not deny same-sex married couples the right to adopt children. Consequently, under DOMA, children being raised by same-sex parents would in fact be disadvantaged by the denial of resources and benefits to their parents and to them as survivors upon their parent's demise as a result of DOMA's sexual orientation classification.

Mindful of the fact that the Court must refrain from scrutinizing "the wisdom, fairness, or logic of legislative choices," *see Heller*, 509 U.S. at 319, the Court finds that no rational relationship exists between the denial of federal marital benefits to same-sex married couples and the objective of discouraging

extra-marital procreation.  *See Romer*, 517 U.S. at 632 ("even in the most ordinary equal protection case calling for the most deferential of standards, we insist on knowing the relation between the classification adopted and the object to be attained.").  BLAG's attempt to offer statistical support for its argument that Congress could have rationally believed that recognizing same-sex marriages and conferring federal marital benefits upon such marriages would further erode the societal conception of marriage as the appropriate child-rearing environment is unavailing.

The Scandinavian study referenced in support of the rationality of such a belief lists a host of statistics which purport to reveal a decline in traditional heterosexual marriage, such as a 25% increase in cohabitation and extra-marital parenting during the 1990s in Denmark, an 11% increase in the out-of-wedlock birth rate in Norway during the 1990s, and an 8% increase in the out-of-wedlock birth rate in Sweden during the 1990s.  *See* Stanley Kurtz, *The End of Marriage in Scandinavia*, Weekly Standard (Feb. 2, 2004).  However, the study begins by explicitly acknowledging that the "trend toward separation of marriage and parenthood" had already begun long before the legalization of gay marriage in the three countries and the study makes no attempt to isolate the factor(s) which instigated the trend, nor the factor(s) which may be contributing to the continuation of the trend.  *Id.*  Although the study notes that the "family dissolution rate" has accelerated since the beginning of the trend, the study does not endeavor to discern whether the factor which prompted the trend has intensified, thus causing the acceleration, or whether new factors have emerged

to cause the acceleration, and if so, what those new factors may be and their relative impact on the trend. *Id.*

Rather than citing the advent of same-sex marriage as the impetus for this demographic trend, the study acknowledges several other factors which may have sparked the trend, including the development of contraceptive methods, abortion, "growing individualism," and the "movement of women into the workforce." *Id.*  These factors have in fact intensified, such that it is rational to surmise that their intensification alone has led to the acceleration of the rate at which Scandinavian families are electing to procreate outside of the marital context.  For example, the amount and variety of contraceptive methods have increased significantly since the 1960s and the presence of women in the workforce has likely increased in light of expansion of regulation of employment discrimination and growing flexibility in part-time and remote-access work options.  The failure to consider or control for the fact that the intensification of these initial instigating factors, rather than the legalization of same-sex marriage, may explain the accelerated rate of out-of-wedlock procreation precludes a finding that it would be rational to rely on the study as an indication that conferring federal marital benefits on same-sex couples would discourage couples from marrying prior to procreating.

The study also acknowledges a host of later-emerging factors which may have contributed to the acceleration of the trend of extra-marital procreation, including the expansion of the welfare state which "renders each individual independent," and undermines the need to rely on a family structure to provide

for and raise children and which increases taxes, thereby driving women into the workforce, further increasing their independence.   Kurtz, *The End of Marriage in Scandinavia*.  The study also recognizes the contribution of cultural-ideological causes such as "radical feminist and socialist ideas [which] pervade the universities and the media," and secularism.  *Id.*  Moreover, countless other factors which were not considered by the study may readily be inferred to have contributed to the trend, including the rise in social media facilitating communication between and connections amongst individuals on the basis of shared interests, mutual friends, or membership in a particular community, the rise of the internet more generally, the influence of economic pressures, or the formation of the European Union.  In light of the study's failure to consider and control for the host of other factors which may have contributed to the trend of increasing extra-marital procreation, it is not rational to rely on this study to speculate that conferring federal marital benefits on same-sex marriages will lead to an increase in extra-marital procreation in the United States.

Further, Section 3 of DOMA is inimical to its stated purpose of protecting children.  As the Plaintiffs have acknowledged, DOMA does not alter or restrict the ability of same-sex couples to adopt children, a right conferred by state law, and therefore DOMA's denial of federal marital benefits to same-sex married couples in fact leads to a significant unintended and untoward consequence by limiting the resources, protections and benefits available to children of same-sex parents.  Each of the states in which the Plaintiffs reside, including Connecticut, Vermont and New Hampshire, permit same-sex couples to adopt children and

afford homosexual individuals the ability to enforce their parental rights.  As the Vermont Supreme Court summarized, in 1996, the Vermont General Assembly enacted, and the Governor signed, a law removing all prior legal barriers to the adoption of children by same-sex couples.  *See* 15 Vt. Stat. Ann. tit. 15A, §1-102 (1995).  At the same time, the Legislature provided additional legal protections in the form of court-ordered child support and parent-child contact in the event that same-sex parents dissolved their 'domestic relationship." *Baker v. State*, 170 Vt. 194, 222, 744 A.2d 864, 885 (1999).  The Connecticut Supreme Court has acknowledged that "it is the public policy of this state that sexual orientation bears no relation to an individual's ability to raise children," as reflected by Conn. Gen. Stat. §45a-727, permitting same sex couples to adopt children.  *Kerrigan*, 289 Conn. at 181.  Similarly, New Hampshire repealed a prior law banning homosexual individuals from fostering and adopting children. N.H. Rev. Stat. Ann. §170-B:4 (2004).  DOMA ham-fistedly deprives these adopted children of governmental services and benefits desirable, if not necessary, to their physical and emotional wellbeing and development creating an increased potential that they will become a burden on society.

DOMA, having no impact on the rights afforded to same-sex couples by a variety of states to adopt and rear children, inflicts significant and undeniable harm upon such couples and their children by depriving them of a host of federal marital benefits and protections.  For example, Section 3 of DOMA deprives members of same-sex marriages of the right, under the FMLA, to take leave to care for a spouse with a serious health condition, as Plaintiffs Raquel Ardin and

Lynda DeForge have experienced.  Children of same-sex families would undoubtedly suffer from their parents' inability to rely on this federal marital benefit, as their household would be put under greater stress in attempting to cope with the serious illness of a parent.  Section 3 of DOMA also prevents same-sex married couples from filing joint-tax returns, resulting in an increased tax burden for such couples and depleting the resources available to provide for their children.  These are merely two examples of the impact of DOMA on children of same-sex marriages, consequences which directly contradict the objective which BLAG asserts Congress could rationally have sought to attain, that is, promoting the institution of marriage as the ideal forum for begetting and rearing children.

Assuming, as Congress has, that the marital context provides the optimal environment to rear children as opposed to non-marital circumstances, it is irrational to strive to incentivize the rearing of children within the marital context by affording benefits to one class of marital unions in which children may be reared while denying the very same benefits to another class of marriages in which children may also be reared.  Such a legislative scheme bears no rational relationship to its objective of fostering marital relationships as the optimal environment to rear children because the legislation in effect harms those children who are raised within marital unions that are denied access to federal marital benefits, thereby creating a social deterrent from raising children within the marital context.

Further, Section 3 of DOMA disincentivizes heterosexual marriage by relieving homosexual couples of legal obligations imposed on heterosexual

couples.  For example, federal officials are subject to financial disclosure requirements to guard against abuse of official office and similar improprieties. *See, e.g.,* 28 U.S.C. §§455(b)(4), 455(c) (requiring federal judges to recuse themselves from matters in which the judge or the judge's spouse has a financial interest and to remain informed about the judge's personal and fiduciary financial interests and those of the judge's spouse); *see also* 5 C.F.R. §§2635.402(a), 2635.402(b)(2) (prohibiting employees of the executive branch from participating in matters in which an employee or an employee's spouse has a financial interest); 5.U.S.C. App. §101 (requiring federal officials to file a financial disclosure report within thirty days prior to assuming the position of federal employment).[11]  These laws require disclosure of the financial interests of the public official's spouse.  By excluding a same-sex spouse from these ethical obligations and financial disclosure requirements, Section 3 of DOMA illogically burdens heterosexual couples and accords a benefit upon homosexual couples.

Accordingly, where there is no rational basis to believe that recognizing or conferring benefits on same-sex married couples will decrease the number of out-of-wedlock births or the incidence of heterosexual marriages, and where the denial of federal marital benefits to same-sex marriages in fact results in a severe and harmful consequence which is directly at odds with the objective sought to

---

[11] Federal officials obligated to file a financial disclosure report include foreign service officers, officers or employees of the executive branch, members of Congress, judicial officers and employees, civilian employees of the Executive Office of the President appointed by the President, and candidates for nomination or election to the office of the President, Vice President , or Member of Congress. 5 U.S.C. App. §§101(c), (f).

be attained, the Court finds that there is no rational relationship between the classification and its objective.

### 2. Recognizing an Institution to Ensure That Children Have Parents of Both Sexes

BLAG raises a similar argument in defense of Section 3 of DOMA, asserting that Congress could rationally have distinguished between same-sex and opposite-sex marriages in order "to preserve the traditional relationship and not extend it to a group that due to biological differences simply does not raise the same concern about unintended offspring." [Dkt. #81, p. 52].  BLAG argues that "[t]he general ability of opposite-sex couples not only to procreate but to do so unintentionally is at the heart of the need to incentivize marriage and stable relationships in opposite-sex couples.  Couples who can procreate only with considerable pre-meditation raise different issues and Congress rationally could treat those groups differently." *Id.* at 50.  Additionally, BLAG contends that Congress could rationally have sought to incentivize the rearing of children by opposite-sex parents, referencing a host of publications which have concluded that dual-gendered parenting is optimal for child development.

Plaintiffs argue that Section 3 of DOMA bears "no rational or plausible connection to the welfare of children," as the statute confers marital benefits on childless opposite-sex married couples and denies marital benefits to same-sex married couples who are raising children. [Dkt. #63, p. 44].  Further, Plaintiffs contend that the objective of intending "actively to discourage same-sex couples from having children, based on their perceived unfitness, as a class, to be parents," must be "subjected to heightened scrutiny because it disparately

burdens the fundamental right to decide 'whether to bear or beget a child.'" *Id.* at 45 (quoting *Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972)).

The Court finds that Section 3 of DOMA "is at once too narrow and too broad," to be rationally related to the purported objective of ensuring that children have parents of both sexes. *Romer*, 517 U.S. at 633. Although the provision results in the conferral of federal marital benefits upon opposite-sex married couples who are raising children, the provision also confers benefits upon opposite-sex married couples who have elected not to create or raise children. Moreover, Section 3 of DOMA impacts over a thousand federal statutes and regulations, many of which are entirely unrelated to the notion of rearing children. For example, DOMA prohibits citizens or permanent residents from petitioning for their same-sex spouse to be granted permanent resident status, and prohibits same-sex married couples from jointly filing for bankruptcy. *See* 8 U.S.C. §§ 1101 et seq. and §1151 (b)(2)(A)(i) (providing that United States citizens may petition the Attorney General to classify their spouses as immediate relatives so that the spouse may obtain permanent resident status); 11 U.S.C. §302(a) (Providing, in relevant part, that a joint case is commenced "by the filing with the bankruptcy court of a single petition . . . by an individual that may be a debtor . . . and such individual's spouse."). This expansive reach of DOMA, affecting a significant number of federal statutes and regulations having no connection to the concept of child-rearing, casts doubt on any purported rational relationship between the statute and dual-gendered parenting. *See Romer*, 517 U.S. at 632-33 (holding that to withstand rational basis review, a classification must be "narrow

enough in scope and grounded in sufficient factual context . . . to ascertain some relation between the classification and the purpose it serve[s].").

In addition to DOMA's expansive scope, depriving the statute of any rational connection to a concern for child welfare, as previously discussed, DOMA does not impede or restrict the ability of same-sex couples to adopt or otherwise raise children.  Therefore, "[w]hether or not children raised by opposite-sex marriages are on average better served," DOMA bears no rational relationship to the purported goal of ensuring that children are reared by opposite-sex parents,  as "DOMA cannot preclude same sex couples . . . from adopting children or prevent a woman partner from giving birth to a child to be raised by both partners." *Massachusetts*, 682 F.3d at 14.

Lastly, if, as BLAG contends, Section 3 of DOMA represents an effort by Congress to provide preferential treatment to opposite-sex marital unions rearing children and conversely to discourage same-sex married couples from parenting children pursuant to a belief that same-sex married couples are inferior or inadequate parents, as stated above, it is likely that such an endeavor would amount to the imposition of a burden on same-sex couples' decision to bear or beget a child, an intrusion on the fundamental right of privacy.  *See Eisenstadt*, 405 U.S. at 453-54 ("If the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child.").  However the Court need not definitively address the issue of the fundamental right of privacy, as the Court finds that DOMA's sweeping scope

belies any rational relationship to the purported objective of promoting dual-gendered parenting.   Where, as here,  the "sheer breadth is so discontinuous with the reasons offered for it that the amendment seems inexplicable by anything but animus toward the class it affects; it lacks a rational relationship to legitimate state interests."  *Romer*, 517 U.S. at 632.

### 3.   Defending Traditional Notions of Morality

The House Report proffers the need to "defend traditional notions of morality" as the second purported rational basis for DOMA's denial of federal marital benefits to same-sex marriages.  Explaining the basis for this objective, the House Report finds that "[c]ivil laws that permit only heterosexual marriage reflect and honor a collective moral judgment about human sexuality.  This judgment entails both moral disapproval of homosexuality, and a moral conviction that heterosexuality better comports with traditional (especially Judeo-Christian) morality."  House Report at 15-16.  The Report then quotes Henry Hyde, the Chairman of the Judiciary Committee, stating "[s]ame-sex marriage, if sanctified by the law, if approved by the law, legitimates a public union, a legal status that most people . . . feel ought to be illegitimate . . .  And in doing so it trivializes the legitimate status of marriage and demeans it by putting a stamp of approval . . . on a union that many people . . . think is immoral."  *Id.* at 16.  The Report concludes that "[i]t is both inevitable and entirely appropriate that the law should reflect such moral judgments." *Id.*

Although BLAG has not raised the objective of defending traditional notions of morality in support of its motion to dismiss, Plaintiffs have addressed

it in their motion for summary judgment.  Consequently, in the interest of a providing thorough review of the constitutional question presented, the Court will nonetheless consider whether this objective is rationally related to the classification incorporated into the statute to deny same-sex married couples eligibility to receive federal marital benefits.

Contrary to BLAG's assertion, there is no universal position shared amongst Judeo-Christian faiths regarding the morality of same-sex marriage. Rather, many mainstream Protestant Christian denominations and Reform Jewish communities recognize and perform same-sex marriage ceremonies.  *See* Frances Grandy Taylor, *Faithful Split on Accepting Gay Marriage: Religious Opponent's Don't Speak for Everyone*, Hartford Courant, March 25, 2003, available at articles.courant.com/2003-03-25/features/0303250984_1_same-sex-marriage-same-sex-ceremonies-same-sex-unions (Members of the Unitarian Universalist Society, the First Church of Christ, a community church, and Reform Jewish congregations discuss their support for and performance of same-sex marriage ceremonies).  Precisely because of the diverse notions of morality in existence across the country, the Supreme Court has cautioned that the role of the judiciary "is to define the liberty of all, not to mandate our own moral code." *Planned Parenthood of Southeastern Penn. v. Casey*, 505 U.S. 833, 850 (1992).  It has long been established that "mere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable [ . . . ] are not permissible bases" for singling out a particular group for disparate treatment.  *Cleburne*, 473 U.S. at 448. As the Supreme Court has more recently held, "[m]oral disapproval of [a] group,

like a bare desire to harm the group, is an interest that is insufficient to satisfy rational basis review under the Equal Protection Clause." *Lawrence*, 539 U.S. at 582.

Accordingly, although the Court acknowledges that disapproval is not always the product of animus, but in fact "may also be the product of longstanding, sincerely held private beliefs," the Court finds that DOMA's exclusion of same-sex marriages from both federal recognition and receipt of federal marital benefits as an effort to reinforce principles of morality does not withstand rational basis review. *Perry*, 671 F.3d at 1093. To hold otherwise would fly in the face of the fundamental principles of religious freedom and liberty upon which this great nation was first colonized and later founded.

### 4. Preserving Scarce Governmental Resources and Protecting the Public Fisc

As the third of the four objectives sought to be advanced through the enactment of DOMA, as referenced in the House Report, the Judiciary Committee invokes the government's interest in preserving scarce governmental resources. After noting that "the Committee has not undertaken an exhaustive examination" of the benefits conferred by DOMA, the Report concludes that "it is clear that they do impose certain fiscal obligations on the federal government." House Report at 18. As the sole example provided, the Report references survivorship benefits paid to the surviving spouse of a veteran of the Armed Services. *Id.*

BLAG's motion to dismiss raises a similar objective, asserting that the Government could have enacted DOMA on the basis of a rational assumption that depriving federal marital benefits to same-sex couples would protect the public

fisc.  Plaintiffs argue that "DOMA is utterly disconnected from any goal of resource preservation," in light of a report issued in 2004 by the Congressional Budget Office concluding that "federal recognition of marriages of same-sex couples by all fifty States would result in a net *increase* in federal revenue." [Dkt. #63, p. 48].  Additionally, Plaintiffs argue that a concern for preserving government resources alone cannot satisfy rational basis review.

Addressing first the assertion that precluding the extension of federal marital benefits to same-sex married couples will preserve government resources, the Court finds that such assertion has no basis in reality in light of the Congressional Budget Office's June 21, 2004 Report.  The Report concluded that the net effect of federal recognition and conferral of marital benefits upon same-sex marriages would be to "improve the budget's bottom line to a small extent: by less than $1 billion in each of the next 10 years."  CONGRESSIONAL BUDGET OFFICE, THE POTENTIAL BUDGETARY IMPACT OF RECOGNIZING SAME-SEX MARRIAGES, at 1 (June 21, 2004), available at https://www.cbo.gov/sites/default/files/cbofiles/ftpdocs/55xx/doc5559/06-21-samesexmarriage.pdf.  Neither the House Report nor BLAG's pleadings present any evidence to the contrary.  This conclusion by the Congressional Budget Office, in the absence of any conflicting evidence, belies any contention that the enactment of DOMA would deplete governmental resources such that the purported goal of preserving governmental resources lacks any "footing in the realities of the subject addressed by the legislation."  *Heller*, 509 U.S. at 321.  Although the Government need not provide evidence to substantiate a rational

basis for a classification, where, as here, the evidence overwhelmingly refutes the Government's purported objective, such an objective is plainly not grounded in rational speculation, particularly where, as is the case here, the law is extremely broad in scope and no meaningful effort was made to ascertain its fiscal impact. *See id.* at 320.

Assuming *arguendo* that evidence existed to support the contention that conferring federal marital benefits upon same-sex married couples would result in increased government expenditures, "more than an invocation of the public fisc is necessary to demonstrate the rationality of selecting [one group], rather than some other group, to suffer the burden of cost-cutting legislation." *Lyng v. International Union*, 485 U.S. 360, 377 (1988); *see also Plyler*, 457 U.S. at 227 ("[A] concern for the preservation of resources standing alone can hardly justify the classification used in allocating those resources.").

Accordingly, as the Congressional Budget Office Report precludes any rational speculation that depriving same-sex married couples of federal marital benefits would meaningfully strain or deplete government resources, and where a vague generalized concern for public fisc cannot, alone, provide a rational basis for both depriving benefits to and saddling a financial burden on a particular class, the Court finds that a "concern for the public fisc" affords no rational basis for Section 3 of DOMA.

5.   Protecting State Sovereignty and Democratic Self-Governance

The final objective referenced in the House Report as a goal sought to be attained by DOMA is the objective of advancing the government's interest in

protecting state sovereignty and democratic self-governance. Analogizing to abortion rights, the Report notes that "[t]he Committee is struck by the fact that this entire issue of same-sex 'marriage,' like so much of the debate related to matters of sexual morality, is being driven by the courts." House Report at 16. The Committee articulated the crux of this concern by stating that "what is most troubling in a representative democracy is the tendency of the courts to involve themselves far beyond any plausible constitutionally-assigned or authorized role." *Id.* Adopting a statement made by a member of the Hawaii State House of Representatives, the Report posited that "[i]t would indeed be a fundamental shift away from democracy and representative government should a single justice in Hawaii be given the power and authority to rewrite the legislative will of this Congress and of the several states, based upon a fundamentally flawed interpretation of the Hawaii State Constitution." *Id.* at 17-18. The Report then summarized the intended role of DOMA in protecting state sovereignty and democratic self-governing, explaining that "[b]y taking the Full Faith and Credit Clause out of the legal equation surrounding the Hawaiian situation, Congress will to that extent protect the ability of the elected officials in each State to deliberate on this important policy issue free from the threat of federal constitutional compulsion." *Id.* at 17.

To the extent that Congress, through DOMA, sought to eradicate the obligation of states, pursuant to the Full Faith and Credit Clause, to honor marriages obtained legally in another state, this objective therefore pertains to

Section 2 of DOMA, the constitutionality of which has not been challenged in the current case.  Accordingly, this objective is not relevant to the Plaintiffs' case.

BLAG invokes a similar concern for democratic self-governance in its motion to dismiss, urging the Court to reserve resolution of the issue of same-sex marriage for Congress and state legislatures.  BLAG cautions that it is not the Court's role "to declare same-sex marriage a constitutional right and eliminate that discussion and resolution;" rather, "Congress and the states are the proper fora for resolving the issue of same-sex marriage." [Dkt. #81, p. 54].

This argument evinces a fundamental misunderstanding of the role of judicial review and ignores the resounding voices of the Connecticut, New Hampshire, and Vermont constituencies who have, through the democratic process, afforded same-sex couples the right to marry.  The doctrine of judicial review, a bedrock principle of our system of government, unequivocally empowers and obligates the federal judiciary to scrutinize the constitutionality of legislative action.  *See Marbury v. Madison*, 1 Cranch 137, 2 L.Ed. 60 (1803).  "The irreplaceable value of the power articulated by Mr. Chief Justice Marshall [in *Marbury*,] lies in the protection it has afforded the constitutional rights and liberties of individual citizens and minority groups against oppressive or discriminatory government action." *United States v. Richardson*, 418 U.S. 166, 192 (1974).  This role, recognized in *Marbury*, "has maintained public esteem for the federal courts and has permitted the peaceful coexistence of the countermajoritarian implications of judicial review and the democratic principles upon which our Federal Government in the final analysis rests." *Id.*  Therefore,

contrary to BLAG's assertion, the Court's review of the current case is not an inappropriate role, but rather is an exercise of judicial authority long-recognized as a key principle of our government.  Moreover, BLAG's articulated concern for democratic self-governance is curious in that same-sex marriage is the product of democratic self-governance at the state level in Connecticut, Vermont, and New Hampshire.[12]  This is a quintessential legislative and democratic question that has been decided by the people of the states of Connecticut, Vermont and New Hampshire.  BLAG's concern for democratic self-governance also ignores the fact that marriage has historically been the exclusive domain of the states.

Moreover, the "theory and utility of our federalism" is only realized where states "perform their role as laboratories for experimentation to devise various solutions where the best solution is far from clear."  *U.S. v. Lopez*, 514 U.S. 549, 581 (1995) (Kennedy, J., concurring); *see also Rodriguez*, 411 U.S. at 50 ("one of the peculiar strengths of our form of government [is] each State's freedom to serve as a laboratory; and try novel social and economic experiments") (internal quotation marks and citation omitted).  Here, Connecticut, New Hampshire, and Vermont have each fulfilled this promise of federalism by, in effect, serving as a laboratory for experimentation.  To the extent that it can be said that DOMA abridges these states' right to confer marital status on its residents, DOMA can be seen to frustrate the utility and promise of federalism and the democratic process more generally.  Accordingly, the Court finds BLAG's democratic process argument to be curiously misguided and unavailing.

---

[12] *See supra* Section I (B) for a discussion of the history of the legalization of same sex marriage in Connecticut, Vermont, and New Hampshire.

**6.  Maintaining Consistency and Uniformity with Regard to Eligibility for Federal Benefits and Employing Caution in the Face of a Proposed Redefinition of the Centuries-Old Definition of Marriage**

Noting that opposite-sex couples can marry in every American jurisdiction, while same-sex couples have only been afforded the right to marry in a few states and the District of Columbia, BLAG argues that Congress could have enacted DOMA as a rational attempt to ensure uniform treatment of federal benefits and to avoid the confusion that could arise where a same-sex couple obtains a marriage license in a state where such licenses are legally authorized but resides in a state where same-sex marriage is neither recognized nor permitted.  Similarly, BLAG argues that Congress could have rationally enacted DOMA in an effort to proceed with caution in an area of social policy of such great significance.  In particular, BLAG suggested that "[a]s an empirical matter, the long-term social consequences of granting legal recognition to same-sex marriages remain unknown," such that Congress "was justified in waiting for evidence spanning a longer term before engaging in what it reasonably could regard as a major redefinition of a foundational social institution." [Dkt. #81, p. 35].

Plaintiffs dispute the suggestion that DOMA creates consistency, arguing instead that DOMA evokes inconsistency by distinguishing same-sex married couples from opposite-sex married couples for purposes of conferring federal benefits where previously all couples validly married under state law were entitled to such benefits.  Rather than affording all married couples the same array of federal benefits, Plaintiffs note that DOMA requires that same-sex married couples receive the same treatment as unmarried same-sex couples.

Further, Plaintiffs' argue that "[i]t is not enough to invoke the novelty of marriages among same-sex couples," as "even historic discriminatory classifications must serve some 'independent and legitimate legislative end.'" [Dkt. #95, p. 21].

Recognizing that "the subject of domestic relations is the exclusive province of the states," including "the powers to establish eligibility requirements for marriage, as well as to issue determinations of marital status," which "lie at the very core of such domestic relations law," the Court finds that DOMA's exclusion of same-sex marriages from receipt of federal marital benefits bears no rational relationship to the goal of "proceeding with caution" in an area of proposed social change. *Gill*, 699 F.Supp.2d at 391 (citing *Elk Grove Unified School Dist. V. Newdow*, 542 U.S. 1, 12 (2004) (noting that "the whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States")). Categorizing a group of individuals as a "vast untested social experiment" (as BLAG has referred to same-sex married couples, see Dkt. #81, p. 35) to justify their exclusion, albeit purportedly temporary, from federal recognition and benefits until long-term evidence is available to establish that such a group will not have a harmful effect upon society is a rationale, which, if allowed to withstand constitutional scrutiny, would eviscerate the doctrine of equal protection by permitting discrimination until equal treatment is proven, by some unknown metric, to be warranted. Further BLAG's logic eviscerates states' rights by nullifying laws adopted through the state democratic process where the will of the citizens is most

powerful.  Such a rationale would have justified bans on interracial marriages,

"invidious" discriminatory schemes held to be in contravention of the Equal

Protection Clause of the Fourteenth Amendment.  *Loving*, 388 U.S. 1.  Moreover,

this rationale is simply a modified articulation of the assertion that preservation

of tradition can justify the use of a legislative classification to deny governmental

benefits, an objective which the Court has already found to be insufficient to

provide a rational basis for DOMA's classification.

The Court finds that BLAG's argument regarding uniformity bears no

rational relationship to Section 3 of DOMA where DOMA in fact infuses

complexity and inconsistency into the conferral of federal marital benefits.  Prior

to DOMA, federal marital benefits were conferred on any couple validly married

under the laws of a state.  Through the enactment of DOMA, Congress has

inserted an additional criterion, requiring the federal government to identify and

exclude all same-sex marital unions from federal recognition.  In light of this

additional basis for scrutiny, it is irrational to assert that DOMA will in fact

simplify the administration of federal marital benefits.

Moreover, the assertion that the legalization of same-sex marriage by

certain states will result in the inconsistent distribution of federal marital benefits

bears "no footing in the realities" of state marital eligibility requirements. *See

Heller*, 509 U.S. at 321.  Prior to the legalization of same-sex marriage by any

state, the eligibility requirements for heterosexual marriages varied pursuant to

the laws of each state, for example by age at which individuals may marry without

parental consent.  By deferring to state laws regarding marriage eligibility, the

federal government simply recognized all heterosexual marriages despite these potential differences across states.  Section 3 of DOMA obligates the federal government to single out a certain category of marriages as excluded from federal recognition, thereby resulting in an inconsistent distribution of federal marital benefits as all marriages authorized by certain states will receive federal recognition and marital benefits, whereas only a portion of marriages authorized by other states will receive federal recognition and benefits.  Therefore, declining to recognize and confer federal marital benefits upon same-sex married couples would in fact insert greater inconsistency into the distribution of federal marital benefits.

BLAG's incrementalism argument is also unavailing, as DOMA frustrates incrementalism.  The adoption of laws at the state level as opposed to the federal level is more incremental and effects change incrementally.  The more incremental state processes which DOMA frustrates afford society the opportunity to gather and analyze empirical data and to test the inchoate hypothesis reflected in the studies cited by the Plaintiffs and BLAG in support of their respective positions, the very goal BLAG curiously offers as a rational basis for DOMA.  A law which frustrates the very goal it purports to achieve cannot be said to be supported by a rational basis.  In consequence, BLAG's proffered objective of ensuring the uniform distribution of federal marital benefits bears no rational relationship to Section 3 of DOMA.

IV.      Conclusion

In sum, having considered the purported rational bases proffered by both BLAG and Congress and concluded that such objectives bear no rational relationship to Section 3 of DOMA as a legislative scheme, the Court finds that no conceivable rational basis exists for the provision.  The provision therefore violates the equal protection principles incorporated in the Fifth Amendment to the United States Constitution.

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment is GRANTED, and Intervenor-Defendant BLAG's Motion to Dismiss is DENIED.


                                        IT IS SO ORDERED.

                                        _____/s/_____
                                        Hon. Vanessa L. Bryant
                                        United States District Judge


Dated at Hartford, Connecticut: July 31, 2012